IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| COMPREHENSIVE HEALTH OF | ) | |
|---|---|---|
| PLANNED PARENTHOOD GREAT | ) | |
| PLAINS, et al., | ) | No. 16-04313-CV-C-HFS |
| | ) | March 21, 2017 |
| Plaintiffs, | ) | Kansas City, Missouri |
| | ) | CIVIL |
| V. | ) | |
| | ) | |
| DR. RANDALL WILLIAMS, in | ) | |
| his official capacity as | ) | |
| Director of Department of | | |
| Health and Senior Services, | | |
| et al., | | |

Defendants.

TRANSCRIPT OF ORAL ARGUMENT

BEFORE THE HONORABLE HOWARD F. SACHS
SENIOR UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106

```
 1                         APPEARANCES

 2
        For Plaintiffs:        MS. MELISSA A. COHEN
 3                             MS. JENNIFER R. SANDMAN
                               Planned Parenthood Federation of
 4                             America
                               123 William Street, 9th Floor
 5                             New York, NY 10038

 6                             MS. JAMIE KATHRYN LANSFORD
                               Arthur Benson & Associates
 7                             4006 Central Avenue
                               Kansas City, MO 64111
 8
        For State              MR. DEAN JOHN SAUER
 9      Defendants:            MS. EMILY A. DODGE
                               Missouri Attorney General's Office
10                             P.O. Box 899
                               Jefferson City, MO 65102
11
        For Defendant Jean     MR. ROBERT TRAVIS WILLINGHAM
12      Peters Baker:          Jackson County Counselor's Office
                               415 East 12th Street, Suite 200
13                             Kansas City, MO 64106

14      For Defendant Dan      MR. TIMOTHY TODD MYERS
        Patterson:             Greene County Prosecutor's Office
15                             1010 N. Boonville
                               Springfield, MO 65802-3851
16
        For Defendant          MR. NORMAN EARL ROUSE
17      Theresa Kenney:        5759 East 20th Street
                               Joplin, MO 64801
18

19

20

21

22

23

24

25

                         Kathleen M. Wirt, RDR, CRR
                         United States Court Reporter
            400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
```

MARCH 21, 2017

- - -

1 

2 

3       THE COURT:  Court is in session for argument of

4  preliminary injunction issues in an abortion case.  Actually,

5  to say it's an abortion case is somewhat of a misnomer because

6  the right to abortion is not at issue in this case.  The case

7  involves whether two aspects of Missouri regulatory law remains

8  applicable, in light of a decision of the Supreme Court in a

9  Texas case last June.

10       I understand that we will only have two principal

11  persons who wish to argue.  That is, a representative of the

12  Planned Parenthood group and Dr. Yeomans, who is an abortion

13  practitioner, and I understand that Ms. Cohen will be arguing

14  on their behalf seeking a preliminary injunction here, and that

15  Mr. Sauer, the new Solicitor for the State of Missouri, will be

16  representing the defendants, the Attorney General -- state

17  defendants, that is, the Attorney General of Missouri and the

18  Executive of the Department of Health and Senior Services.

19       We also have as defendants the prosecutors from

20  Boone, Jackson, Greene, and Jasper County, where I'm being

21  asked to enjoin any possible prosecutions based upon the

22  subject matter that we're dealing with here.  And my impression

23  is that the defendant prosecutors either may not be wishing to

24  argue or will only have brief argument.  But I've reserved the

25  afternoon, so counsel can do as they wish.

1          I did inquire through my law clerk whether those who
2    wished to divide the principal argument can agree on time
3    limits.  And I won't hold counsel to the time that has been
4    suggested to me.  I'm prepared to hear you out.

5          So on behalf of the plaintiff seeking the
6    preliminary injunction, I would call upon Ms. Cohen.

7          MS. COHEN:  Good afternoon, Your Honor.  Melissa
8    Cohen for the plaintiffs.

9          Your Honor, the parties discussed about 45 minutes
10   per side should be sufficient.  So I'll start with about 30
11   minutes, and I'd like to reserve about 15 minutes for rebuttal.

12         THE COURT:  All right.

13         MS. COHEN:  Your Honor, under the Supreme Court's
14   recent decision in *Whole Woman's Health*, which held that
15   Texas's ambulatory surgical center and hospital privileges
16   restriction were unconstitutional, Missouri's similar
17   restrictions must also be invalidated.

18         Like the Texas requirements, Missouri's ASC
19   restriction and hospital relationship restriction do not
20   further the state's interest in women's health, and they impose
21   substantial obstacles on Missouri women's access to abortion.
22   Balancing the restriction's lack of benefits against the
23   devastating effects they have on Missouri women, it's clear
24   that they impose an undue burden and are unconstitutional.

25         Your Honor has raised several questions that you've

1   asked the parties to address today, and I'm going to go ahead
2   and walk through each one of those.  First --

3          THE COURT:  Let me interrupt you.  It's true that I
4   decided to come up with a little different practice, and I sent
5   some questions in advance by e-mail so that counsel wouldn't be
6   surprised by the questions.

7          I do understand that the state's principal argument
8   that the Missouri statutory plan is different from the Texas
9   plan would be that the -- that under the Missouri requirement
10  of the surgical center compliance that there is a regulation
11  authorizing the -- authorizing some exemptions that might be
12  granted by the department, whereas that was not an issue in the
13  Texas case.  That issue of exemption is not in the statute, but
14  is in a regulation adopted pursuant to statute.

15         I'm not too clear -- I have read most of the
16  filings, but I'm not too clear as to how you respond to that
17  particular issue.

18         MS. COHEN:  Sure, Your Honor.  So it is true that a
19  portion of the ambulatory surgical center regulations are
20  permitted to be waived by the Department of Health, but that
21  waiver process is only available for certain of the physical
22  facility requirements that abortion providers are required to
23  meet under the ambulatory surgical center restriction.

24         There's a whole separate set of regulations under
25  the ambulatory surgical center restriction for which there is

1   no waiver process available.  And so even if plaintiffs were to

2   engage in the waiver process as to certain of the physical

3   facility restrictions for which it is available, they would

4   still be unable to get a license because they cannot meet

5   requirements for which there is no waiver process available.

6          And furthermore, Your Honor, as you noted in the

7   Court's decision denying the state defendants' motion to

8   dismiss, there is no reason to believe that a process of

9   negotiation here would be fruitful and that the parties would

10  be able to agree upon terms for a couple of reasons, Your

11  Honor.

12         First, there's a long history here between the

13  Planned Parenthood -- between Planned Parenthood and the

14  Department of Health.  And the Department of Health has tried

15  at every turn to prevent these facilities from obtaining

16  licenses, even those that have engaged in prior litigation and

17  that have a settlement agreement in place.

18         About a year ago, the Department of Health attempted

19  to illegally revoke the license of the Columbia Health Center,

20  which resulted in litigation.  And even just recently, Your

21  Honor, plaintiffs in mid-January sent the department a letter,

22  informing it that they believe that one of the health centers

23  is now in compliance with the hospital relationship restriction

24  and asking for the department's view on that issue, and the

25  department has not responded in over two months.

1          And so for those two reasons, the assistance of the
2  waiver process does not allow these facilities to obtain
3  abortion facility or ambulatory surgical center licenses, and
4  so that restriction remains -- it remains that those facilities
5  can't comply without restriction, and so it is burdening
6  Missouri women's access to abortion.

7          THE COURT:  Now, is it true that the Kansas City
8  facility uses only medication for abortion purposes and that
9  there was a complete waiver by the department of the
10  application of the surgery center requirements?  I'm not
11  entirely clear, but you probably know what I'm talking about.

12          MS. COHEN:  Yes, Your Honor.  It is correct that the
13  Kansas City facility has historically offered only medication
14  abortion, which involves only taking pills, and the Kansas City
15  facility seeks to reinstate only medication abortion services.

16          The settlement agreement that resulted from the
17  prior litigation regarding the ambulatory surgical center
18  requirement does include an agreement that the Kansas City
19  Health Center will not be subject to certain physical facility
20  requirements.  So, for example, they're exempted from minimum
21  hallway width, minimum procedure room sizes, et cetera.  But
22  the settlement agreement did not remove the Kansas City
23  facility entirely from under the ambulatory surgical center
24  requirement, and so there are a number of requirements that do
25  still apply to that facility, including requirements around

1   certain administrative policies, staffing, and other things

2   like that.  So they're only exempted from the physical aspects

3   of the restriction.

4           THE COURT:  All right.  And, of course, we're not

5   talking at this point about the doctor requirements about

6   affiliation with hospitals.  Go ahead.  I'm interrupting you

7   too much, perhaps.

8           MS. COHEN:  That's okay.  So first, Your Honor

9   raised a question with the parties regarding the safety of

10  abortion, and specifically you asked, even if you thought the

11  defendants' arguments that abortion is dangerous had merit,

12  whether you would be free to rule inconsistently with the

13  Supreme Court in *Whole Woman's Health,* which held that abortion

14  is extremely safe with particularly low rates of serious

15  complications.

16          Your Honor, even if defendants' argument had merit,

17  which it does not, the Supreme Court's holding regarding the

18  safety of abortion does bind this Court.  As Your Honor pointed

19  out, the Supreme Court has stated in *State Oil v. Khan* that

20  it's its prerogative alone to overrule its precedence.

21          And there's actually recent guidance from the Eighth

22  Circuit on this very question whether a lower court is free to

23  depart from a Supreme Court holding in the abortion context.

24  In 2015, the Eighth Circuit affirmed a district court decision

25  striking down a North Dakota law that prohibited abortion after

1 a fetal heartbeat could be detected or after approximately six

2 weeks' gestation.  That case is *MKB Management Corporation*, and

3 it's reported at 795 F.3d 768.

4       The Eighth Circuit in that case noted that there was

5 a dispute between the parties as to when viability occurred in

6 a pregnancy, but that the Court was bound by the Supreme

7 Court's holding that viability is the time when a fetus can

8 survive outside the womb, and that occurs at approximately 24

9 weeks' gestation.

10       But the court went even further, Your Honor, and

11 stated that not only were the lower courts bound by the Supreme

12 Court's holding, but that evidence presented by the State of

13 North Dakota that viability occurs earlier in pregnancy could

14 not even create a genuine dispute because it was contrary to

15 the Supreme Court's holding.

16       Defendants in this case raise arguments, not only

17 about whether abortion is safe, but also regarding a number of

18 other issues that have already been decided by the Supreme

19 Court, including whether the restrictions at issue here serve

20 various medical benefits.  But as the Eighth Circuit in *MKB*

21 *Management* has held, those arguments cannot even create a

22 genuine dispute, and the Supreme Court's holding in *Whole*

23 *Woman's Health* controls.

24       Regarding the safety of abortion, I do want to

25 quickly address the flurry of recent filings on this issue.  To

1 be clear, Your Honor, even if this Court could depart from

2 *Whole Woman's Health's* holding that abortion is safe, there

3 would be no reason to do so because the record in this case

4 only reinforces that holding.

5 The record shows that every reliable study,

6 including some of the studies cited by defendants, have found

7 that abortion is extremely safe with very low rates of

8 complications. And the discovery that's been produced by the

9 plaintiffs in this case regarding the rates of complications

10 their patients experience shows that abortion in Missouri in

11 particular is extremely safe and that complication rates in

12 Missouri are consistent with the rates described from the

13 literature.

14 Defendants are scraping the bottom of the barrel

15 trying to come up with evidence to the contrary, including

16 issuing a subpoena recently to the St. Louis Fire Department

17 for information regarding ambulance calls to Plaintiff RHS's

18 St. Louis Health Center. But the documents that are responsive

19 to that subpoena, which were produced on Friday night, only

20 reinforce that abortion is extremely safe and that plaintiffs'

21 tracking of complications is accurate.

22 Defendants' ongoing focus on the safety of abortion

23 is really just a distraction, which they're harping on because

24 they cannot show that the restrictions at issue in this case

25 benefit women's health.

1       Next, Your Honor raised some questions regarding the

2   ASC requirement and specifically asked for some clarification

3   about what procedures are required to be performed in

4   ambulatory surgical centers in Missouri.

5       Your Honor, under Section 197.200 of the Missouri

6   Statutes, which is the section that defines what facilities are

7   required to be ambulatory surgical centers, a medical facility,

8   in general, is only required to be an ASC if it is operated

9   primarily for the purpose of performing surgery, and

10  regulations define "primarily" to mean 51 percent of patients

11  or 51 percent of revenue comes from surgery.  That rule applies

12  for all types of surgery.  So, for example, a physician can

13  perform colonoscopies, skin cancer surgery, cataract surgery,

14  liposuction, other plastic surgeries, et cetera, in a doctor's

15  office setting, so long as those procedures don't make up more

16  than half of the physician's practice.

17      THE COURT:  Let me ask a question on that subject.

18  I think there's a filing that -- by one of your experts saying

19  that the handling of miscarriages and the handling of some type

20  of exploratory procedures that occur during examination of

21  women would be very similar in nature to what occurs during an

22  abortion and that neither the miscarriages, nor the exploratory

23  procedures which we refer to, I guess, as very invasive, that

24  that would not be required to be performed in the ambulatory

25  surgical center.  Is that your understanding and is that

1  comparison significant?

2  MS. COHEN:  Yes, Your Honor.  That's correct that

3  other gynecological procedures that are very similar to

4  abortion are not required to be in an ambulatory surgical

5  center, unless they make up more than half of the practice.

6  And Your Honor is correct that plaintiffs' medical

7  expert, Dr. Eisenberg, explained that the management of

8  miscarriage is almost identical to what occurs during a

9  surgical abortion when physicians evacuate the contents of the

10  uterus.  And Your Honor -- and it is a significant comparison

11  because Dr. Eisenberg also explains that the kinds of

12  complications that may rarely result from either of those two

13  kinds of procedures are identical, and yet miscarriage

14  management and other gynecological procedures are not required

15  to be in an ambulatory surgical center, whereas abortions -- if

16  a physician provides even one second-trimester abortion, it's

17  required to be in an ambulatory surgical center, and if they

18  provide five first-trimester abortions, it's required to be in

19  an ambulatory surgical center.  So, yes, Your Honor, that is a

20  significant comparison.

21  THE COURT:  You may continue.

22  MS. COHEN:  And an additional important point, Your

23  Honor, in addition to the fact that an ASC is required for, if

24  a practice performs five or more first-trimester abortions is

25  that the same is true, even if the provider offers only

1 medication abortion. So even if a provider offers only

2 abortion via pills, it's still required to be an ambulatory

3 surgical center.

4 There's a similar -- there is similar differential

5 treatment, Your Honor, in terms of the hospital relationship

6 requirement, just to be clear. So in general, a physician does

7 not have to have hospital privileges or a transfer agreement

8 with a hospital unless the majority of the physician's practice

9 is surgery. And, again, that rule applies to all types of

10 surgery. So, for example, colonoscopies, skin cancer surgery,

11 cataract surgery can all be provided by a physician without a

12 hospital relationship.

13 And as Your Honor has just pointed out, the same is

14 true for miscarriage management and other similar gynecological

15 procedures. A physician is not required to have hospital

16 privileges or a transfer agreement with a hospital, unless

17 those procedures make up more than half of his practice. But

18 physicians who provide even one abortion must have hospital

19 privileges, and that's true, even if they're only providing

20 medication abortion with pills.

21 Your Honor, as the evidence in the record shows,

22 there's no medical basis to single out abortion in this way

23 because, as Dr. Eisenberg has explained and as the Supreme

24 Court has held, an ambulatory surgical center setting and a

25 relationship with a local hospital are irrelevant to the safe

provision of abortion and also irrelevant to the treatment of complications when they rarely occur. And furthermore, colonoscopies, plastic surgery, liposuction and the like, which may be performed in a doctor's office setting by a physician with no hospital relationship, are less safe than abortion, as the Supreme Court explicitly recognized in *Whole Woman's Health*.

Given this, it's clear that these restrictions are not actually based on medical necessity, and we're asking the Court to follow *Whole Woman's Health* and hold them unconstitutional.

Your Honor also asked what it would mean for things like fire safety regulations if the ambulatory surgical center restriction was enjoined as to abortion providers. Medical facilities in Missouri that are not ASCs are subject to state and local building codes which build in various fire safety and life safety requirements, and, as with all buildings in the state, medical facilities need to meet these requirements in order to get a certificate of occupancy. So this is the regulatory scheme that applies to non-ASC medical facilities in which surgical procedures are performed, like doctors' offices where skin cancer surgeries, cataract surgeries are performed, and the same regulatory scheme applies to doctors' offices in which nonsurgical procedures, like chiropractic procedures and stress tests, are done.

1          So if abortion providers were no longer subject to

2    the ASC restriction, they would be subject to state and local

3    building codes and the fire safety requirements contained

4    therein, just like every other doctor's office in the state.

5          To be clear, though, Your Honor, abortion providers

6    would still be subject to an array of state regulatory

7    requirements that other physicians in the state are not subject

8    to, even if the ASC restriction were enjoined.  Just to take a

9    few examples of the kind of regulations that apply to abortion

10   providers, there's a 72-hour waiting period for abortion in

11   Missouri.  The State of Missouri prescribes specific

12   information, including written materials that need to be

13   provided to patients during the informed consent process for

14   abortion.  The State of Missouri requires that tissue samples

15   from every abortion be sent to a pathologist, who has to file a

16   report with the state Department of Health.  Providers have to

17   file an individual report with the Department of Health for

18   each abortion they provide.  And those are just a few examples.

19          So, Your Honor, if the ASC restriction is held

20   unconstitutional, abortion providers will still be subject to

21   an array of regulations, some that other physicians in the

22   state are subject to, and also a number that are specific to

23   abortion providers.

24          THE COURT:  All right.  I was wondering whether --

25   the State of Texas said they've gotten into a lot of

complications over abortion facilities proceeding without
adequate regulation or arguably doing things that should not be
allowed, whether there are arguments about how much regulation
there should be.  And I am not aware of any further legal
activity, any rulings that I find -- there are newspaper and
radio reports out of Texas that would suggest that whatever
problems I was concerned about have not arisen in that -- the
story of the Waco abortion services, which apparently would
require a new building because they sold the old one, that that
would be -- that Planned Parenthood is advising that that
facility would be probably restarted within the year and
that -- and in Austin that in April that a closed facility
would reopen.  If that information is accurate, and it sounds
so, that there are no further issues before the district judge
down there that have complicated this situation there.  Is that
consistent with your understanding?

     MS. COHEN:  That's correct, Your Honor.  So the
Supreme Court decision in *Whole Woman's Health* ended that
litigation.  The case was not remanded to the district court or
otherwise sent back for further proceeding.  So following the
June Supreme Court decision, Texas's ambulatory surgical center
and hospital privileges laws simply don't apply.

     Your Honor also asked the parties to address Justice
Alito's comment in his *Whole Woman's Health* dissent that
*Planned Parenthood v. Casey* appears to have set a bright-line

1   rule that a 150-mile driving distance is not an undue burden.

2           Your Honor, Justice Alito's reading of *Casey* is

3   incorrect.  First, I just want to point out that *Casey* did not

4   discuss a 150-mile distance at all.  In evaluating the

5   constitutionality of Pennsylvania's informed consent

6   requirement for abortion, the *Casey* court discussed the fact

7   that some percentage of women would have to travel at least one

8   hour, and up to three hours, as a result of that requirement.

9           But in any event, *Casey* did not set any bright-line

10  rule.  Instead, the court balanced the benefits of the informed

11  consent law against its burdens.  The court there found that

12  the informed consent law did, in fact, further a state interest

13  and so, in that context, the travel burden that it imposed was

14  not undue.

15          THE COURT:  And I think that the waiting period in

16  Texas -- in Pennsylvania was acceptable.  So it was an

17  otherwise reasonable form of regulation, and that was not

18  overridden by travel problems, whereas I think the issue here

19  is that the Supreme Court has not found that the two

20  requirements here are, in themselves, reasonable restrictions

21  designed toward the safety of women who have gone through

22  abortions.

23          So in balancing things, you're not balancing against

24  a restriction that's been considered reasonable without

25  considering that travel requirement.  And it does seem to me

1   that there's a -- that this 150 miles is kind of a delusion
2   here as a problem, particularly since apparently traveling from
3   El Paso to, I guess it would be Las Cruces in New Mexico, a
4   fairly short distance, was not considered to be permissible in
5   the Texas case.  I take it you agree with that comment?

6          MS. COHEN:  Yeah, that's correct, Your Honor.  So I
7   think there are sort of two different issues going on here.
8   One is just the -- what sort of travel distance is permissible,
9   and Your Honor is correct.  The key difference between the
10  informed consent requirement that the court addressed in *Casey*
11  and the ambulatory surgical center and privilege restrictions
12  that the court addressed in *Whole Woman's Health* is that the
13  *Casey* requirement furthered a state interest, and so some
14  burden was permissible, whereas, in *Whole Woman's Health*, the
15  restrictions were found to not further state interests, and so
16  the burden imposed was not permissible.

17         And so, Your Honor, in this situation that we have
18  here when there is really nothing on the benefit side of the
19  balance, even a small burden could be undue.  But in any event,
20  the driving distances women currently face in Missouri are very
21  long and, in fact, are longer than the 150-mile distance that
22  Justice Alito refers to.

23         Just to take a couple examples, women in Missouri
24  currently have to travel nearly 300 miles one way from the
25  Joplin area to reach St. Louis and over 200 miles one way from

1  the Springfield area, when they could access abortion in their
2  home communities, but for the restrictions.

3         Plaintiffs' expert, Dr. Henshaw, has provided
4  testimony that these long distances prevent at least 20 to 25
5  percent of Missouri women who would have sought an abortion
6  from doing so.  And Dr. Henshaw and plaintiffs' other expert,
7  Dr. Katz, also explained that many women who are able to
8  overcome these long distances to reach a provider are delayed
9  and that that pushes their access to abortion later in
10 pregnancy, which, as Dr. Eisenberg has explained, increases the
11 risks of the procedure.

12        Your Honor, as to the issue of crossing state lines
13 to reach an abortion provider, court after court has held that
14 states cannot rely on their neighbors to protect their own
15 citizens' constitutional rights.  And as Your Honor points out,
16 this is even true when an out-of-state provider is right across
17 state lines.  So the Fifth Circuit's --

18        THE COURT:  Which is true here apparently, that
19 Overland Park is where the abortions are -- physical facility
20 abortions occur.

21        MS. COHEN:  That's correct, Your Honor.  So the
22 situation in Kansas City is similar to the situation in El Paso
23 and Las Cruces, New Mexico.  And in *Whole Woman's Health*, the
24 Fifth Circuit held that there was no undue burden to those
25 women in El Paso because they could just cross state lines and

1  obtain an abortion in New Mexico.  But the Supreme Court

2  overturned that holding and specifically did not consider

3  out-of-state providers, even though El Paso had an out-of-state

4  provider right nearby.  And so that same logic applies here to

5  the Kansas City area.  The fact that there's a provider on the

6  Kansas side is irrelevant to the burden analysis under *Whole*

7  *Woman's Health*.

8       Your Honor also asked the parties for information on

9  the status of other cases similar to this one.  We've already

10  talked about the Texas case, but there's another case in Alaska

11  regarding physical facility requirements for abortion that was

12  filed the same day as this case.  That case sought a

13  preliminary injunction against Alaska's regulations that

14  prevented second-trimester abortions from being performed

15  outside of a hospital setting.  After that case was filed, the

16  State of Alaska indicated that it would issue new regulations

17  that would make clear that a hospital setting is not required,

18  and so the court proceedings are currently stayed, pending

19  those regulations.

20       THE COURT:  They gave up in Alaska?

21       MS. COHEN:  Correct, Your Honor.

22       Importantly, Your Honor, no court has found

23  differently and upheld physical facility requirements for

24  abortions since *Whole Woman's Health*.

25       In terms of other cases regarding hospital

1  privileges requirements, requirements have been permanently

2  enjoined in Wisconsin, Alabama, and, as of this past Friday, in

3  Mississippi.  There is also ongoing litigation in Louisiana

4  regarding the privileges requirement, and that case is awaiting

5  decision on the merits in the district court.

6       THE COURT:  So we're ahead of others as far as some

7  live activity is concerned?

8       MS. COHEN:  Well, the Louisiana case is actually

9  awaiting decision on the final merits of the case, so they're a

10 little further along than we are here.

11      And there's one additional case out of Arkansas

12 challenging a requirement that physicians who provide abortion

13 must have a contract with another physician with privileges.

14 That requirement has been preliminarily enjoined by an Arkansas

15 district court, and that decision is now being reviewed by the

16 Eighth Circuit.  So argument has been held before the Eighth

17 Circuit, and that case is awaiting decision.

18      Again, Your Honor --

19      THE COURT:  So there is a pending case before the

20 Eighth Circuit on a preliminary injunction that is comparable

21 to the one you're seeking here?

22      MS. COHEN:  It's a little bit different, Your Honor.

23 In that case, the requirement is that physicians who provide

24 abortion must have a contract with another physician to

25 provide -- they must have a contract with another physician,

1   and the second physician must be the one to have hospital

2   privileges.  So it's a little bit different than the privileges

3   requirement in this case where the provider themself must have

4   the privileges.  But, yes, Your Honor, many of the same issues

5   that are present in this case are present in that case, as

6   well.

7            THE COURT:  And it's already been briefed in the

8   circuit?

9            MS. COHEN:  Correct.  It was briefed and was

10  recently argued, yes.

11           THE COURT:  Could you give us the citation, if you

12  have it?  The name of the case with the number or whatever.

13           MS. COHEN:  Sure, Your Honor.  Your Honor, I will

14  have that for you when I come back up for rebuttal.

15           THE COURT:  All right.

16           MS. COHEN:  I'm going to have to pull up the

17  citation.

18           Finally, Your Honor, I'd like to address the proper

19  scope of relief in this case, including addressing the prior

20  settlement agreement that Comprehensive Health --

21           THE COURT:  Let me interrupt.  I did ask a question

22  about the state's argument that there's a settlement agreement

23  of a controversy in 2010 and that that should be a bar as to

24  the Kansas City organization proceeding on what is considered

25  to be related litigation.  Do you have any comment on that

1    settlement agreement, the impact of the settlement agreement?

2            MS. COHEN:  Yes, Your Honor.  So before I reach the

3    settlement agreement, I think it's helpful first to talk just a

4    little bit about facial relief generally.

5            So, Your Honor, the Supreme Court in *Whole Woman's*

6    *Health* invalidated the entire Texas ambulatory surgical center

7    restriction as a whole, finding it facially unconstitutional,

8    and we're asking this Court to reach the same result and

9    facially invalidate the entire ASC restriction as to abortion

10   providers.

11           Texas argued in the Supreme Court that facial relief

12   was inappropriate and that the court should go piece by piece

13   through the various ASC requirements.  But the court explicitly

14   rejected that approach, explaining that because the plaintiffs

15   had shown that the restriction was facially invalid, that sort

16   of piecemeal approach was not required.

17           Similarly, we're asking the Court to invalidate the

18   entire hospital relationship restriction, including not only

19   the various requirements for hospital privileges, but also the

20   option contained in the ASC law of having a transfer agreement

21   with a local hospital.  For both the ambulatory surgical center

22   and hospital relationship restriction, any lesser relief as to

23   only parts of those restrictions would be contrary to *Whole*

24   *Woman's Health*.

25           As to the settlement agreement, we're asking the

1  Court to find that the settlement agreement does not preclude

2  such facial relief for Comprehensive Health.  As an initial

3  note about the scope of the settlement, the case out of which

4  the settlement arose involved only Comprehensive Health and not

5  the other plaintiffs in this case, and it concerned only

6  certain aspects of the ambulatory surgical center restriction

7  and did not involve any challenge to the hospital relationship

8  restriction.

9       This is why, Your Honor, the settlement was not at

10  issue in the recent case that was before Judge Laughrey

11  regarding the Columbia center's license.  In that case, the

12  department attempted to revoke the license, based only on the

13  fact that the physician at the Columbia center had her hospital

14  privileges revoked, and so the settlement agreement was just

15  not relevant to that case.  So to be clear --

16       THE COURT:  Let me interrupt.  I'm not sure -- you

17  may have said this, but it didn't ring through to me.  Are you

18  not seeking relief against the statutes that would make it

19  criminal activity, I take it, for a doctor to perform abortion

20  without an affiliation or affiliation within 30 miles, or

21  something of that sort?

22       MS. COHEN:  We are, Your Honor.  So the hospital

23  relationship restriction is codified in essentially two

24  different places.  First, there's the standalone statute that

25  requires a physician to have hospital privileges.  And as Your

1    Honor points out, that statute does include criminal penalties.

2            There was also a separate provision that is

3    contained within the ambulatory surgical center requirements

4    that also requires either hospital privileges or a transfer

5    agreement, and we're seeking an injunction as to both of those

6    sets of regulations.

7            THE COURT:  All right.  And you've reached the

8    argument that a preliminary injunction -- a preliminary

9    injunction could be issued and that we needn't wait until a

10   final ruling as to injunctive relief.  I guess you covered that

11   in the briefing.

12           MS. COHEN:  That's correct, Your Honor, we've

13   briefed that issue extensively, and, yes, plaintiffs believe

14   that they have met their burden under the *Dataphase* factors for

15   a preliminary injunction.

16           So going back to the settlement agreement.  So to be

17   clear, the settlement certainly does not bar plaintiffs RHS and

18   Dr. Yeomans from being awarded full facial relief as to both

19   restrictions in this case, and it clearly does not bar

20   Comprehensive Health from being awarded facial relief as to the

21   hospital relationship requirement.

22           As to the relief Comprehensive Health is entitled to

23   for the ambulatory surgical center restriction, first, as Your

24   Honor recognized in the decision denying the state defendants'

25   motion to dismiss, the prior litigation from which the

1  settlement agreement resulted involved only a challenge to
2  certain physical facility requirements, but that case did not
3  challenge the fact that abortion providers are subject to the
4  ASC restriction as a whole.

5          THE COURT:  Now, I'm not sure that -- the original
6  complaint may have been broader than you're suggesting, but I
7  suppose during the course of the litigation they backed away
8  from it.

9          MS. COHEN:  Your Honor --

10         THE COURT:  Or am I wrong?

11         MS. COHEN:  Your Honor, the original complaint in
12 that case was specific to only certain physical facility
13 requirements, and I believe that the complaint has actually
14 been attached to a filing in this case, which I can get you
15 the --

16         THE COURT:  It's on file.

17         MS. COHEN:  Okay.  So, Your Honor, that case did not
18 challenge the fact that abortion providers are defined to be
19 included in the ASC restriction in general.  And because of
20 that, Comprehensive Health is not precluded here from seeking
21 and obtaining facial relief.  They're seeking a different kind
22 of relief in this case, and the language of the settlement
23 agreement is not to the contrary.

24         Since the prior case did not challenge the fact that
25 abortion providers were swept into the overall ambulatory

surgical center scheme, the settlement agreement only addresses
what requirements the Kansas City and Columbia health centers
have to meet, assuming that they're required to be licensed as
ASCs.  The settlement does not require that these health
centers have to continue to be licensed as ASCs, even if that
scheme no longer applies to abortion providers.  So the
agreement does not preclude facial relief from Comprehensive
Health.

And for the same reason, Your Honor, should the
other plaintiffs in this case, RHS and Dr. Yeomans, be granted
facial relief as to the ASC restriction, the settlement
agreement becomes obsolete because by its own terms, the
settlement sets out conditions under which the department will
grant a license to these facilities.  But if the ASC
restriction is invalidated, then the Department of Health will
no longer be in the business of issuing ASC licenses to
abortion facilities at all.  There would be no license to be
granted, and requirements of the settlement agreement become
moot.

THE COURT:  In a worst case situation, let's say I
found the Kansas City organization was completely restricted.
I suppose there's nothing that would prevent the St. Louis
organization from moving to Columbia, for example.  Would that
be -- has that occurred to anybody?

MS. COHEN:  That's correct, Your Honor.  And I think

1   this exact fact sort of illustrates the absurd result that we

2   would have if the settlement agreement was held to continue to

3   apply.  The settlement agreement is specific to two specific

4   buildings, actually, it's not even general as to the

5   Comprehensive Health entity.  So this absurd result would be

6   the case where either RHS could come into the city or

7   Comprehensive Health could simply move buildings.  And so it

8   would really be kind of an absurd outcome.

9           And, Your Honor, continuing to apply the settlement

10  agreement just would not make sense after *Whole Woman's Health*.

11  It cannot be the case that the State of Missouri can continue

12  to impose an unconstitutional licensing scheme on only two

13  specific buildings in the state because of a prior settlement

14  agreement.  That would create a result in which some women in

15  Missouri who happen to reside near these health centers would

16  have their access to abortion burdened in an ongoing way

17  because the history here has shown that, even with the

18  settlement in place, these facilities have not been able to

19  keep their licenses.  They've been licensed on and off over

20  time as a result of coming in and out of compliance with the

21  various requirements and as a result of the Department of

22  Health changing their definition of what's required under the

23  settlement agreement, attempting to revoke the license, et

24  cetera.

25          So, Your Honor, even if the settlement agreement by

1    its own terms would still apply if the ASC restriction were

2    struck down, which I've already explained would be contrary to

3    the agreement's plain language, such a result would be contrary

4    to *Whole Woman's Health*.

5          I would like to make one more point about the scope

6    of relief, Your Honor. In the Court's decision denying

7    Defendant Patterson's motion to dismiss, the Court raised the

8    question whether it would be appropriate to extend a

9    preliminary injunction to include the four prosecuting attorney

10    defendants in this case. Your Honor, because the prosecuting

11    attorneys have responsibility for enforcing the criminal

12    privileges law, as well as the ambulatory surgical center law,

13    it's necessary for them to be included in any preliminary

14    relief.

15          THE COURT: It might be favorable to them to enjoin

16    them so they wouldn't have people coming to them and saying,

17    "Why aren't you prosecuting?"

18          MS. COHEN: That may be true, Your Honor. But in

19    addition to that, if a preliminary injunction were entered only

20    as to the state defendants, plaintiffs' physicians would still

21    be unable to provide abortions because of the criminal

22    privileges law. That law runs against the physicians

23    themselves and threatens them, not only with a criminal

24    prosecution, but also dire consequences to their medical

25    licenses and their careers.

1       So unlike at the conclusion of the merits of this

2  case when the restrictions might be declared unconstitutional

3  and so they could not be enforced by anyone, a preliminary

4  injunction runs only against the parties who are specifically

5  enjoined.  So the physicians need the protection of a

6  preliminary injunction against the prosecuting attorneys in

7  order to be able to provide abortions while the preliminary

8  injunction is in place and as the rest of this case is

9  litigated.

10      If Your Honor has no further questions, I'll reserve

11  the remainder of my time.

12      THE COURT:  All right.  I guess you have some time

13  to respond, so you can step back.

14      MS. COHEN:  Thank you, Your Honor.

15      THE COURT:  Mr. Sauer?

16      MR. SAUER:  Thank you, Your Honor.  May it please

17  the Court.  John Sauer appearing on behalf of the state

18  defendants.

19      THE COURT:  Is this your first appearance in your

20  current capacity, or have you been busy?

21      MR. SAUER:  This is my first court appearance in my

22  new -- in my new job.

23      THE COURT:  First court appearance, that's what I

24  mean.

25      MR. SAUER:  Yeah.  I was in court, actually, a week

1 and a half ago in front of Judge Bough, and I second-chaired

2 that and didn't present anything to the Court.

3 So, thank you, Your Honor. May it please the Court.

4 John Sauer appearing on behalf of Defendants Hawley and

5 Williams, the state defendants in this case.

6 Your Honor, I'd like to begin by discussing the

7 point that plaintiffs' counsel ended with, which is the scope

8 of relief that's being requested by the plaintiffs in this

9 case. And I can't overemphasize how broad that scope of relief

10 really is and how it contrasts with the nature of relief that

11 the Supreme Court granted in the *Whole Woman's Health* case.

12 I would like to direct Your Honor's attention to

13 Page 2314 of the Supreme Court Reporter in the *Whole Woman's*

14 *Health* opinion. In that case, the majority opinion emphasized

15 that the Texas statutes and regulations that have been passed

16 in House Bill 2 were additive to a whole series of health and

17 safety regulations that would remain on the books in Texas that

18 allowed the state to engage in reasonable health and safety

19 inspection and regulation of abortion clinics. And virtually

20 everything that the Supreme Court identified in its holding in

21 *Whole Woman's Health* is stuff that Texas, the State of Texas

22 would still be allowed to do. It's stuff that these plaintiffs

23 are asking this Court to enjoin.

24 So in particular, on Page 2314, the majority opinion

25 pointed out that even though House Bill 2 would be enjoined,

1  Texas's other statutes that imposed reporting requirements on
2  abortion facilities, quality assurance programs had to be
3  implemented, personnel policies, environmental policies,
4  infection control policies, disclosure requirements, patients'
5  rights requirements, medical services requirements, safe
6  anesthesia requirements, and, perhaps most importantly, random
7  and unannounced annual inspections to ensure compliance with
8  all of these state health and safety regulations.

9          In this particular case, virtually every single one
10  of these requirements that Texas had is implemented by the
11  State of Missouri through the ambulatory surgical center
12  requirement that's set forth in 197.200 and sort of has its
13  regulatory instantiation in Chapters 60 and 70, are subject in
14  60 and 70, Chapter 30-30 of the 19 -- 19 Code of State
15  Regulations.

16          So what the plaintiffs are asking the Court to do is
17  essentially impose a regulatory blackout of health and safety
18  regulations on all abortion providers throughout the state of
19  Missouri.  Literally if the plaintiffs receive the injunction
20  that they're requesting, it would become legal overnight to
21  perform an abortion anywhere in Missouri, in the back of an RV,
22  potentially.  And so it's a very broad scope of relief that's
23  being asked, one that risks empowering sort of what plaintiffs'
24  expert in other contexts has described as the worst providers,
25  the shoddiest operators, not these plaintiffs, but other

1  potential abortion providers who overnight would be completely

2  deregulated.

3        That's not what the Supreme Court did in *Whole*

4  *Woman's Health* against Texas.  In that case, the Supreme Court

5  emphasized very strongly that they were leaving in place a

6  whole series of preexisting Texas statutes and regulations.

7        Unfortunately, the way that the statutes are written

8  in Missouri, the way that the regulations are written is the

9  vast majority of those sorts of requirements, the vast majority

10 of them are contained in Chapter 60 of those regulations, and

11 plaintiffs are seeking a blanket injunction against the

12 enforcement of any regulation in Chapter 60, whether or not

13 that regulation is being announced pursuant to the ambulatory

14 surgical center statute.

15        So there are at least three provisions in Chapter 60

16 that implement statutes the plaintiffs haven't even challenged

17 in this case.  For example, there's a provision in Chapter 60

18 on regulations that implements the informed consent statute,

19 and they've only challenged a tiny piece of that that relates

20 to the hospital privileges requirements.  There's a provision

21 in mandatory -- in Chapter 60 that enforces the mandatory

22 reporter requirement that abortion facilities, like many other

23 places, are a mandatory reporter of suspected child abuse.

24 They're seeking an injunction against that regulation, even

25 though they haven't challenged the statute.  The requirement

1    that only physicians perform abortions, they haven't challenged

2    that statute, but they're seeking injunction against the

3    regulation that makes that enforceable by DHSS.

4         THE COURT:  I know the Supreme Court did not favor

5    severance, but isn't there some way that the way the statutes

6    are organized that it could deal with ASC as a package?

7         MR. SAUER:  Yes, Your Honor.  I think there's a very

8    natural way for the Court to carve an issue in this case, if

9    the Court were, which I don't concede, to accept the merits

10   arguments that the plaintiffs are making here.  And that would

11   be they're seeking an injunction against the entirety of

12   Chapter 70.  So it's 19 CSR 30-30.070, which implements the

13   physical plan requirements for ambulatory surgical centers.

14   They're seeking an injunction against that.

15        Then the only provision in Chapter 60 as to which

16   they've made any evidence or argument is the one piece of

17   Chapter 60 that contains the hospital privileges requirements.

18   That's 30-30.060(1)(C)(4).

19        So really the only provisions of law as to which

20   they've made any arguments that are unconstitutional within the

21   regulatory code are Chapter 70 and that one provision of

22   Chapter 60.  The rest of Chapter 60, the vast majority of which

23   is completely noncontroversial, contains a whole series of

24   requirements, the sorts of requirements that the Supreme Court

25   in *Hellerstedt* said these are still on the books in Texas, but

1  these plaintiffs are seeking an injunction against.  For

2  example, the infection control regimes in Chapter 30-30.060.

3  That's 30-30.060(1)(B)(8) and (9), for example.  The mere fact

4  that abortion providers have to have licenses at all.  The fact

5  that DHSS has the right to conduct annual inspections to make

6  sure what's going on in abortion facilities is safe.  That's

7  30-30.060(1)(A)(5).

8           COURT REPORTER:  Could you please repeat that?

9           MR. SAUER:  I apologize.  Yeah.  The mere -- the

10 entitlement of DHSS to conduct annual inspections of abortion

11 facilities to make sure that what's going on in them is safe,

12 they're seeking an injunction against that, and they're

13 sweeping it in, just by purporting to bring a facial challenge

14 to all of 30-30.060.

15           And so the breadth of relief in this case that is

16 sought is, I think, completely inappropriate.  It is entirely

17 distinct from the severance analysis that was conducted by the

18 Supreme Court in *Hellerstedt* because the Supreme Court

19 emphasized in *Hellerstedt* that all of these exact same kind of

20 requirements, infection control procedures, quality assurance

21 procedures --

22           COURT REPORTER:  Could you please slow down?

23           MR. SAUER:  I apologize.  Infection control

24 procedures, quality assurance procedures, the right of annual

25 and random inspection, all of that remains on the books in

1  Texas.  Here, that would not be the case if they receive the

2  injunction that they seek.

3          So the state right off the bat submits that

4  *Hellerstedt's* severability analysis is addressing an entirely

5  distinguishable situation that was presented in this case and

6  that the relief that the plaintiffs are seeking is sweepingly

7  overbroad, statewide invalidation, not just as applies to these

8  particular plaintiffs, but as applied to anyone who wants to

9  provide abortions in any physical setting.

10          Now, plaintiffs' counsel alluded to the fact that

11  there were certain requirements that would not be swept in

12  here.  Those requirements in Chapter 188 of the Revised

13  Statutes of Missouri.  But those requirements almost all

14  implement, not the state's interests in promoting health and

15  safety of abortion, but the state's interests in promoting its

16  preference for fetal life.  So the informed consent

17  requirement, the 72-hour waiting period.  The only thing in

18  there of plaintiffs' health and safety that plaintiffs' counsel

19  went into was the requirement of submitting tissue samples to

20  the pathologist.

21          But the vast majority of what DHSS does to ensure

22  that abortions are provided safely to women throughout Missouri

23  would become illegal immediately if the Court -- if the

24  plaintiffs receive the injunction they've asked for.

25          I'd like to move on from there, Your Honor, to

1  discuss two other, I think, critical ways in which the
2  *Hellerstedt* decision is distinguishable from this particular
3  case.

4          One of them is this addresses what I take it was one
5  of Your Honor's principal questions about whether or not the
6  State of Missouri is, in a sense, collaterally estopped from
7  disputing the generalized sort of safety of abortion procedures
8  by the Supreme Court's decision in *Hellerstedt*.

9          I would point the Court to the fact that the
10 *Hellerstedt* opinion referred over 25 times to the record
11 evidence that was submitted in the Texas case.  So the holding
12 of *Hellerstedt* is that they announce certain principles of law,
13 the legal standard under which the undue burden analysis should
14 be conducted, and then apply that to the district court's
15 factual findings based on the record evidence in that
16 particular case.  I don't see anything in the *Hellerstedt*
17 opinion that suggests that the State of Missouri is somehow
18 bound by the factual record created by the State of Texas that
19 focused on -- the State of Texas did not focus on abortion as
20 it's provided in Missouri.  I do not think that *Hellerstedt*
21 somehow means that Missouri is completely bound by factual
22 determinations that were made in that case.

23          And I would point out to Your Honor that the record
24 evidence in this particular case is very different from the
25 record evidence that was presented in the Texas case.  It does

1 require a *Hellerstedt* analysis under the undue burden,

2 considering the evidence that's actually been presented to the

3 Court in this case.

4 THE COURT: I don't remember any citations that

5 you've given about the court's narrowing of the broad

6 statements of the holding in a case to the particular facts

7 that have been presented and saying, well, since we don't have

8 those facts, we start from the beginning. I don't remember any

9 citations on that.

10 MR. SAUER: Your Honor, I think the Court maybe

11 sent -- that's one of the e-mails you sent to counsel earlier

12 before the questions relating to oral argument saying that

13 *Hellerstedt* certainly provides substantial guidance as to how

14 this evidence should be considered and weighed, with the notion

15 that *Hellerstedt* has prevented any litigant from presenting new

16 factual evidence that relates to the safety of abortion

17 procedures, particularly in a totally different state where we

18 have specific evidence about the way abortion is being

19 administered in the state of Missouri that was completely

20 absent from the record in *Hellerstedt* is, I believe would --

21 THE COURT: But is there any -- is there any

22 precedent that I can follow on that?

23 MR. SAUER: Your Honor, I'll actually point the

24 Court to *Hellerstedt* itself, and I think there's a critical

25 point in the *Hellerstedt* opinion where the Supreme Court uses

1 the phrase that Texas's -- Texas failed to submit any expert

2 evidence to rebut the plaintiffs' evidence, and the majority

3 opinion drops a footnote, and it's Footnote 4, that points out

4 that in the district court opinion in *Hellerstedt,* there was a

5 systematic finding that the experts that the State of Texas

6 relied on lacked credibility because they allowed some, I

7 guess, litigation consultant actually who was a non-expert to

8 exercise editorial control.  So even the expert evidence in the

9 *Hellerstedt* case is particularly one-sided.

10          Now, as for a case outside of -- and that one side

11 is not present in this case at this time, nor need it ever be.

12          In addition to a case outside of *Hellerstedt*, I

13 would direct the Court's attention to the case that you

14 yourself cited when you submitted this query to counsel, which

15 is you cited Justice O'Connor's separate opinion in Roper

16 against Simmons.  In *Roper*, the Supreme Court had held 16 years

17 prior that it was constitutional, it was consistent with the

18 Eighth Amendment, to impose the death penalty on a offender who

19 was a juvenile at the time of capital murder.  Subsequent to

20 that, the Missouri Supreme Court in this state held about, I

21 guess, about 16 years later, that the facts have changed.  That

22 was the holding in Supreme Court 16 years earlier, but the

23 facts have changed and, you know, mores, societal mores have

24 developed towards a consensus against juvenile capital

25 punishment.

1　　　　　And the Supreme Court affirmed without criticizing

2　the Missouri Supreme Court, right?  The opinion you cited,

3　Justice O'Connor's opinion, was a dissent.  Justice O'Connor

4　said, I think this is inappropriate what the majority of the

5　Supreme Court is doing in this particular case, which is

6　allowing the Missouri Supreme Court to reassess the legal

7　principles that were announced in the prior decision based on

8　the submission of fresh evidence.

9　　　　　So to the extent that there's a case on point, I

10　would say -- I would submit that it's the case that you

11　yourself had cited to counsel, Roper against Simmons.

12　　　　　THE COURT:  But I guess, though, Justice O'Connor

13　say that the lower court, in this case, I guess, the Missouri

14　Supreme Court, did it the wrong way, so you're asking me to do

15　it the wrong way.

16　　　　　MR. SAUER:  I would say, Your Honor, what I -- what

17　I'm asking you to do is apply the legal principles in the Whole

18　Woman's Health again Hellerstedt decision to the unique

19　evidence that's at issue in this case, and I believe that's the

20　only appropriate reading of *Hellerstedt*.  The alternative

21　reading would be that no state can make its own case, so to

22　speak, to defendants' own regulations, and I don't believe

23　that's -- again, the Supreme Court in *Hellerstedt* referred to

24　the factual evidence in that specific record over 25 times in

25　the majority opinion.

1        If I may just comment briefly on some of that

2  evidence.  Your Honor, I believe the evidence we submitted in

3  this case is kind of like a Rorschach test.  I'm not a

4  specialist in this area, but health and safety issues that, to

5  me, seem very, very concerning are dismissed by their experts

6  as, so to speak, nothing to see here.

7        I believe the evidence in this case, Judge, shows,

8  the way I figure it is, four layers of risks of physical

9  complication from abortion in the state of Missouri.  The

10  nucleus of that is the actual complications, physical

11  complications that the St. Louis plaintiff has actually

12  produced in discovery and that it briefed in this court.  And

13  those themselves, and many ones that we've highlighted in our

14  briefing, exceed both the rates of physical complications that

15  were predicted by their own expert in preliminary injunction

16  filings and, in addition to that, they exceed rates of

17  complication on key data points the Supreme Court relied on in

18  *Hellerstedt*.

19        I can give the Court one example.  The Supreme Court

20  in *Hellerstedt* repeatedly relied on a study showing 15

21  instances of hospital treatment or emergency transfers to a

22  hospital in over 54,000 abortions.  The hospital treatment rate

23  that we got from discovery from the St. Louis plaintiff in this

24  case shows a rate of hospital treatment over three times that

25  high.  So that's concerning, as are the other data points we

1   point to in our -- in our briefing.

2            So there's that initial layer of complications they

3   have reported in discovery are sufficiently concerning and

4   raise a risk of complication that exceeds that that the Supreme

5   Court discussed in *Hellerstedt*.  But in addition to that,

6   there's also the concern that there's a set of complications

7   that may go unreported.

8            And we've alluded to -- in the briefing to the fire

9   department Sunshine records.  Late Friday we received

10  supplemental records from the fire department.  The records we

11  produced are incomplete.  As of yesterday, I requested further

12  information from the St. Louis Fire Department, and we would

13  just ask the Court for leave to supplement the records, and

14  we'll share whatever supplemental we get with all counsel,

15  obviously, in this case.  And we ask leave to supplement the

16  record to address those after the hearing when we actually get

17  them.

18           THE COURT:  Well, the case is important, and I want

19  to get as much education as possible.  I think I probably will

20  allow both sides to file something, if they wish to, say, ten

21  days from today, which you could put in some new material, and

22  I would give it appropriate consideration.  I think due process

23  requires them to respond.

24           MR. SAUER:  I have no objection to allowing them to

25  respond.

1     THE COURT:  I would allow ten days to both sides.

2     MR. SAUER:  Thank you, Your Honor.  And actually,

3  there's one other thing that's relevant to this very point that

4  I'm making that we would -- we may want to include in that

5  supplemental filing, and that is plaintiffs' counsel has

6  alluded to the fact there's a statute in the State of Missouri,

7  it's Section 188.052, that requires reports to be filed by

8  abortion providers.  There's an abortion report that's filed by

9  every abortion provider, and then there's a separate abortion

10 complication report that's to be filed by any healthcare

11 provider that provides follow-up healthcare after an abortion

12 in the event of a complication or an adverse event.  And these,

13 both of these reports are to be treated strictly

14 confidentially, to be used for statistical purposes only.  In

15 fact, the state's position is that we would seek a court order

16 before we went to access and use those for this litigation.

17 But the purpose of these reports is to do exactly what we're

18 trying to do here, which is to get to the bottom of how risky a

19 procedure this is as it's administered in Missouri.

20     And I was notified last week that our records

21 custodian at DHSS has conducted a diligent search, and not a

22 single abortion complication report has been filed by either of

23 the plaintiffs in this case in the last 15 years.  If that's

24 true, we would like a chance to verify that and file something

25 supplemental in ten days.  If that is true, it raises a grave

1  concern about un -- I would say underreporting, but really

2  unreporting of abortion complications.

3        THE COURT:  It seems to me that the question -- or

4  the point I mentioned about contention that miscarriages would

5  create the same kind of problems and that there are invasive

6  examinations that women undergo that would be comparable to

7  what they say at least in the first trimester would be a four

8  or five-minute procedure if -- I think maybe that came in

9  rather late.  If there's something that you want to say on that

10  again, you could include something on that subject, if you do

11  file something in, say, ten days.

12        MR. SAUER:  Thank you, Your Honor.

13        THE COURT:  Friday, the 31st.

14        MR. SAUER:  Thank you, Your Honor.  We'll follow up

15  on that point, as well.

16        THE COURT:  I don't think there's been any comment

17  on that subject on your side, and it would seem to be of

18  interest.

19        MR. SAUER:  Thank you, Your Honor.  And I was just

20  going to ask if there would be any sort of a page limitation or

21  guidance on any supplemental filing.  We stipulated to five

22  pages for the previous filings at this stage.

23        THE COURT:  Both sides, I would recommend as short

24  as possible.

25        MR. SAUER:  Yes, Your Honor.  There have been

1  numerous filings in this case already.

2        So in any event, Your Honor, from the state's
3  perspective, there are, as I was saying, four layers of
4  physical sort of complications.  There's the ones that go
5  reported, there's the ones that, for whatever reason, the
6  abortion providers are aware of, but they go unreported or
7  underreported.  Thirdly, there's a whole universe of
8  complications, Your Honor, that there's every reason to believe
9  never go reported to the abortion provider, unlike colonoscopy
10  and various other surgical procedures we're discussing today.
11  In many places, abortion still is surrounded by social stigma,
12  and there's a strong reason to believe -- and the experts have
13  disputed this, but there's a strong reason to believe that --
14  for example, in abortion studies where there are so-called laws
15  to follow up, and there's a disproportionate representation of
16  women who have had negative experience with their abortion
17  provider and are reluctant to go back and relive that negative
18  experience and, therefore, seek treatment elsewhere.

19        And I would direct the Court's attention to the
20  Niinimaki study from Finland.  You know, our experts have
21  relied on certain European studies based on Finnish data.  In
22  Finland -- unlike the United States-based studies that the
23  plaintiffs' experts have relied on heavily in this case, in
24  Finland there isn't this concern about underreporting because,
25  due to the nature of the medical system in that case, the data

1   gatherers are not relying solely on the initial provider to get

2   it, and those studies show a much higher rate of complication

3   than shown in the United States-based studies.

4           THE COURT:  I think there was some criticism of the

5   studies in Finland, but I'm not anxious to -- it's overly

6   complicated.

7           MR. SAUER:  No pun intended, actually, Your Honor.

8   And actually, Your Honor, I was going to propose that

9   potentially in addition to these supplemental filings, it might

10  benefit the Court if the parties with access to these various

11  studies we've been talking about, maybe the parties could

12  confer and stipulate to actually filing the studies themselves.

13  I think that would be helpful to the Court, as well.  That

14  occurred to me when I was preparing for this hearing today.

15          Finally, Judge, I would point out there's a fourth

16  layer of complications that Missouri is trying to prevent, and

17  that's the complications that have never happened, right?

18  Because the state has required -- has these ambulatory surgical

19  center requirement and hospital privileges requirements in

20  place.

21          The St. Louis facility, for example, is the -- is

22  the one Missouri-based abortion provider where we have

23  substantial data, and I would point out that that facility is

24  the safest the state can make an abortion facility.  It meets

25  the requirements of the ASC requirements.  It has physicians

1  with hospital privileges at BJC, an outstanding hospital

2  very -- in very close proximity to it.

3          So one thing that the evidence does not show that

4  the state is very legitimately concerned about is will the

5  health and safety record get substantially worse if these

6  restrictions are removed.  And the safe -- the evidence in the

7  St. Louis facility, given the nature of complications they have

8  there, raises concerns about an increase in both the rate of

9  complications and the treatment that's given to the very

10  serious complications that are reflected in the discovery

11  responses.

12          I want to briefly address, Your Honor, plaintiffs'

13  argument that these two sets of requirements essentially impose

14  no benefit to patient health and safety, and I respectfully

15  submit that, outside of the sort of politically charged,

16  heavily litigated context of abortion, it is routinely viewed

17  as a benefit, a significant benefit to patient health and

18  safety to have these kinds of moderate surgical procedures

19  performed in an ambulatory surgical center environment and

20  in -- and by physicians with hospital relationships or hospital

21  privileges.

22          I would point out, for example, that -- you know,

23  for example, Medicaid regulations require an ambulatory

24  surgical center to have exactly the same hospital relationship

25  that Missouri requires of its abortion providers outside of the

1  context of abortion, and that's at 42 CFR 416.41(b)(3).  That

2  requirement requires exactly the same hospital relationship for

3  people who are doing colonoscopies at ambulatory surgical

4  centers, people who are doing, you know, cataract surgery and

5  so forth.

6          So there's -- outside of the contentious area of

7  abortion, there's widespread consensus that there's at least

8  some significant benefit to having these particular procedures

9  and these -- or this particular physical plan and this

10  particular hospital relationship.

11         Similarly, you know, our expert has cited a whole

12  series of medical -- a host of sort of medical associations,

13  all of which, you know, had signed on to ASC requirements.  The

14  plaintiffs argue principally that -- not that it's unreasonable

15  to have colonoscopies done in ASCs, but that abortion is

16  singled out because, you know, five first-trimester abortions

17  per month or one second-trimester abortion triggers the ASC

18  requirement, whereas it's a higher volume of procedures that

19  triggers the ASC requirements in other contexts.  But that

20  requirement doesn't undermine the fact that, outside of this

21  context, it's almost universally recognized that there are

22  significant health benefits to these kinds of requirements.

23         Finally, Judge, I just want to briefly discuss the

24  issue of burdens on access.  I believe we submitted a

25  compelling case.  There's a dramatic difference between the

1  burdens on access -- the evidence of burdens on access in this

2  case than were submitted to the Supreme Court -- or submitted

3  to the Texas district court in *Hellerstedt* and then opined upon

4  by the Supreme Court.  And in particular, I would just direct

5  the Court's attention to recent studies that came out in early

6  2017 funded by, you know, the --

7              COURT REPORTER:  I didn't hear that.

8              MR. SAUER:  I would just direct the Court's

9  attention to recent studies, the Jerman studies that are

10  alluded to by the expert affidavits in this case.

11              For example, here is quote from the 2014 study,

12  which were comprehensive nationwide studies trying to find a

13  causal relationship between closing of clinics and loss of

14  clinic access and the abortion rate overall.  In 2014, no

15  evidence was found that the overall drop in abortion incidents

16  was related to decrease in providers or to restrictions

17  implemented between 2008 and 2011, a period in which there was

18  a particular flurry of state legislative activity that resulted

19  in a large number of clinic closings in some states.  And that

20  what the study finds is there was really no relationship

21  between the abortion rate in those states, perhaps

22  counterintuitively.

23              Similar finding in 2017 study, fluctuation in clinic

24  numbers were not clearly associated with abortion rates.

25  Rather, restriction between access -- or abortion access and

1  abortion rates is not straightforward.  Both of those studies

2  point, as our expert witness does, to the increased use of

3  contraceptives and the decline -- steadily declining rate in

4  number of unwanted pregnancies as the only factors that --

5  where there's a demonstrative causal relationship in that

6  context.

7          THE COURT:  I'm not quite sure what you think

8  happens if -- are you suggesting that people who want an

9  abortion, feel they need an abortion are -- that the great

10  majority, 95 percent of them are capable of going 500 miles,

11  whatever, to get an abortion and, therefore, closing a nearby

12  facility doesn't affect really determined people, and that

13  almost everybody seems to be both determined and able to go

14  wherever they find a clinic?

15          MR. SAUER:  I would say, Your Honor, that is what

16  the non-anecdotal, empirical evidence strongly indicates.  It

17  does indicate that there has been no significant impact on

18  actual access to abortion, and this is by studies that are

19  published by the --

20          COURT REPORTER:  I'm sorry, I didn't -- published

21  by?

22          MR. SAUER:  The Guttmacher Institute.

23          THE COURT:  I'm not -- are you saying it's

24  inexplicable but that's what the numbers show?

25          MR. SAUER:  That is what the numbers show.  I think

1  it is explicable, Your Honor.  It is explicable by, for

2  example, the driving distances analysis that was submitted by

3  Dr. Solansky in his first affidavit.  That in truth and fact --

4  and actually, abortion was -- in truth and fact, even before

5  clinic closures, there's a long history of women in Missouri

6  seeking abortions out of state.

7           So it isn't the case -- it's, in fact, a factual --

8  it's a fiction that, as Your Honor yourself pointed out,

9  that -- for example, women in Kansas City aren't driving to the

10 St. Louis facility when there's an Overland Park facility

11 across the border.  Similarly, women in Joplin are not going to

12 St. Louis, most likely they're going to Fayetteville.  And Dr.

13 Solansky pointed out that up to 46 percent of -- regardless of

14 these restrictions, independent of them, the history is that 46

15 percent of women in Missouri seek abortions outside of the

16 state, and that the driving distance -- impact of the driving

17 distances is much less than they project.

18           THE COURT:  My guess is that it's central Missouri

19 that has the greatest problem, but I don't know how you're

20 suggesting that in human terms there's no problem there.

21           MR. SAUER:  The empirical evidence suggests that

22 there's no significant impact on the abortion rate.

23           Now, I would point out, Your Honor, that this point

24 sort of returns to the scope-of-relief point that I made at the

25 beginning of this presentation.  In addition to seeking a

1  blanket injunction against every regulation, including

2  infection control and the like, in Subchapter 60 of 30-30, the

3  plaintiffs are also seeking complete statewide relief.  So you

4  see the inconsistency in their position.

5          When it comes to the undue burden analysis, they say

6  repeatedly that the relevant population to consider is really

7  just the women in central Missouri.  For example, don't

8  consider the half of Missouri's population that lives within

9  easy driving distance to the St. Louis clinic.  Just consider,

10  you know, that women, for example, in Springfield and Joplin

11  who would go down to the Springfield clinic currently have to

12  go to Kansas City or Fayetteville or wherever.  But the relief

13  they're seeking is not so limited.  The relief they're seeking

14  is a statewide injunction facially that, for example, you

15  couldn't apply -- it would be an undue burden to apply these

16  kinds of restrictions to a clinic that opened down the street

17  from the St. Louis facility.  There's an inconsistency and

18  disconnect in their position.

19          THE COURT:  If statistics show it makes no

20  difference to abortions whether there's a facility in central

21  Missouri, it seems to me that opponents of abortions are going

22  to great lengths to -- they must be deluded if they're raising

23  a great fuss about, say, opening a facility where one has been

24  closed.  I'm somewhat baffled.  I guess I don't understand the

25  statistics, but if the statistics show it doesn't make any

1   difference, I suppose, as the Supreme Court did, I need to rely

2   on common sense.

3          MR. SAUER:  Your Honor, I can't speak for what

4   motivates the opponents of abortion, but what motivates these

5   particular regulations is promoting the health and safety of

6   women.  And I would point out that *Hellerstedt* reaffirmed what

7   the Supreme Court said way back in *Roe v. Wade*, which is the

8   state has an interest, not just in promoting women's health and

9   safety, but ensuring maximum safety in the provision of

10  abortion procedures.

11         Turning to Your Honor's point, I would point out,

12  again, that the 2017 Jones and Jerman study pointed out that

13  the overall national abortion rate declined by 13 -- I believe

14  it's by 13 percent, so about 12 percent between 2011 and 2014.

15  In that period, the number of operating clinics in Missouri

16  fluctuated from four to one, and the overall decrease in the

17  abortion rate in Missouri was 12 percent.  So the empirical

18  evidence shows that Missouri went from having four clinics,

19  which is what these plaintiffs want their injunction to effect,

20  to one clinic, and in that period, Missouri -- the abortion

21  rate in Missouri actually declined less than national averages.

22  It's compelling statistically.

23         I would reemphasize that the state has an interest

24  in ensuring the maximum safety in the provision of abortion.

25  And I would return to the point I started with, that the

1  injunction they actually seek is so overbroad, it would impose

2  a complete regulatory blackout on the actual health and safety

3  regulation of abortion by the Department of Health and Senior

4  Services, and I would urge Your Honor not to grant relief.

5          THE COURT:  Perhaps I ought to make a comment that

6  you and I have been talking about some statistics that make it

7  hard to understand what effect closing clinics would have, but

8  there are also records, I think, from Georgia and Texas that

9  have been interpreted as showing that has a great effect.

10          MR. SAUER:  I can address those studies, if you

11  like, Your Honor.  I would just point out that, in particular

12  in Texas, the Grossman studies from Texas -- the Grossman

13  studies fail to control for the fact that there was already a

14  strong downward trend in the abortion rates.  They confuse

15  correlation with causation.  And the second Grossman study,

16  which is the stronger study, in my view, the one that has --

17  like paints the counties darker to show the decline in the

18  abortion rate, that's a study that fails to take into account a

19  number of factors that may have explained the abortion rate in

20  those particular -- the decline in abortion rate in those

21  particular counties.

22          In contrast is that the -- I'm sorry.  The Jones and

23  Jerman studies considered national trends that generalize

24  across the country.  They're not dependent on the specific

25  Texas geography and topography and particularly huge travel

1 distances in a state the size of Texas.

2          THE COURT:  You remember -- I don't suppose you

3 remember any criticism relating to the study in Georgia, I

4 think that's been cited as --

5          MR. SAUER:  I do, Your Honor.  Dr. Solansky, one of

6 our experts, addressed that in one of his affidavits.  He

7 pointed out that the Georgia study suffers from at least two

8 deficiencies.  One is that it's dated 1976, so it's based on

9 data that's immediately after *Roe v. Wade*.  So it's looking at

10 a population that had different access to travel, different

11 access to listings of abortion providers, different social

12 attitudes towards abortion.  In other words, it's -- the study

13 is so remote in time that it's potentially obsolete.

14          Secondly, he pointed out that that

15 study categorically omitted consideration of two abortion

16 providers in rural Georgia.  So it was assuming that everyone

17 that was getting an abortion in Georgia was doing it at --

18 22,000 abortions was doing it at the Atlanta clinics and

19 analyzing travel distance on that basis when, in truth and

20 fact, 10 percent of the abortions in Georgia were being

21 performed at rural clinics that were completely omitted from --

22 2,200 abortions, roughly, completely omitted from consideration

23 in that study.

24          So it's an old study.  It has grave methodological

25 weaknesses.  The recent Jones and Jerman studies are far more

1  persuasive on this point.  As is Dr. Solansky's statistical

2  analysis, which points out that there's a statistical

3  correlation.  In other words, how do you predict what the

4  abortion rate is in Missouri, how do you predict what it is

5  nationwide.  The strongest predictor is the year, which means

6  that whatever the causes for the downward trend do not respond

7  to fluctuations in the number of clinics.

8          THE COURT:  Do abortion records reflect what might

9  be felt are illegal abortions, that is, completely

10  unprofessional activity that causes abortion?  Is there any way

11  of keeping records on that?

12          MR. SAUER:  Not to my knowledge, Your Honor.  None

13  of the studies I have seen purport to provide any empirically

14  sound data as to how much is going on in the dark, so to speak,

15  or through what the plaintiffs' expert has described as the

16  shoddiest operators.  And, again, I would emphasize that's a

17  strong reason not to engage in this injunction.

18          THE COURT:  I can't imagine what kind of records

19  they have on things of that sort.  But --

20          MR. SAUER:  But I would point out the *Chicago*

21  *Tribune* study of 2011 that's cited in one of our experts'

22  affidavits where it was found that there was significant

23  underreporting of abortion complications, which, like in

24  Missouri and Illinois, was required by law, that reporters

25  discovered that almost 4,000 abortion complication reports were

1  completely missing.  That is an interesting result because it

2  corresponds with what our preliminary assessment is as to the

3  status of reporting in the state of Missouri.  Substantial

4  underreporting, unreported abortion complications.

5         Your Honor, if you have no further questions, I'll

6  step aside.  Thank you very much, Your Honor.

7         THE COURT:  And I haven't forgotten the prosecutors,

8  if they want to say something, but go ahead.

9         MS. COHEN:  Your Honor, do you want to --

10        THE COURT:  No, go ahead.

11        MS. COHEN:  Your Honor, I'd like to address a few

12  points raised by Mr. Sauer, and I'll start where Mr. Sauer

13  ended, which is on effects.

14        Your Honor, Mr. Sauer is incorrect that the

15  empirical evidence shows that access to abortion is not

16  affected by the loss of clinics.  Defendants in this case have

17  looked at the overall abortion rate in the state in order to

18  argue that the loss of providers has not burdened women.  But

19  this, Your Honor, is the wrong legal analysis.

20        The Supreme Court has been clear since *Casey*, and it

21  recently reaffirmed in *Whole Woman's Health*, that the correct

22  group of women to look at when assessing the burden of abortion

23  restriction is the women for whom the restriction is relevant.

24  So, Your Honor, Dr. Solansky, the defendants' expert, talks

25  about driving distances for all women of reproductive age in

the state.  For women who don't seek an abortion at all and for
women who happen to live near St. Louis, the restrictions are
not relevant, so this is the wrong group of women.  It's also
the wrong group of women to look at the overall abortion rate
in the state because that includes women who have easy and
local access to abortion providers.

I think there's actually an agreement, Your Honor,
between defendants' experts and plaintiffs' expert, Dr.
Henshaw, that it's true that the overall number of clinics in a
state does not correlate directly to the overall abortion rate
in the state, and that's because a clinic may close near one
that remains open, and so that does not affect women's travel
distance.  Some providers only provide a few abortions a year,
and, if they close, it does not affect the overall rate in the
state.

But regardless, the overall rate is simply the wrong
thing to be considering.  The correct thing to be considering
is women who live in or near communities that would have an
abortion provider, but for the restrictions.  And when that
correct group of women is examined, as the Supreme Court
requires under *Whole Woman's Health*, it's clear that those
women are significantly burdened.

The studies that Dr. Henshaw relies upon look at
those kinds of situations where women in a particular community
are affected because there's a loss of abortion access, and

1  those studies show that that situation affects them

2  significantly.

3        So, for example, Dr. Henshaw has said that an

4  additional driving distance of 100 miles will prevent 20 to 25

5  percent of women who would have obtained an abortion from being

6  able to do so.

7        THE COURT:  I think there was a calculation of 7

8  percent of the state seemed to be affected by reduction in

9  calculation by your expert, which itself seems to be less than

10  one can understand.  But go ahead.

11        MS. COHEN:  Yes, Your Honor.  I think, again, the

12  overall abortion rate in the state, all of the experts agree

13  that that's not a great indicator and that you really need to

14  look at the women in particular geographic areas that are

15  affected.

16        And I just want to quickly respond to Mr. Sauer's

17  criticisms of the studies that Dr. Henshaw relies upon.  Dr.

18  Henshaw submitted a rebuttal declaration with plaintiffs'

19  sur-surreply that explains that those studies are, in fact,

20  valid.  The Georgia study, for example, he explains that the

21  age of the study is irrelevant because, while some things have

22  changed that have increased access to abortion, other things

23  have changed that have made access to abortion more difficult.

24  So, for example, the women who seek abortion in the U.S.

25  currently are far more poor than women who sought abortion in

1  the 1970s, so have a far more difficult time traveling to

2  access abortion providers.

3        So, Your Honor, the bottom line is just that the

4  defendants are applying the wrong legal analysis here, and when

5  the correct legal analysis is applied and the studies that Dr.

6  Henshaw relies upon are considered, it's clear that there is a

7  substantial burden on women.

8        And one other important point, Your Honor, is

9  defendants are only focusing on women who are prevented

10 altogether from accessing abortion.  Those abortion rates don't

11 tell us anything about the significant proportion of women who

12 are delayed in accessing abortion because of the long distances

13 that they need to travel.  And, in fact, defendants have

14 submitted no evidence at all in this case to refute that

15 evidence that plaintiffs have submitted that shows that the

16 distances delay women, and that causes abortion to be pushed

17 later in pregnancy, which increases the risks of the procedure.

18 An abortion that's pushed later in pregnancy may get pushed

19 into the second trimester, and a woman may have delay that

20 causes her to be past the gestational age where she could have

21 a medication abortion and she's forced to have a physical

22 procedure instead.  And so there's a whole other set of burdens

23 here that the defendants have just failed to address

24 altogether.

25        Your Honor, turning to defendants' arguments

1  regarding the safety of abortion, Your Honor, the defendants

2  are just wrong on the safety point.  They keep saying over and

3  over again that abortion in Missouri is unsafe, but the

4  evidence just does not bear that out.  The discovery produced

5  by plaintiffs regarding the complication rates at RHS show that

6  abortion is extremely safe there, that the rates of

7  complications are extremely low, and that there's no factual

8  difference here in Missouri between -- there's no factual

9  difference here that would counsel this Court to depart from

10  *Whole Woman's Health's* conclusions on safety in any way.  The

11  state keeps saying there's underreporting going on in the

12  state, but there's just no evidence of that, and saying it over

13  and over again just does not make it true.

14          Secondly, the safety point is, in a sense, a little

15  bit beside the point because it doesn't -- defendants have to

16  show that the restrictions at issue in this case benefit

17  women's health, and that they have not done.  They've said

18  multiple times, and Mr. Sauer said again today, that it

19  benefits women's health, but they've never explained how,

20  except to reiterate some arguments that the Supreme Court has

21  already rejected.

22          Mr. Sauer says today that there's a consensus that

23  gynecological procedures ought to be done in ambulatory

24  surgical centers, but that's just incorrect.  In fact, the

25  American College of Obstetrics and Gynecology, which is the

1   leading obstetrics and gynecological professional organization

2   does not require that abortions be performed in ASCs.

3          Abortions are very different from the other surgical

4   procedures that Mr. Sauer addressed here today.  They're not --

5   they don't involve an incision, they don't involve any deep

6   sedation, and many abortions are provided with just oral

7   medication.  And defendants throughout these proceedings so far

8   have not presented any argument, either here today or in their

9   papers, that medication abortion -- that there's any reason for

10  medication abortion to be provided in an ambulatory surgical

11  center.

12         Mr. Sauer also argued that the expert evidence in

13  *Whole Woman's Health* was one side and that's another reason why

14  Your Honor should depart from the *Whole Woman's Health*

15  decision.  But that's incorrect.  The evidence in this case

16  shows that all the credible studies have found that abortion is

17  very safe.  Defendants' experts rely on studies that are about

18  different things altogether or from different countries, and we

19  know that they don't apply to the United States.  But even some

20  of the defendant -- studies that defendants cite that are

21  actually reliable, those are the very same studies that the

22  Supreme Court relied upon when it found that abortion is, in

23  fact, extremely safe.

24         In addition, Your Honor, Mr. Sauer says that

25  plaintiffs are asking for a regulatory blackout here, and that

1   could not be further from the case.  First of all, as I've

2   already discussed today, abortion is incredibly closely

3   regulated in Missouri, and plaintiffs here only challenge the

4   ambulatory surgical center and hospital relationship

5   restrictions.  Mr. Sauer talked about a number of other

6   restrictions that plaintiffs don't challenge and that will

7   remain in place.  The requirement that only physicians may

8   provide abortions in Missouri, the various reporting

9   requirements, mandatory reporting around minors, that's all

10  remaining in place, and plaintiffs are not challenging those

11  requirements.

12          In terms of requirements in Texas, so in Texas,

13  there were some underlying regulatory schemes in place before

14  the state passed the ambulatory surgical center requirement.

15  Mr. Sauer is correct that those regulations do remain in place

16  in Texas, but that's because they were not challenged in *Whole*

17  *Woman's Health*, and the court had no occasion to comment on

18  whether or not they have any benefit.

19          Plaintiffs here are not arguing that Missouri should

20  not be able to regulate abortion.  The state is free to pass a

21  constitutional regulatory scheme; however, it's clear under

22  *Whole Woman's Health* that the ambulatory surgical center

23  restriction is unconstitutional and that they cannot regulate

24  abortion in that way.

25          Just a couple of housekeeping matters, if Your Honor

1  doesn't have any further questions.  I want to go ahead and

2  provide that citation to the Arkansas case that's currently

3  before the Eighth Circuit that is reviewing -- is addressing

4  some similar issues.  That case is *Planned Parenthood v.*

5  *Jegley*, and the case number in the Eighth Circuit is 16-2234.

6  The district court decision in that case that preliminarily

7  enjoined the statute at issue is reported at 2016 WL 6211310.

8        THE COURT:  To the extent I'm not making notes, it's

9  because it's all supposedly written down here, and I'll be able

10  to look at it later.

11        MS. COHEN:  Yes, I'm with you, Your Honor.  So, Your

12  Honor, in conclusion, the current law in Missouri, the

13  ambulatory surgical center requirement and the hospital

14  privileges requirement, significantly burden access to abortion

15  with zero medical benefit and, under *Whole Woman's Health*, they

16  simply cannot stand.  Thank you.

17        THE COURT:  Thank you.  And I guess you traveled

18  further than anyone, so I thank you for that.

19        Do any of the attorneys for the prosecutors wish to

20  be heard?

21        MR. MYERS:  Todd Myers for Defendant Patterson.  I

22  don't wish to be heard, Your Honor.

23        MR. ROUSE:  Norman Rouse for Theresa Kenney.  I

24  don't need to be heard.  Thank you, Your Honor.

25        MR. WILLINGHAM:  Travis Willingham for Jean Peters

1 Baker, and I think I had the shortest amount of travel for

2 this.  I have nothing.

3          THE COURT:  All right.  I will take the preliminary

4 injunction issue under advisement, and I have advised counsel I

5 would consider any filing by Friday the 31st, and I'm not

6 urging that there be anything substantial filed.  I would

7 repeat that I would hope that you keep it as short and simple

8 as possible because, if not, why, we'll be getting into more

9 issues of wanting to respond.  But I will take this under

10 advisement at this time.

11          (Hearing adjourned.)

12                         - - -

13                         - - -

14                      <u>CERTIFICATE</u>

15          I certify that the foregoing is a correct transcript

16 from the record of proceedings in the above-entitled matter.

17

18

19  March 22, 2017

20                              /s/_____
                                Kathleen M. Wirt, RDR, CRR
21                              U.S. Court Reporter

22

23

24

25