IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

COMPREHENSIVE HEALTH OF PLANNED )
PARENTHOOD GREAT PLAINS, et al. )
                                                                           )
                      Plaintiffs,      )
                                                                    )
v.                                                    )    Case No. 2:16-cv-04313-HFS
                                                   )
DR. RANDALL WILLIAMS, in his official )
capacity as Director of the Missouri )
Department of Health and Senior Services, )
et al., )
                                                   )
                      Defendants.    )

## **MEMORANDUM AND ORDER**

      Planned Parenthood organizations in Kansas City and St. Louis that divide the State, together with a doctor seeking to perform abortions, have filed motions for a preliminary injunction. They ask for relief from two varieties of statutory and regulatory restriction, imposing (1) a hospital admitting privileges requirement on doctors and (2) an ambulatory surgical center (ASC) requirement on clinics. The challenges here are designed to invoke successful challenges in Texas. Whole Woman's Health v. Hellerstedt, 136 S. Ct 2292 (2016). The Missouri State defendants, Attorney General Hawley and Director Williams, newly appointed executive of the Department of Health and Senior Services, resist judicial relief, adopting positions asserted by the previous State Administration.

      Since the restrictions were imposed in 2007, abortion facilities in Missouri

[1]

have been intermittently confined geographically. At present, only St Louis has an operating facility. Abortion clinics in Overland Park, Kansas, and Fayetteville, Arkansas, are used by some Missourians. Central Missouri lacks ready access to such facilities and the Springfield - Joplin area is notably unserved.

This is not a contest over abortion rights as such. All parties must acknowledge that, until viability of a fetus, pregnant women and girls have had, for more than forty years, constitutionally protected rights to obtain abortions. The challenged restrictions were imposed purportedly as health measures for abortion patients. Both restrictions are said by plaintiffs to be unnecessary, useless, burdensome or impossible to achieve, so much so that they have been called Targeted Regulation of Abortion Provider laws (TRAP legislation). The Texas restrictions, challenged here, were so characterized in Justice Ginsburg's concurring opinion in <u>Hellerstedt</u>, 136 S.Ct. at 2321. As noted in my ruling denying dismissal of this case, "targeted regulation" is not an unknown concept in Missouri. An incoming State Senator was recently quoted as advocating regulation as "one avenue" to wholly eliminate abortions in Missouri. (Doc. 68, p. 5).

The Missouri State defendants contend, however, that the surgical center requirement can be justified as a health measure, that closed centers have not been statistically shown to reduce the rate of abortions, and that the hospital affiliation requirements are both reasonable and achievable, as in St. Louis. The State defendants further contend that the hospital affiliation requirement, invalidated by the Supreme Court, can be defended here because Missouri is more compact than Texas and they have new evidence of reasonableness not presented in the Texas case. With

respect to the surgical center requirement, although there is a statute specifying that abortion clinics shall be classified as Ambulatory Surgical Centers (§ 197.200(1) R.S.Mo.), there is a regulation in Missouri (19-CSR 30.30.070(1)), but allegedly not in Texas, allowing relief through deviations granted by the Department.[1]  The Department has allowed grandfathering of some surgical facilities that do not comply. The abortion clinic in Kansas City has been exempted by the Department when only medicinal abortions have been proposed.  And the Columbia facility has negotiated for some modifications in the regulatory requirements, although it required a lawsuit before this was achieved in 2010 and since that time there have been a number of disputes and alleged changes of position by the Department.

For reasons discussed below, I am granting a preliminary injunction against enforcing the hospital affiliation requirement (§ 197.215(2) R.S. Mo.; 188.080 R.S.Mo.; 188.027.1(1)( e) R.S. Mo.; and  regulation 19-30-060 (1)( c)(4))  for doctors performing abortions.  The Texas case clearly controls that ruling.  I am  also  granting  a  preliminary injunction against using the surgical center requirement, as the Supreme Court did, where the statutory and regulatory pattern is similar to that in Missouri.  Even if we assume the regulation permits the Director to disregard mandatory language of the statute and to use "physical facility" regulations no more onerous than are used for procedures performed in typical medical and dental offices, the surgical center rules have not been withdrawn by the Department during the months after the Texas ruling, and the new Director's filings here belie the prospect of his granting relief voluntarily. The principal argument of the State defendants is that, contrary to the conclusions of the Supreme Court, abortions are sufficiently dangerous to pregnant women so that surgery center requirements are

---

[1] The Hellerstedt majority noted, however, that "full or partial waivers" are possible in Texas.  136 S.Ct. at 2308.

appropriate. Thus it would be fruitless to await regulation relief.

Moreover, taking into account the highly contentious political status of abortions, it would take a very hardy Director, even if not personally opposed to pre-viability abortion rights, to agree voluntarily to establishment of abortion clinics in Springfield or Joplin that would be out of compliance with ASC standards. I am therefore satisfied that plaintiffs should have relief from such standards, as the Supreme Court mandated, and that relief should be prompt, given the needs of women seeking abortions and the need for available clinics to serve their needs. Without the guidance of a favorable ruling here it seems inevitable that the establishment of new clinics would be unduly delayed.[2]

1. Hellerstedt Controls

Filings of the parties have added voluminous material to the record, largely directed toward the issue of dangerousness of abortions. Surgery center requirements are needed for safety, according to the State Defendants. (Doc. 84). Plaintiffs argue, correctly I believe, that because the Supreme Court has spoken on this subject I am required to follow. The Court noted that childbirth has a mortality rate 14 times that of abortions, and that colonoscopies, for example, have a mortality rate 10 times higher. 136 S.Ct. at 2315. The Court found that "in the face of no threat to women's health" Texas unreasonably required them to travel to distant surgery centers, "superfacilities." Id. at 2318. There were three dissenters, two of whom filed outspoken opinions, but the dissenters did not take issue with the majority on the question of abortion safety. In that respect, the ruling was 5 to zero.

---

[2] The Texas decision expresses the hope that details of clinic design and requirements will not become judicial issues. Thus, I should go as far, but not farther, than the Supreme Court did in rejecting surgery center requirements as a package.

[4]

For me to accept new material, copies of studies and expert opinions, and to find a greater safety problem than was found in Hellerstedt, would be impermissible judicial practice. Lower court judges are bound by Supreme Court precedent even if they seriously question what the Court has done. MKB Management Corp. v. Stenehjem, 795 F.3d 768 (8th Cir. 2015). The lower federal courts cannot second-guess the Supreme Court regarding "underlying facts." Id. at 772. Defendants cite no authority for what they ask, although they observe that the Missouri Supreme Court did reappraise the issue of teenage capital punishment in advance of the High Court's ruling in Roper v Simmons, 543 U.S. 551 (2005). Although the Court majority agreed with the Missouri Supreme Court, Justice O'Connor's dissent criticized the Missouri Court's practice, saying it was her Court's "prerogative alone to overrule one of its precedents." She cited State Oil Co. v. Khan, 522 U.S. 3, 20 ( 1997).

The State Defendants' contention that I should reappraise the abortion safety issue, after the very extensive advocacy on both sides in Hellerstedt, would be like attempting to undermine Brown v. Board of Education, 347 U.S. 483 (1954), based on a Missouri school district contention that the effect of segregation was better understood in Plessy than in the Brown case, or that racial segregation in Missouri is more benign than elsewhere.

Hellerstedt's factual conclusions were not confined to Texas. The majority relied on Wisconsin and Alabama case-law (136 S.Ct. at 2312) and amicus briefs and materials unrelated to Texas. It is of course true that Hellerstedt, like Roe v. Wade, might someday meet the fate of Plessy v. Ferguson, but only the Supreme Court could reach that result. The filings are of interest, and have been studied to the extent feasible and appropriate,

but cannot support a ruling inconsistent with Hellerstedt.³

2. Hospital Affiliation Requirement

Various Missouri statutes, including criminal prohibitions, mandate that a doctor cannot perform an abortion in a clinic unless he or she has hospital privileges at a nearby hospital, within 30 miles of the clinic. Regulations tighten the requirement to distances within fifteen minutes of the clinic, which raises questions regarding Kansas City.

In Hellerstedt, however, the Supreme Court found "no significant health-related problem that the new (hospital affiliation) law helped to cure." 136 S.Ct. at 2311. At oral argument in the Supreme Court Texas counsel acknowledged that he could not cite "a single instance in which the new requirement would have helped even one woman obtain better treatment." Id. at 2311-12. The Court noted that similar admitting-privileges laws in Wisconsin and Alabama had been ruled useless, from a health standpoint. The Court also found the requirement disabling for almost all abortion practitioners for various reasons unrelated to competency, and places a "'substantial obstacle in the path of a woman's choice.'" Id. at 2312 (*citing* the plurality opinion in Casey, 505 U.S. at 877). The Court also reviewed the closing of clinics, apparently caused by the absence

---

³ Taking the liberty indulged in by the MKB judges, I am struck by a considerable increase in danger in the immediate weeks before viability. "Abortion-Related Mortality" article (2004) by Linda A. Bartlett (Doc. 86-2, p. 9). This reaffirms the view of the Hellerstedt majority that abortions in the earlier weeks are extremely safe, but does create possible questions concerning the final several weeks before viability. The category of risk at that later time may still be considered very low – perhaps somewhat closer to childbirth and colonoscopies. Studies that do not separately analyze these two divergent periods of pregnancy may seem defective. Since the great majority of abortions occur many weeks before viability this observation seems to confirm the practice mandated by Hellerstedt, but would leave for further study appropriate health regulations during the last few weeks.

[6]

of doctors who could meet the affiliation requirement. Without confining its appraisal to Texas, the Court ruled that "the admitting-privileges requirement does not serve any relevant credentialing function." Id. at 2313.

Hellerstedt also discussed the burden that closing of convenient clinics has on persons seeking abortions. From the record in that case it recited that many tens of thousands of women would be forced to travel more than 150 miles to find an open clinic if seeking an abortion, and a great number would travel over 200 miles. It is true that increased driving distance does not "always" constitute an "undue burden," as noted in Casey, but the Hellerstedt Court said the "the virtual absence of any health benefit" from the hospital affiliation requirement was a factor to be weighed in making an undue burden ruling. Id. at 2313. Balancing is therefore required. Id at 2309. This necessarily means that the burden to be considered undue is greatly reduced as a requirement as the benefit from the regulation becomes miniscule, if any. West Alabama Women's Center v. Miller, 2016 WL 6395904, *4 (M.D. Ala.) (and citations).

In Casey a waiting period was ruled to be an appropriate benefit to society, like a waiting period before a serious act comparable to marriage. Nothing like that benefit exists here. Minimization of the distance-burden issue is dramatized by the Court's holding that forcing El Paso residents to travel to New Mexico was invalid when the surgical center requirement was deemed of slight if any value. Id. at 2304. Although the Court was not explicit, I doubt that the state line crossing was the most critical aspect of the ruling.[4] In the abortion context, unlike professional education, a state line has little

---

[4] Members of the Court would have been aware that Las Cruces, New Mexico, is quite near El Paso (less than 50 miles), and if abortion facilities were not presently available there the provision of such facilities in Las Cruces, as in other sites in New Mexico, presumably would be feasible. If traveling 150 miles is an acceptable burden in waiting

[7]

practical significance.

This case is not a close one in any event, as the absence of a clinic in Central Missouri requires hundreds of miles of travel, round-trip, with two trips needed unless a woman has the means and time available for a long stay in St. Louis or other rather distant clinics. Compare the excessive travel burden for women in Tuscaloosa, discussed in West Alabama, supra, * 9. The lesson of Hellerstedt thus requires an undue burden conclusion when, as here, major travel is needed, because the hospital affiliation requirement has made it practically impossible to continuously staff an abortion clinic in Columbia.

Defendants make an argument, based on some statistical curiosities, that the reduced number of clinics may have minimal effect on the number of recorded abortions. Counsel concedes, candidly and commendably, that his contention is "counter-intuitive." Plaintiffs have offered the contrary declaration of Dr. Sheila Katz, convincingly stating sociological realties consistent with what can be judicially noticed. (Doc. 15-5). Not claiming expertise in statistics, I can suppose the major fallacy of the statistics relied on (which are inconsistent with other statistics)[5] is that they are generally State-wide in nature, not focused on a major area of concern, such as Central Missouri. A fall-off in professionally-handled abortions in a locale seems almost certain when there is no

---

period cases I would suppose implicit in the Hellerstedt ruling would be a supposition that a 50 mile trip is an excessive burden for restrictions which confer little or no benefit.

[5] As one might expect, the statistical argument seems to be contrary to a study published in January in the Journal of the American Medical Association and a Research Brief at the University of Texas, deposited in February, which tend to show a significant drop-off in reported abortions when travel distance to clinics is increased by 25 miles, and a much more notable drop when distances are increased as much as occurs when the Columbia, Missouri facility is closed. Grossman, White, Hopkins & Potter (2017) Change in distance to nearest facility and abortion in Texas, 2012 to 2014, JAMA 317, 437-439; Grossman, White, Hopkins & Potter, J.E. (2017); How greater travel distance due to clinic closures reduced access to abortion in Texas. PRC Research Brief 2(2). (Doc. 86-6).

convenient place to go. In that sense the hospital affiliation requirement probably <u>creates</u> health hazards for women. No one has rebutted Dr. Katz regarding human behavior expectations.

In oral argument, the State defendants' counsel argued against a state-wide injunction if the travel burden was imposed mostly harmfully on women living in central Missouri (Doc. 78, p. 52). Apparently he was asking that the court limit relief to a circle of counties with boundaries established somewhat arbitrarily by the court. No authority is cited for such a limitation of relief. It would compromise the difference between a facial challenge like this one and an "as applied" challenge. <u>Hellerstedt</u> imposed state-wide relief and I am bound to do so here. If anything, the area of impact here covers more of the State of Missouri than occurred in Texas. The dissent by Justice Alito refers to the point advocated for defendants here and failed to persuade a majority of the Court. 136 S.Ct. at 2349-2350.

3. Arkansas Case

The second authority that has a bearing on the result here is the pending decision by a panel of the Eighth Circuit in the argued and submitted case, <u>Planned Parenthood of Arkansas v. Jegley</u>, No. 16-2234. On appeal is Judge Baker's ruling in <u>Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley</u>, 2016 WL 6211310 (E.D. Ark.). The trial and opinion below preceded <u>Hellerstedt</u>, and reached the same result on preliminary injunction, invalidating a requirement slightly less onerous than the hospital affiliation requirement here and in <u>Hellerstedt</u>. Arkansas had a "contracted physician requirement" rather than a direct hospital affiliation requirement. As very plausibly

found by Judge Baker, the Arkansas statute was both unnecessary and close to prohibitory in its result, essentially for reasons later stated in <u>Hellerstedt.</u> While that may be a slightly more difficult case than this one (and of course required a great deal more work), I agree with the opinion and result. If affirmed by the Circuit, that would seem to require invalidation of Missouri's hospital affiliation requirement.[6]

4. Ambulatory Surgical Center Requirement

Abortion clinics in Missouri are currently required by statute to comply with requirements imposed for Ambulatory Surgical Centers (ASCs); that is, they must have facilities suitable for significant surgery. Wide hallways are notably required, to facilitate moving of still unconscious patients lying on gurneys. Requirements are imposed because of special sterilization needs of patients undergoing incisions. Normal medical and dental office facilities, with strict cleanliness requirements, cubicles for medical procedures, limited staffing requirements, etc. are not considered adequate for ASCs. Abortion clinic objections to ASC status are founded on the very considerable cost of compliance – perhaps $3 million for either remodeling or building new clinics – and the lack of need because of the absence of incisions, the use of limited anesthetics rather than general anesthesia or deep sedation, and the modesty of the procedures used. It has been repeatedly asserted by plaintiffs' counsel, without contradiction, that first

---

[6] A procedural quirk in <u>Jegley</u> is that plaintiffs sued two prosecutors to prevent enforcement of the Arkansas law, and the district judge also enjoined them "from failing to notify immediately all state officials responsible for enforcing the requirements."

trimester abortions, the bulk of abortion clinic activity, generally take four to five minutes to complete.[7]

The statute, enforced according to its terms, would require the Kansas City clinic to gird itself with the full panoply of ASC features even though medicinal abortions are exclusively used in Kansas City. This is one area of abortion regulation where exemptions have been granted in the past, but the future is unpredictable, with a new Director subject to political pressure from abortion opponents in the General Assembly and elsewhere, and the unqualified mandatory statute remaining on the books.

Hellerstedt invalidated the entire ASC package of restrictions for abortion clinics in Texas, without evaluating specific requirements. 136 S.Ct. at 2314-2318. An undue burden of costliness, when balanced against benefits, is clearly imposed in Springfield and Joplin according to the lesson of Hellerstedt.[8]

The lack of necessity and "nearly arbitrary" imposition of ASC requirements, as found in Hellerstedt (136 S.Ct. at 2316), adequately establishes that these plaintiffs are very likely to receive relief. There has also been some debating and inquiry about

---

[7] It will perhaps have been noted that the background facts in this case are essentially uncontroverted at this time. The disputed issues regarding safety and the alleged benefits of ASC and hospital affiliation requirements have been presented by expert declarations and published studies. They need not be dealt with, I conclude, because controlled by Hellerstedt.

[8] The focus has now shifted to Southern Missouri, where abortion clinics would be made available under the auspices of the St. Louis organization. The St. Louis clinic itself satisfies ASC requirements and was described by defendants' counsel as "the safest the state can make an abortion facility." (Doc. 78, p. 46). The Columbia clinic has been modeled under the Settlement Agreement of 2010, but is crippled by the absence of doctors with hospital affiliations. The Kansas City clinic has been operational in the past, but the facilities there and in Columbia reportedly have some minor physical issues before licensing. Those are not my concern, at least at this time. The Department is free to use any normal, nondiscriminatory licensing and inspection activities.

whether abortion clinics in Missouri are the victims of discriminatory treatment, by being required to provide accommodations and facilities not required for medical procedures of a comparable nature. The record is not clear enough on some points to make findings. I note, however, that I still have questions about whether miscarriage treatment and intrusive gynecological examinations, which both seem similar to abortions, particularly early term abortions, are subject to ASC requirements. Colonoscopies have ASC requirements where they constitute more than 50% of a medical practice. But if four and five minute first trimester abortions could not be fairly characterized as significant surgery (what used to be called "operations"), that would require all abortions to be exempted, since those early term abortions constitute the bulk of abortion practice in the St. Louis clinic, and presumably elsewhere under the same auspices. It would surely be an invidious discrimination against abortion clinics if the 50% rule used for other procedures were not used in that context. Yet the statute is operable when there are only five first term abortions. On this issue see footnote 9, infra.

5. Miscellaneous Issues

   A. Preliminary Injunction requirements

The familiar requirements for a preliminary injunction, as set forth in <u>Dataphase Systems Inc. v. CL Systems Inc.</u>, 640 F.2d 109 (8th Cir. 1981) are easily met in this case. The issues include a plaintiff's probability of success and irreparable injury absent the injunction. The court must also consider harm to other interested parties if the relief is granted, and factor in the effect on the public interest. In this case, because of

Hellerstedt and plaintiffs shaping their claim on that controlling case, their likelihood of success is very high. The ability to function as abortion clinics and to perform abortions is crippled in Columbia, Springfield and Joplin, and to some extent in Kansas City, by reason of the statutory and regulatory hospital affiliation requirement for doctors. Especially in Springfield and Joplin, but to a lesser extent in Columbia and Kansas City, the ASC (surgery center) requirement imposes burdens that have closed or prevented development of clinics. Prompt relief from the requirements that Hellerstedt ruled invalid would not harm defendants. While the State Defendants assert harmful deregulation going beyond what is required, I am seeking the assistance of counsel in shaping an order which minimizes collateral damage. The Supreme Court's directive that the ASC requirement be invalidated as a package, rather than engaging in severance, may necessarily result in some temporary elimination of useful requirements, harmless to plaintiffs. Without considering the judgment proposal, it would seem that the pre-2007 regulation of offices of doctors and dentists, not included as surgery centers, should suffice.

The failure to act promptly in this case would seriously frustrate the opportunity to open clinics in Springfield and Joplin and the restoration of clinical service in Columbia and Kansas City. The abortion rights of Missouri women, guaranteed by constitutional rulings, are being denied on a daily basis, in irreparable fashion. The public interest clearly favors prompt relief.

I am aware that caution is to be exercised in altering the status quo during litigation and that mandatory preliminary injunctions are not favored. A mandatory injunction is not needed. I would suppose the status quo in this case was changed by the Supreme

Court in Hellerstedt, and the danger to the status quo is being posed by defendants, insofar as they would try to enforce statutory and regulatory provisions that are inconsistent with the Texas ruling. Preliminary injunctions against the operation of invalid State laws are often appropriate. Fish v. Kobach, 840 F.3d 710 (10th Cir. 2016); Jane Doe v. Mundy, 514 F.2d 1179 (7th Cir. 1975) (an early abortion case). A recent local case denying relief notes that a preliminary injunction that is both mandatory and disruptive of the status quo can properly be granted when the factors considered weigh heavily and compellingly in favor of the movant. Real Time Pharmacy Services, Inc. v. Express Scripts, Inc., 2017 WL 1196485 (E.D. Mo.) (citing Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)). If that heavy burden were applicable, plaintiffs have met it. Further delay would be unacceptable.

B. Collateral Harm

At oral argument the State Solicitor gave first priority to the possible collateral damage of a ruling against the State Defendants. I have invited counsel to suggest a proposed order minimizing that problem. By reason of Hellerstedt, however, which warns against district judges getting unnecessarily involved in regulatory detail, there are limits to how narrowly I can confine my order, but I await a proposal or proposals within ten days.

C. One plaintiff's Settlement Agreement

The Kansas City organization, but not the St. Louis organization or the plaintiff physician, sought to litigate various aspects of the 2007 statute which imposed surgical

center standards on abortion clinics having material activity. Without benefit of Hellerstedt or more recent experience with targeted regulation of abortion clinics, Judge Smith filed a mixed ruling on application for a preliminary injunction and urged the plaintiffs and Department of Health and Senior Services to work together to develop feasible plans for the physical requirements and operation of clinics in Kansas City and Columbia. Planned Parenthood of Kansas and Mid-Missouri, Inc. v. Drummond, 2007 WL 2811407 (W.D. Mo).[9] Negotiations finally produced a Settlement Agreement in 2010. (Doc. 27-1). The State Defendants contend that this agreement is a bar to relief, at least in favor of the Kansas City plaintiff.

Briefing on this issue has been fitful, given the limited effect of a ruling on this point in favor of the State Defendants. It is obviously not a bar to relief that would advance the prospect of abortion clinics in Springfield and/or Joplin, sponsored by the St. Louis plaintiff. Those prospective clinics have the greatest needs for eliminating the surgery center requirement. The Columbia and Kansas City clinics seem in most need of physicians who are not crippled by the hospital affiliation requirement, and thus the

---

[9] The Drummond ruling expresses some skepticism concerning plaintiffs' then-novel reference to an equal protection issue. After anti-abortion regulation became more ubiquitous, however, Judge Posner observed that an "issue of equal protection of the laws is lurking in this case. For the state seems indifferent to complications from non-hospital procedures other than surgical abortion . . . even when they are more likely to produce complications." Planned Parenthood of Wisconsin, Inc. v. Van Hollen, 738 F.3d 786, 789 (7th Cir. 2013). The Hellerstedt majority opinion emphasizes disparate treatment, a subject dealt with in many of the filings here. The Court majority is now scrutinizing closely how protected but often unpopular abortion activity is being "targeted" by legislatures in many States. The Thomas dissent in Hellerstedt complains of this heightened scrutiny. 136 S.Ct. at 2329. It seems likely, however, that this approach was a major factor in moving Justice Kennedy toward a protective ruling, given his record of special sensitivity to discrimination against unpopular groups and protected activities. See, e.g., Romer v. Evans, 517 U.S. 620 (1996). This aspect of Hellerstedt may have produced the strongest ruling protecting abortion rights in decades, as Justice Thomas has characterized it. Id. at 2326.

plaintiff physician has the primary need for injunctive relief from that requirement. I am thus not compelled to make a definitive evaluation of the Settlement Agreement in advance of granting a preliminary injunction.[10]

D. Prosecuting Attorneys

The defendant prosecuting attorneys appearing at argument declined an opportunity to participate. Enjoining the prosecutors, as was done in Jegley, is unusual when the likelihood of prosecution is remote. Judicial notice, however, is taken that abortion clinic activity is controversial and that opponents of abortion may well urge prosecutors to enforce the law, as it appears in the statute books. A precautionary injunction is therefore useful here. The preliminary injunction, when issued, will be applicable to all defendants except the Attorney General, who should not be enjoined, according to Reproductive Health Services of Planned Parenthood of the St. Louis Region Inc. v. Nixon, 428 F.3d 1139 (8th Cir. 2005).

E. Security

As is customary in cases of this nature, where plaintiffs are serving a public interest, the Planned Parenthood entities are not-for-profit organizations, and the governmental

---

[10] It may be worth noting that the 2010 agreement on its face was primarily intended to resolve physical requirements for existing clinics and questions about the amount of attorney's fees of plaintiffs for which the defendants became responsible. There was an incidental release of defendants and "any current or former employee" from liabilities which the Kansas City organization has or "which may hereafter accrue" regarding "licensure of the Columbia and (Kansas City) centers." Whether future officials would be protected and how long the protection might last seem questionable. Superior Concrete Accessories Inc. v. Kemper, 284 S.W.2d 482 (Mo. 1955). The 2010 agreement seems not to have been raised as a defense in litigation before Judge Laughrey regarding physician availability and licensing of the Columbia clinic. Planned Parenthood of Kansas and Mid-Missouri v. Lyskowski, 2015 WL 9463198 (W.D. Mo.)

[16]

entities will not be harmed by the order entered, security for costs and damages in the event the defendants are wrongfully enjoined will not be required.

In accordance with previous notice to counsel, it is therefore ORDERED that the motion for preliminary injunction (Doc. 14) is hereby GRANTED, and that counsel supply to the court, within ten days of this date, a proposed preliminary injunction order (or orders) effectuating the foregoing ruling, without prejudice to appellate rights the parties may wish to pursue. As previously noted, the principal objective of requesting drafts is to avoid unintended collateral harm from enjoining the surgery center requirement.

    /s/  Howard F. Sachs    .
    Howard F. Sachs
    United States District Judge

April 19, 2017
Kansas City, Missouri