IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD GREAT PLAINS, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:16-cv-04313-BCW |
| JOSHUA D. HAWLEY, in his official capacity as Attorney General of Missouri, et al. | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' SUGGESTIONS IN SUPPORT OF SECOND MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION AND EXPEDITED BRIEFING AND CONSIDERATION

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... I

TABLE OF AUTHORITIES ............................................................................................ II

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

   I.   Missouri's Repeated Efforts to Bar Abortion Access Through Medically Unnecessary
      Restrictions, and Resulting Litigation ............................................................... 3

   II.   The Columbia Health Center's Inability to Comply with the Privileges Requirement ...... 6

   III.  The Prior Preliminary Injunction and the Eighth Circuit's Limited Reversal ................... 7

   IV.  The Safety of Abortion ............................................................................... 8

   V.   The Privileges Requirement Is Medically Unnecessary .................................... 13

   VI.  The Privileges Requirement's Impact on Women in the Columbia Area ........................ 16

ARGUMENT .................................................................................................................. 17

   I.   Plaintiffs Are Likely to Prevail on the Merits of Their Claim ......................................... 18

     A.   The Privileges Requirement Does Not Benefit Patient Safety ..................................... 18

     B.   The Privileges Requirement Severely Burdens Columbia-Area Women Seeking
         Abortions ............................................................................................................... 22

   II.   The Remaining Factors for a Temporary Restraining Order or Preliminary Injunction
       Favor Plaintiffs ....................................................................................................... 24

   III.  Bond is Unnecessary .................................................................................. 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) ............................ 25

*Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, No. 17-1996, 2018 WL 4288362 (8th Cir. Sept. 10, 2018)........................................................................ 8, 10, 18, 24

*Comprehensive Health of Planned Parenthood Great Plains v. Williams*, 263 F. Supp. 3d 729, 733–34 (W.D. Mo. 2017)...................................................................................... 19, 22

*Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc).................... 17

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ................... 24

*Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1268 (N.D. Iowa 1995) ... 25

*June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 61 (M.D. La. 2017) ............. 19, 20, 21, 22

*Planned Parenthood of Ark. & E. Okla v. Jegley*, 864 F.3d 953, 959 (8th Cir. 2017) ................ 22

*Planned Parenthood of Ark. & E. Okla. v. Jegley*, No. 4:15-cv-00784-KGB (E.D. Ark. July 3, 2018) (preliminary injunction order) ................................................................ 19, 21

*Planned Parenthood of Kan. & Mid-Mo. Inc. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 WL 2811407 (W.D. Mo. Sept. 24, 2007).............................................................. 2, 4, 24

*Planned Parenthood of Kan. & Mid-Mo., Inc. v. Lyskowski*, No. 2:15-cv-04273-NKL, 2016 WL 2745873, at *2 (W.D. Mo. May 11, 2016) ...................................................... 6

*Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 912 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 2545 (2016) ................................................................... 19, 20, 21, 22

*Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015).... 21

*Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1364 (M.D. Ala. 2014) 19, 20, 21, 22

*Saint v. Neb. Sch. Activities Ass'n*, 684 F. Supp. 626, 628 (D. Neb. 1988) .................................. 25

*Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993) ................................................................................................................................ 17

*Springfield Healthcare Ctr., Inc. v. Nixon*, No. 05-4296-CV-C-NKL (W.D. Mo. September 16, 2005) ............................................................................................................................... 24

*Webster v. Reprod. Health Servs.*, 492 U.S. 490 (1989)............................................................. 3

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016) passim

*Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 684 (W.D. Tex. 2014) ........................... 19

## STATUTES

Mo. Rev. Stat. §188.021(2)........................................................................................................... 5

Mo. Rev. Stat. §188.027(1)(1)(e)............................................................................................... 1, 5

Mo. Rev. Stat. §188.027.6 ............................................................................................................ 5

Mo. Rev. Stat. §188.075 ............................................................................................................... 3

Mo. Rev. Stat. §188.080 ............................................................................................................ 1, 3

Mo. Rev. Stat. §197.200 ............................................................................................................... 1

Mo. Rev. Stat. §197.215 ............................................................................................................ 1, 3

## REGULATIONS

19 CSR 30-30.061........................................................................................................................ 5

43 Mo. Reg. 505, 624 (Mar. 15, 2018) ........................................................................................ 5

Mo. Code Regs. Ann. tit. 19, §30-30.060(1)(C)(4) ............................................................. 1, 3, 15

Mo. Code Regs. Ann. tit. 19, §30-30.070 ..................................................................................... 1

Tex. Health & Safety Code Ann. §171.0031 .............................................................................. 15

## INTRODUCTION

In May 2017, this Court (Sachs, J.) preliminarily enjoined two Missouri abortion restrictions virtually identical to those the Supreme Court struck down in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016). The Missouri restrictions mandate that abortion providers have a relationship with a local hospital, including admitting privileges, Mo. Code Regs. Ann. tit. 19, §30-30.060(1)(C)(4); *see also* Mo. Rev. Stat. §§188.080, 188.027(1)(1)(e); §197.215 ("Hospital Relationship Requirement"), and that facilities in which abortion is provided be licensed as ambulatory surgical centers ("ASCs"), Mo. Rev. Stat. §197.200; Mo. Code Regs. Ann. tit. 19, §30–30.070 ("ASC Requirement"). In *Whole Woman's Health*, the Supreme Court struck down nearly identical requirements in Texas as an undue burden because "neither . . . confers medical benefits sufficient to justify the burdens upon access that each imposes." 136 S. Ct. at 2300.

On September 10, 2018, the Eighth Circuit vacated this Court's preliminary injunction, in a narrow opinion holding (in relevant part) that this Court failed to make adequate findings about the safety of abortion in Missouri, instead relying solely on *Whole Woman's Health*'s findings about abortion safety. Plaintiffs now seek a second, limited preliminary injunction for a single health center—the Columbia health center—of Missouri's criminal requirement that physicians who provide abortions have local hospital admitting privileges, *see* Mo. Rev. Stat. §188.080, and a related requirement that patients be provided information about those privileges, *see* §188.027(1)(1)(e) (together, "Privileges Requirement").[1] That relief is necessary to prevent that

---

[1] Plaintiffs previously sought and obtained a preliminary injunction of Missouri's entire Hospital Relationship Restriction, which is comprised of several overlapping requirements relating to admitting privileges, some (but not all) of which give the alternative option that an abortion facility have a transfer agreement with a local hospital. *See* Mo. Rev. Stat. §197.215; Mo. Code Regs. Ann. tit. 19, §30-30.060(1)(C)(4). Because the Columbia facility has a transfer agreement with a local hospital, *see* Decl. of Brandon Hill in Supp. of Pls.' Second Mot. for TRO and/or Prelim. Inj.

facility—one of only two in the entire state that is currently able to provide abortions—from being forced to suspend services.[2]

Because the parties have already engaged in expedited discovery and extensive briefing on identical issues, there is more than ample evidence in the record, as well as in the limited updated declarations filed with Plaintiffs' motion, for the Court to make the necessary findings that abortion in Missouri (as in the United States as a whole) is extremely safe, and that the Privileges Requirement does not advance the State's interest in women's health. There is similarly ample evidence that, if the Columbia health center is forced to shut down abortion services, at least 22% of women in the Columbia area who seek an abortion will be prevented from obtaining one, and other women will be delayed or otherwise burdened.

Without further relief, vacatur of the preliminary injunction of the Privileges Requirement will force the Columbia facility to stop abortion services on October 1, the date the mandate will issue from the Eighth Circuit. Because women are currently scheduled for abortions on October 3, this Court should enter relief by that date to protect these women's rights. Plaintiffs therefore request an expedited briefing schedule, hearing, and ruling on this motion prior to October 3.

---

¶4 ("Hill Decl."), attached hereto as Ex. A, Plaintiffs at this time seek an injunction of only the Privileges Requirement.

[2] The ASC Restriction does not prevent the Columbia health center from providing abortions because, as a result of a 2010 settlement of prior litigation, the Department of Health and Senior Services ("DHSS") is not enforcing the full set of facility requirements for that health center. *See Planned Parenthood of Kan. & Mid-Mo. Inc. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 WL 2811407 (W.D. Mo. Sept. 24, 2007); Decl. of Laura McQuade in Supp. of Pls.' Mot. for a Prelim. Inj. ("First McQuade Decl.") ¶¶13–16, ECF No. 15-1. Only one very minor issue remains regarding the amount of space surrounding recliners in the Columbia health center's recovery room, and Comprehensive Health expects to resolve that issue with DHSS quickly. Hill Decl. ¶¶11–12.

## STATEMENT OF FACTS

**I. Missouri's Repeated Efforts to Bar Abortion Access Through Medically Unnecessary Restrictions, and Resulting Litigation**

For over a decade, the state of Missouri has steadily restricted access to abortion by imposing multiple medically unnecessary restrictions.

Missouri law contains several overlapping statutes and regulations requiring that abortion providers have various forms of hospital admitting privileges and/or a written transfer agreement with a nearby hospital,[3] including the Privileges Requirement, which makes it a class A misdemeanor for a physician to provide an abortion without clinical privileges at a hospital within thirty miles. Mo. Rev. Stat. §§188.080; 188.075. Because of the criminal statute, even if a health center has a written transfer agreement, as the Columbia facility does, its physicians are still unable to provide abortions unless they have local hospital privileges.[4]

Before 2007, DHSS licensed abortion facilities only if they primarily performed surgical procedures. In 2007, Missouri law changed to require that a facility performing five or more first-trimester abortions or any second-trimester abortion be licensed as an ASC.[5] At that time, DHSS refused to license Comprehensive Health's Columbia and Kansas City health centers, but after a

---

[3] Specifically, ASC licensing requirements mandate privileges in a hospital in the community, or a written working agreement with such a hospital. Mo. Rev. Stat. §197.215(1)(2). Regulations separately require staff privileges at a hospital within fifteen minutes, or proof of a working arrangement with such a hospital. Mo. Code Regs. Ann. tit 19, §30-30.060(1)(C)4. Because the Columbia health center currently has a transfer agreement and can comply with this statute and regulation, Plaintiffs do not seek preliminary relief as to these provisions at this time.

[4] Prior to 2005, Missouri law required physicians who provided abortions to have hospital privileges, but did not impose a geographic restriction requiring privileges at a hospital within a specified distance. *Webster v. Reprod. Health Servs.*, 492 U.S. 490 (1989). The physician who provides abortions at the Columbia health center meets the pre-2005 requirement.

[5] In 2017, as part of S.B. 5, discussed below, Missouri removed abortion providers from the statutory definition of ASC, defining them instead as "Abortion Facilities," but the substance of the required licensure remains the same. S.B. 5, 99th Gen. Assemb., 2nd Extraordinary Sess. (2017 Mo.). Because this requirement has been referred to as the "ASC Requirement" throughout the litigation, Plaintiffs continue to use that term.

lawsuit was filed and a preliminary injunction entered, DHSS entered a settlement agreement in 2010 by which it licensed the Columbia health center to provide medication and surgical abortion and the Kansas City health center to provide medication abortion. *See Planned Parenthood of Kan. & Mid-Mo. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 WL 2811407, at *2 (W.D. Mo. Sept. 24, 2007); Release & Settlement Agreement, Ex. A to Aff. of John Langston, ECF No. 28-1. However, due to the Privileges Requirement, those health centers were only able to provide abortion services some of the time. Because of these restrictions, by 2015, Missouri was limited to a single abortion provider on the eastern edge of the state: Reproductive Health Services ("RHS")'s St. Louis health center.

In June 2016, the Supreme Court invalidated Texas's requirements—nearly identical to Missouri's—that abortion providers have local hospital privileges and abortions be performed in ASCs. *Whole Woman's Health*, 136 S. Ct. at 2300. Plaintiffs then brought this lawsuit. On May 2, 2017, this Court, relying on *Whole Woman's Health*, preliminarily enjoined the Hospital Relationship Requirement and the ASC regulations' physical facility requirements. Order Granting Prelim. Inj., ECF No. 97. Plaintiffs were, therefore, able to move forward with the licensure process at the Columbia health center, as well as their health centers in Kansas City, Springfield, and Joplin.[6]

Unhappy with that result, former Governor Greitens called the Legislature into a special session on abortion and enacted Senate Bill 5, which imposed numerous new abortion restrictions. S.B. 5, 99th Gen. Assemb., 2nd Extraordinary Sess. (2017 Mo.). S.B. 5's sponsor stated its purpose

---

[6] Plaintiff Comprehensive Health obtained a license from DHSS on August 11, 2017 to provide medication abortion at its health center in Kansas City, but has subsequently been forced to stop providing services. Hill Decl. ¶7. RHS's applications for licenses for its Springfield and Joplin health centers remain pending.

was to prevent Planned Parenthood from opening additional health centers in Missouri following the preliminary injunction. Jason Hancock, *Fate of New Abortion Limits Unclear as Missouri Senators Return to Capitol*, Kan. City Star (July 24, 2017), http://www.kansascity.com/article163000723.html. And as described below, these restrictions also further exacerbate the burdens imposed by the Privileges Requirement at issue here.

One such restriction is S.B. 5's amendment of Missouri's requirement that patients make a medically unnecessary trip to a health center seventy-two hours before an abortion to receive state-mandated information. This information could previously be provided by a qualified health professional, *see* Mo. Rev. Stat. §188.027.1, allowing women to obtain it at the health center closest to their home. S.B. 5 requires patients to obtain this information in person from the physician who will provide the abortion, Mo. Rev. Stat. §188.027.6, forcing patients to travel twice to the same health center regardless of how far away they live—an extreme burden, particularly on women with low incomes or who lack access to transportation. Plaintiffs challenged this requirement in state court, but it remains in effect.

Another new requirement imposed by S.B. 5 is that physicians providing medication abortion must obtain approval from DHSS of a "complication plan," Mo. Rev. Stat. §188.021(2), which DHSS has interpreted to require a written contract with at least two board-certified or board-eligible ob-gyns with local hospital privileges, who must agree to be available twenty-four hours a day, seven days a week to personally treat all complications from medication abortion. 43 Mo. Reg. 505, 624 (Mar. 15, 2018); 19 CSR 30-30.061. Plaintiffs are unable to comply with this restriction at the Columbia, Springfield, and Joplin health centers, and challenged it in federal court. Following an evidentiary hearing, the court denied Plaintiffs' request for a preliminary injunction on the grounds that women could obtain surgical abortion at the Columbia health center

and that there was no legal impediment to the Springfield health center offering that service (despite not being currently licensed to do so). As a result, the Columbia facility was forced to cease medication abortions shortly after its license was granted, and the Springfield and Joplin health centers are also unable to provide it. Thus, more than two years after the Supreme Court's ruling in *Whole Woman's Health*, the *only* abortion access left in the state is at the Columbia and St. Louis health centers.

## II. The Columbia Health Center's Inability to Comply with the Privileges Requirement

The Privileges Requirement has been an impediment to providing abortion at the Columbia health center for over a decade, causing multiple suspensions of services, because Comprehensive Health has been unable to recruit and retain community physicians who have privileges at a local hospital, or to maintain local privileges for out-of-town physicians. Decl. of Laura McQuade ("First McQuade Decl.") ¶¶19–21, ECF No. 15-1. Multiple local physicians with privileges have resigned after short periods, one because of anti-abortion protests at her home and another because of harassing calls to her private practice. *Id*. ¶20. The current abortion provider at the Columbia health center is an out-of-town physician whose local privileges were revoked in late 2015 as a result of pressure on the hospital from the Missouri Senate Interim Committee on the Sanctity of Life, forcing the Columbia health center to suspend abortion services at that time. First McQuade Decl. ¶¶22–23; *see also Planned Parenthood of Kan. & Mid-Mo., Inc. v. Lyskowski*, No. 2:15-cv-04273-NKL, 2016 WL 2745873, at *2 (W.D. Mo. May 11, 2016) (noting that legislators pressured the hospital to revoke physician's privileges); Rachel Herndon, *Mizzou Drops Refer and Follow Privileges for Planned Parenthood Doctor*, The Missouri Times, Sept. 24, 2015, http://themissouritimes.com/22797/mizzou-drops-planned-parenthood-privileges/ (legislator stating he "made good on pledge to 'get MU out of the abortion business'"). Despite ongoing efforts to recruit other physicians (with or without privileges) to provide abortions in Missouri,

6

Comprehensive Health has been unable to do so. Hill Decl. ¶6. As a result, not until the entry of the preliminary injunction in this case enjoining the Privileges Requirement was the Columbia facility able to restart abortion services. Hill Decl. ¶2 .

Therefore, without further relief from this Court, the Columbia health center will be forced to stop providing surgical abortions (the only type of abortions it is currently able to provide) as of the issuance of the Eighth Circuit's mandate on October 1, and to cancel patient appointments beginning October 3, the next subsequent date on which patients are scheduled. Hill Decl. ¶14. If that occurs, Missouri, which covers nearly 70,000 square miles, will return to being a one-abortion-provider state, with the only remaining access at the RHS clinic in St. Louis.

### III. The Prior Preliminary Injunction and the Eighth Circuit's Limited Reversal

As noted above, this Court (Sachs, J.) preliminarily enjoined the Privileges Requirement (as well as other restrictions not at issue here), holding that the record evidence regarding abortion safety "[could] not support a ruling" inconsistent with *Whole Woman's Health*'s holding that abortion is extremely safe. Memo. & Order ("PI Order") at 5–6, ECF No. 93.[7] In compliance with *Whole Woman's Health*'s clarification that the undue burden test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer," 136 S. Ct. at 2309, this Court weighed the lack of any health benefit from the Requirements against the burdens they would impose on Missouri women and concluded "[t]his case is not a close one" because the Requirements had created a situation that "require[d] hundreds of miles of travel,

---

[7] This Court also preliminarily enjoined physical facilities requirements of the ASC Requirement. However, as noted above, Plaintiffs believe that the Columbia health center will be able to provide abortion services without an injunction of the ASC Requirement because of a prior settlement agreement. *See supra* n.1.

round-trip, with two trips needed unless a woman has the means and time available for a long stay in St. Louis or other rather distant clinics," without providing medical benefit. PI Order at 8.

On September 10, the Eighth Circuit issued an opinion vacating the preliminary injunction. *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, No. 17-1996, 2018 WL 4288362 (8th Cir. Sept. 10, 2018). As to the Privileges Requirement, the Eighth Circuit held this Court's prior order was in error because it relied on *Whole Woman's Health*'s holdings regarding the safety of abortion, and failed to make sufficient findings regarding the safety of abortion *in Missouri* and whether the Requirement furthered Missouri's interest in women's health. *Hawley*, 2018 WL 4288362 at *6 ("Perhaps there was a unique problem Missouri was responding to."). The Court of Appeals' order thus calls for further analysis of whether there are any abortion safety issues specific to Missouri that would justify the Privileges Requirement.

Both sides have previously presented extensive evidence about the safety of abortion in numerous rounds of briefing and expert declarations, and Defendants conducted discovery of both Plaintiffs and third parties regarding abortion safety in Missouri specifically. *See* PI Order at 41 ("Filings of the parties have added voluminous material to the record, largely directed toward the issue of dangerousness of abortions."). As reflected in this robust record, there is no "unique problem" in Missouri. Legal abortion is just as safe in Missouri as in Texas, or indeed in the many states where courts have examined these identical issues and invalidated privileges laws.

## IV. The Safety of Abortion

Legal abortion is one of the safest medical procedures in the United States. *See* Corrected Decl. of David L. Eisenberg ("Eisenberg Decl.") ¶5, 38, ECF No. 63-1. Indeed, Defendant Williams has admitted in other litigation that abortion is safe. Hr'g Tr. Vol. II, *Comprehensive Health of Planned Parenthood Great Plains v. Williams*, No. 2:17-cv-04207-BP (W.D. Mo. 2018) at 444:310 (Williams). There are two types of induced abortion, medication abortion and surgical

abortion, only the latter of which is at issue here. Surgical abortion does not involve an incision or the use of general anesthesia. Eisenberg Decl. ¶9. Instead, a provider evacuates the uterus using instruments inserted through the cervical opening. *Id*. ¶¶9, 19. The procedure involves only a small number of medical personnel and a small amount of equipment; requires only local anesthesia; and in the first trimester typically takes five to eight minutes. *Id*. ¶¶9, 12. Notably, surgical abortion is analogous to other gynecological procedures commonly and safely performed in a doctor's office setting and without admitting privileges being required, such as surgical completion of miscarriage and diagnostic dilation and curettage. Eisenberg Decl. ¶¶21–22, 36-37; *see also* Rebuttal Decl. of David L. Eisenberg in Supp. of Pls.' Mot. for a Prelim Inj. ("Eisenberg Rebuttal Decl.") ¶24 n.28, ECF No. 42-1.

As the record evidence shows, less than 1% of women will experience any complication following an abortion, and even fewer—0.3%—a complication that requires treatment in a hospital. Eisenberg Decl. ¶6. To put these risks in context, the risk of death following miscarriage is roughly double the risk of death following an abortion, and the risk of death from childbirth is approximately fourteen times higher. *Id*. ¶7.

Following this Court's first preliminary injunction, these facts were re-affirmed by the National Academies of Sciences, Engineering, and Medicine ("the National Academies")—a body of esteemed experts established by Congress to provide independent, objective analysis and public policy advice. The National Academies conducted a review of abortion in the United States and published its findings in a consensus study report, which is a peer-reviewed, official statement. It found that abortion is safe, and that "[s]erious complications are rare." National Academies Report, Ex. 1 to Decl. of David L. Eisenberg in Supp. of Pls.' Second Mot. for TRO and/or Prelim. Inj. ("Eisenberg Second PI Decl.") at 5-3, attached hereto as Ex. B. Abortion-related mortality (0.7 per

100,000) is not only a "small fraction of that for childbirth (8.8 per 100,000)" but "also lower than that for colonoscopies (2.9 per 100,000), plastic surgery (0.8 to 1.7 per 100,000), dental procedures (0.0 to 1.7 per 100,000), and adult tonsillectomies (2.9 to 6.3 per 100,000)." *Id*. at 2-24. The National Academies further found that, where there are variations in safety between states, these result because "state *regulations* have created *barriers* to optimizing each dimension of quality care" (emphasis added).[8]

Notwithstanding this overwhelming national medical and legal consensus, the Court of Appeals has instructed this Court to review the record and consider whether "there was some unique problem Missouri was responding to" in imposing the Privileges Requirement. *Hawley*, 2018 WL 4288362 at *6. There was not. The record shows that abortion is extremely safe in Missouri, as in other states, and indeed contains no evidence of any safety issues specific to Missouri.

Earlier in this litigation Defendants obtained discovery regarding abortion complication rates at Plaintiffs' facilities in Missouri for 2012–2016, including rates of hospitalizations and transfers to the emergency department. This evidence showed that complication rates in Missouri are entirely consistent with the rates reported in the national literature and those relied upon by the

---

[8] Defendants' extensive prior submissions failed to undermine this overwhelming evidence. First, Defendants speculated, with no supporting evidence, and relying largely on a witness who is not a medical doctor and whose work on abortion has been discredited, that the peer-reviewed data under-reports complications. State Defs.' Suggestions in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' PI Resp.") at 10, ECF No. 28; Decl. of Andrew Steele ¶18, ECF No. 28-4; Decl. of Tumulesh K. S. Solanky ¶21, ECF No. 28-3; Decl. of Priscilla K. Coleman Sec. IV ¶9, ECF No. 54-2. However, the data collection methods employed by the pre-eminent national studies are no different than those throughout the medical field and are reliable. *See* Eisenberg Rebuttal Decl. ¶¶3–4; Suppl. Rebuttal Decl. of David L. Eisenberg in Supp. of Pls.' Mot. for a Prelim. Inj. ("Eisenberg Suppl. Rebuttal") ¶¶10–15, ECF No. 76-1. Defendants similarly attempted to undermine the clear evidence of abortion safety by relying on outdated, irrelevant and discredited studies. *See* Eisenberg Rebuttal Decl. ¶¶6, 11; Eisenberg Suppl. Rebuttal ¶¶16–23.

Supreme Court in *Whole Woman's Health*. Specifically, the Supreme Court relied upon expert testimony citing a study that found an overall complication rate following abortion of 2.1%, 136 S. Ct. at 2311, and Plaintiffs' data show an overall rate of complications and adverse events following abortion at Plaintiff RHS's health center in St. Louis (the only health center in the state that was providing abortions at the time) of 0.91%. Pls.' Suppl. Suggestions in Further Supp. of Mot. for Prelim. Inj. at 1–2, ECF No. 70; Ex. 1 to the St. Defs.' Suppl. Br. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Suppl. Br.") at RHS0001–5, ECF No. 65. Similarly, the Supreme Court noted that the highest rate of major complications for first trimester abortions reported in the scientific literature was less than one-quarter of 1%. *Whole Woman's Health*, 136 S. Ct at 2311. The rate in Missouri is 0.14%, entirely consistent with the numbers relied upon by the Supreme Court. Ex. 1 to Defs.' Suppl. Br. at RHS0001–5. The same is true for second trimester abortions— the Supreme Court noted that the highest rate found in the literature was 0.45%, 136 S. Ct. at 2311, and the rate in Missouri is identical at 0.45%. *Id*. Most critically, the rate of transfers to the hospital in Missouri is extraordinarily low: 0.08%, or twenty-one patients out of nearly 25,000 over a five-year period, and the evidence shows that at least four of those patients were transferred out of an abundance of caution, but did not actually need treatment in the hospital. Third Rebuttal Decl. of David L. Eisenberg ¶5, ECF No. 70-2. In prior filings, Defendants attempted to slice and dice Plaintiffs' data, and made misleading comparisons,[9] in an effort to show that abortion is dangerous, but their attempts failed. The bottom line is Plaintiffs' data shows that abortion in Missouri is extremely safe, just as it is in Texas and nationally.

---

[9] To take just one example, Defendants misleadingly compared the literature's rate of hospital *admissions* with the rate of RHS patients who had any hospital contact at all. 70-2 ¶ 9 n.4.

Faced with this clear data, Defendants in prior filings desperately attempted to find other evidence of dangerousness of abortions in Missouri, but came up short. First, Defendants issued third-party subpoenas to ambulance services that serve the St. Louis area in an attempt to show that RHS underreported hospital transfers, but the documents turned over show no such thing and in fact confirm RHS's data. *See* Exs. 1–3 to ECF No. 83 (filed under seal), discussed in Pls.' Second Suppl. Suggestion in Supp. of Prelim. Inj., ECF No. 83.[10]

Defendants also asserted in prior filings that Plaintiffs failed prior to 2017 to report individual patient complications to DHSS, implying Plaintiffs are bad actors hiding complications. In fact, DHSS had never collected individual complications reports from Plaintiffs or any other entities in Missouri that treat abortion complications, including private physicians and hospitals. Suppl. Decl. of Mary M. Kogut ("Suppl. Kogut Decl.") ¶6,. ECF No. 83-4; Second Suppl. Decl. of Laura McQuade ("Second Suppl. McQuade Decl.") ¶4, ECF No. 83-5. Since this issue was discovered in the spring of 2017, Plaintiffs have been submitting complication reports to DHSS, and these reports have reflected the very low rate of complications at Plaintiffs' facilities. Eisenberg Second PI Decl ¶12; Hill Decl ¶10.

In short, Defendants have had ample opportunity to identify any "unique problem" with abortion safety in Missouri that would distinguish this case from the well-reasoned, national-evidence-based analysis in *Whole Woman's Health* finding that abortion is extremely safe, and there is simply no evidence whatsoever of any such problem.

---

[10] Indeed, RHS's discovery responses reflect almost exactly the same number of transfers as the fire department and private ambulance companies' records do for the years 2012–2016. *See* Pls.' Second Suppl. Suggestions in Further Supp. of Mot. for Prelim. Inj. at 3, ECF No. 83.

## V.  The Privileges Requirement Is Medically Unnecessary

The robust record already developed in this case further shows that the Privileges Requirement is irrelevant to the safe provision of abortion services, consistent with the findings of the Supreme Court and numerous other courts around the country that have addressed this question. Not only is the risk of complications from surgical abortion very low, but in the vast majority of cases the complications that may occur need not be treated in a hospital. Eisenberg Decl. ¶¶13, 38. Even in the rare case of a complication requiring hospital treatment, there is no medical benefit to the abortion-providing physician having privileges. *Id.*

In the extremely unlikely event of a serious complication at the health center that requires emergency treatment, Plaintiffs ensure continuity of care by communicating directly with the emergency room that will receive the patient and sending necessary medical information with the patient to the emergency department. *Id.* ¶39; First McQuade Decl. ¶9. If an emergency room physician decides to involve an ob-gyn he or she will contact the hospital's on-call ob-gyn, who can admit the patient if necessary. Eisenberg Decl. ¶40. Whether the physician providing the abortion has privileges makes no difference to this process. *Id.*

On the contrary, even if the abortion-providing physician has privileges at the hospital at which the patient is seen, he or she may not be the appropriate physician to manage the patient's hospital care.[11] *Id.* ¶42. It is extremely common and, indeed, the standard of care in contemporary medicine for physicians to refer patients to other physicians as necessary.[12] *Id.* ¶51.

---

[11] Moreover, even if a physician has admitting privileges at a nearby hospital, that does not mean the patient will be taken to that particular hospital; patients are taken to the hospital EMS deems appropriate. Eisenberg Decl. ¶41.

[12] Physicians who perform non-gynecological procedures comparable to or riskier than abortion, including colonoscopy and certain forms of plastic surgery, are not required to maintain hospital privileges. Eisenberg Decl. ¶24. Some of these procedures are performed under general anesthesia, which by itself is much riskier than abortion. *Id.* ¶24. Analogous gynecological procedures such as surgical completion of miscarriage and diagnostic dilation and curettage also may be performed

Appropriate care is also ensured in the rare case that a patient experiences a complication after leaving the health center. *Id.* ¶¶45–47; First McQuade Decl. ¶10. All Planned Parenthood abortion patients receive detailed instructions on what to expect following their procedure as well as the telephone number for a twenty-four-hour after-hours line staffed by nurses, with a physician always available for consultation. Eisenberg Decl. ¶46; First McQuade Decl. ¶10. Usually, patients' concerns can be addressed over the phone or with a follow-up appointment at a health center. Eisenberg Decl. ¶46; First McQuade Decl. ¶10.

In the very rare case that the nurse or physician determines the patient should be evaluated immediately he or she will direct her to the closest emergency room, consistent with the standard of care for complications from any outpatient procedure after-hours. Eisenberg Decl. ¶46; First McQuade Decl. ¶11. Again, whether a physician has privileges does not affect the care a patient will receive. Eisenberg Decl. ¶48. Every hospital has an obligation under the Emergency Medical Treatment and Labor Act (EMTALA) to provide emergency treatment to any patient who arrives at the hospital—as, indeed, multiple hospitals have recognized in declining to enter a transfer agreement because they will treat Planned Parenthood's patients regardless of whether such an agreement is in place. *Id.* ¶47; Decl. of Mary M. Kogut in Supp. of Pls.' Mot. for a Prelim. Inj. ("Kogut Decl.") ¶14, ECF No. 15-2; McQuade Decl. ¶40. Treatment of complications from abortion is straightforward and does not require specialized knowledge of abortion; it is identical to treatment of complications from spontaneous miscarriage. Eisenberg Decl. ¶45.

Finally, the Privileges Requirement is also irrelevant because if, after discharge, a woman who lives far from the health center where she obtained her abortion experiences a rare

---

by physicians who do not have hospital privileges and in facilities that do not have transfer agreements with hospitals. Eisenberg Decl. ¶36.

complication that requires hospital treatment, she should be treated at the hospital closest to her. *Id.* ¶44. She should not travel to a hospital near the abortion clinic—in fact, it might be unsafe for her to do so—just because her abortion provider has privileges there. *Id.*

These record facts were recently confirmed by the National Academies report, which concluded that "hospital privileges" requirements, by limiting the pool of available providers, "diminish [one] dimension of quality care": i.e., the availability of "abortion services that best meet [patients'] needs." Eisenberg Second PI Decl. ¶9. The committee found that while providers "should be able to provide or arrange for patient access or transfer to [emergency] medical facilities," there was "no evidence indicating that clinicians that perform abortions require hospital privileges to ensure a safe outcome for the patient." *Id.* at S-12; 5-7.

Defendants attempted to argue in prior filings that the Privileges Requirement is necessary to prevent patient abandonment, but the record is clear that it is common and consistent with the standard of care for outpatient physicians to transfer care of their patients to hospital-based physicians. Eisenberg Rebuttal Decl. ¶19. Nowhere in prior filings did Defendants or their witnesses even attempt to show that the Privileges Requirement does anything to reduce the rate of complications from abortion or improve the way complications are treated. Nor could they—as Dr. Eisenberg has explained, privilege requirements do not affect the quality of patient care. *See* Eisenberg Decl. ¶¶38, 39–49; Eisenberg Rebuttal Decl. ¶¶19–23. Defendants also have not attempted to suggest that Missouri's Privileges Requirement is in any way different from the Texas restriction struck down in *Whole Woman's Health* or those struck down by various other courts around the country; nor could they, as all require physicians to have hospital privileges within a small geographic area near a health center. *See* Mo. Code Regs. Ann. tit. 19, §30-30.060(1)(C)(4); Tex. Health & Safety Code Ann. §171.0031.

## VI. The Privileges Requirement's Impact on Women in the Columbia Area

Without injunctive relief, the Privileges Requirement will eliminate abortion in Columbia altogether and limit Missouri to a single provider on the easternmost edge of the state. As this Court previously found and the Eighth Circuit took no issue with, "the absence of a clinic in Central Missouri requires hundreds of miles of travel, round-trip, with two trips needed unless a woman has the means and time available for a long stay in St. Louis . . ." PI Order at 8. In particular, women in the Columbia area will have to travel 245 miles round-trip to St. Louis— twice.[13] Decl. of Sheila M. Katz ("Katz Decl.") ¶23, ECF No. 15-5.

Shutting down abortions in Columbia will therefore have a severe impact on women in the middle of the state, particularly those with low incomes or limited access to transportation. The required travel increases the cost and logistical difficulty of reaching an abortion provider. Katz Decl. ¶¶17–32. In addition to the cost of public transportation or gas and potentially multiple nights in a hotel, women often have to pay for childcare and lose wages for the time they are out of town—which, given the seventy-two-hour waiting period/same doctor law in Missouri, can be up to four days. *Id.* ¶¶25–30. In addition to financial costs, women may have to disclose why they are traveling to employers or friends and family helping with child care, which jeopardizes the confidentiality of their abortion decision. Katz Decl. ¶¶20, 26, 29; Kogut Decl. ¶¶16, 18. These burdens disproportionately affect women with low incomes, who make up the majority of women seeking abortions in Missouri. Kogut Decl. ¶17; Katz Decl. ¶16.

For some women, the increased cost and logistical difficulty associated with traveling are insurmountable barriers and prevent women from accessing abortion at all. *Id.* ¶36. Based on the

---

[13] Even if Comprehensive Health's Kansas City health center is able to resume services, that would not decrease the distances women would need to travel, twice, if the Columbia health center ceases providing abortion services, since the St. Louis and Kansas City health centers are the same distance from the Columbia health center. Hill Decl. ¶8.

Columbia health center's abortion data since entry of the prior preliminary injunction, shutting down abortion services at the Columbia health center will prevent at least 22% of patients who would obtain an abortion in Columbia from doing so. Decl. of Jason M. Lindo in Supp. of Pls.' Second Mot. for TRO and/or Prelim. Inj. ("Lindo Decl") ¶¶7–8, 31, attached hereto as Ex. C. As this Court previously recognized, some women unable to travel to St. Louis may resort to desperate measures and this would "create[] health hazards for women." PI Order at 8–9.

Other women need time to raise necessary funds and/or deal with logistical problems and this delays their access to abortion. Kogut Decl. ¶16; McQuade Decl. ¶49; Lindo Decl. ¶33. While abortion is one of the safest procedures in contemporary medicine, risk (as well as cost) increases as the pregnancy advances. Eisenberg Decl. ¶61. And even women in the Columbia area who are able to get a timely abortion will be burdened by being forced to travel to St. Louis, twice—taking increased time off of work or school and away from children, putting miles on their car and paying for gas—when otherwise they could have had a procedure closer to home.

For all these reasons, by depriving many Columbia-area women of access to legal abortion altogether and delaying and otherwise burdening others, the Privileges Requirement poses a devastating risk to women's health in Missouri.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction of the Privileges Requirement to allow the Columbia health center to continue providing abortion services, preventing a situation where the women of Missouri will be limited to a single provider on the eastern border of the state. The relevant factors for issuance of a preliminary injunction are: (1) probability of success on the merits; (2) threat of irreparable harm to the movant; (3) balance between this harm and any injury that granting the injunction will inflict; and (4) whether issuance is in the public interest. *Sanborn*

*Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

## I. Plaintiffs Are Likely to Prevail on the Merits of Their Claim

Plaintiffs are likely to succeed on the merits of their claim that the Privileges Requirement imposes an undue burden on women who seek abortions at the Columbia health center. The undue burden test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309; *see also Hawley*, 2018 WL 4288362 at \*4 (characterizing undue burden test as a "cost-benefit analysis").

The Eighth Circuit vacated this Court's prior preliminary injunction of the Privileges Requirement and remanded for further findings to determine whether there is a "unique problem Missouri was responding to" that would "require a different response than what was needed in Texas," *Id.* at \*6, and so this Court could consider the evidence in the record and engage in Missouri-specific balancing of the "asserted benefits" of the Privileges requirement against the burdens it imposes. *Id.* The extensive record in this case is abundantly clear that the Privileges Requirement cannot withstand this balancing, but rather—like the privileges requirement struck down in *Whole Woman's Health*—the burdens it imposes on abortion access substantially outweighed any possible benefit to women's health. In fact, by so severely limiting women's access to abortion, the Privileges Requirement actually harms women's health.

### A. The Privileges Requirement Does Not Benefit Patient Safety

Every court, including the Supreme Court, to examine a requirement that physicians who provide abortion have hospital privileges has found both that abortion is extremely safe and that hospital privileges do not advance states' interest in women's health. Like the restrictions

invalidated in these other cases, Missouri's Privileges Requirement "br[ings] about no . . . health-related benefit." *Whole Woman's Health*, 136 S. Ct. at 2311.

The Supreme Court held in *Whole Woman's Health* that the medical evidence in the record in that case (which is nearly identical to the medical evidence put forth by Plaintiffs' medical expert, *see supra*, Statement of Facts, Section IV) amply supported a finding that abortion was already extremely safe, "with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure," *id.* (quoting *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 684 (W.D. Tex. 2014)), and that, therefore, there was "no significant health-related problem that the [privileges] law helped to cure." *Id.*[14]

Numerous other courts examining hospital privileges and similar requirements have found, based on records that mirror the record here, the same. *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 912 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 2545 (2016) ("[C]omplications from an abortion are both rare and rarely dangerous."); *June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 61 (M.D. La. 2017) ("Abortion is one of the safest medical procedures in the United States."); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1364 (M.D. Ala. 2014) (abortions "extraordinarily safe"); *see also Planned Parenthood of Ark. & E. Okla. v. Jegley*, No. 4:15-cv-00784-KGB (E.D. Ark. July 3, 2018) (preliminary injunction order) ("Jegley Prelim. Inj. Order") at 89 (attached hereto Ex. D) ("abortion in the first and second trimester is a safe procedure"); *Comprehensive Health of Planned Parenthood Great Plains v. Williams*, No. 17-

---

[14] The factual conclusions reached in *Whole Women's Health* were not confined to Texas. *See* 136 S. Ct. at 2311 (citing evidence including peer-reviewed multistate studies and expert testimony discussing abortion safety in the California Medicaid Program); *see also Comprehensive Health of Planned Parenthood Great Plains v. Williams*, 263 F. Supp. 3d 729, 733–34 (W.D. Mo. 2017) (noting the *Whole Women's Health* majority relied on amicus briefs and materials unrelated to Texas).

4207-CV-C-BP, 2018 WL 2927775, at *5 (W.D. Mo. June 11, 2018) ("[t]he evidence establishes that complications are rare").

The evidence in the record shows, consistent with this overwhelming precedent, that abortion in Missouri in particular is extremely safe, and there is no "unique problem" that would set Missouri apart from any other state. Indeed, the rates of abortion complications in Missouri mirror the rates relied upon by the Supreme Court in *Whole Woman's Health* in finding that abortion is safe. *See supra* Statement of Facts, Section IV. Following months of factual and expert development in the context of the prior preliminary injunction proceeding, there is simply no basis in the extensive record before this Court to reach a different conclusion regarding the safety of abortion than the Supreme Court and every other court to address this question.

The same is true as to the Privileges Requirement's lack of benefit. Missouri's Requirement is nearly identical to the Texas law invalidated by the Supreme Court, as well as to the Wisconsin, Alabama, and Louisiana laws invalidated in *Schimel*, *Strange*, and *Kliebert*, as all required physicians who provide abortion to have privileges at a hospital within a specified distance from the health center.[15]

In examining the Texas restriction, the Supreme Court cited expert testimony (which mirrors the expert testimony here) that it is extremely unlikely a patient will experience a serious complication from abortion requiring immediate hospitalization and that, even if this did occur, the quality of care a patient receives is not affected by whether the abortion provider has privileges. *Whole Woman's Health*, 136 S. Ct. at 2311. The Court also pointed to evidence that most

---

[15] Nor is the Privileges Requirement "consistent with a more exacting medical regulatory scheme than that present in Texas." *Hawley*, 2018 WL 4288362 at *6. On the contrary, just as in Texas, Missouri has singled out abortion in requiring physicians to have hospital privileges and does not require such privileges for similar gynecological procedures or other outpatient procedures that have higher risk profiles than abortion. *See supra* Statement of Facts, Section IV.

complications requiring hospital care that do occur after surgical abortion do not happen immediately, as well as testimony that patients who need care at a hospital will likely seek medical attention at the hospital closest to them rather than travel farther to a hospital where a physician has admitting privileges. *Id.* As the Supreme Court observed, there was no evidence that the requirement would help "even one woman obtain better treatment." *Id.*

Moreover, the Court in *Whole Women's Health* observed that this was "consistent with the findings of the other Federal District Courts that have considered the health benefits of other States' similar admitting-privileges laws." *Whole Women's Health*, 136 S. Ct. at 2311–12 (citing *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015), *aff'd sub nom.*, *Schimel*, 806 F.3d 908; *Strange*, 33 F. Supp. 3d at 1378). In *Schimel*, the Seventh Circuit affirmed a permanent injunction against Wisconsin's hospital privileges law, finding "no reason to believe" that "the health of women who have abortions is endangered if their abortion doctors don't have admitting privileges." *Schimel*, 806 F.3d at 912. Similarly, in *Strange*, the district court examining Alabama's privileges requirement determined that the continuity-of-care model the State advocated to justify the admitting-privileges requirement fell "outside the range of standard medical practice for complication care for this kind of simple and extremely safe procedure." *Strange*, 33 F. Supp. 3d at 1372. And in *Kliebert*, the district court examined Louisiana's privileges requirement and found it "provides no benefits to women and is an inapt remedy for a problem that does not exist." *Kliebert*, 250 F. Supp. 3d at 64.

Similarly, courts within the Eighth Circuit have found that laws requiring abortion providers to have a relationship with physicians with hospital privileges do not benefit patient safety. In a recent decision, a district court in Arkansas preliminarily enjoined a law requiring abortion providers who offer medication abortion to have a contractual relationship with a

physician with privileges, finding it "does little if anything to advance" women's health. *Jegley* Prelim. Inj. Order at 90. Similarly, in a recent decision regarding Missouri's complication plan requirement, this Court (Phillips, J.) found that the requirement that abortion providers who offer medication abortions have a contractual relationship with a provider with admitting privileges is not necessary for continuity of care and would not reduce referrals to the emergency room, and for these reasons among others "has virtually no benefit." *Williams*, 2018 WL 2927775, at *7.

Again, there is simply nothing in the record that distinguishes this case, and this privileges law, from those discussed above. As in *Whole Women's Health*, *Schimel*, *Strange*, and *Kliebert*, the record demonstrates that abortion in Missouri is extremely safe, as elsewhere; that most complications can be treated safely in an office setting; that in the rare event of a hospital transfer, continuity of care is assured through direct communication between the abortion provider and the emergency room physician; and that whether or not the abortion provider has admitting privileges at a nearby hospital has no bearing on whether or how the patient will be treated there. *See supra*, Statement of Facts, Section V.

Accordingly, following the Eighth Circuit's directive to make Missouri-specific findings, it is clear that—just as the Supreme Court made clear in *Whole Woman's Health* and as numerous other courts have agreed—the Privileges Requirement is medically unnecessary and Plaintiffs are therefore likely to succeed in showing that the Requirement fails to advance Missouri's interest in women's health.

## B. The Privileges Requirement Severely Burdens Columbia-Area Women Seeking Abortions

Plaintiffs are also likely to succeed in showing that the Privileges Requirement imposes extreme burdens on women seeking abortion in the Columbia area. *See Planned Parenthood of Ark. & E. Okla v. Jegley*, 864 F.3d 953, 959 (8th Cir. 2017). As this Court found in entering the

prior preliminary injunction, "[t]his case is not a close one" because without abortion access in central Missouri women are faced with "hundreds of miles of travel, round-trip, with two trips needed unless a woman has the means and time available for a long stay in St. Louis . . . ." PI Order at 8. And this situation "*creates* health hazards for women." *Id*. at 9.

The record in this case plainly supports a finding that a substantial number of women seeking abortion in the Columbia area will be prevented or delayed in obtaining one. It is undisputed that, should the Columbia facility be forced to cease abortion services, all women in the area will be forced to travel 245 miles round trip to St. Louis, on the eastern edge of the state, to obtain an in-state abortion, and will have to make that trip twice. *See supra* Statement of Facts, Section VI. These travel distances will mean that, based on the number and residence of women who obtained abortions in Columbia since the entry of the preliminary injunction, at least 22% of women—and likely more due to the fact that two trips are required—who would otherwise have obtained an abortion in Columbia will be prevented entirely by the Requirement from obtaining an abortion. *Id.*

But these are not the only women this Court should find are unduly burdened by the Requirement. Other women will be delayed due to the travel distance and the burdens it imposes. *Id*. While abortion is a safe procedure, its risks increase as pregnancy advances. *Id*. Furthermore, even those Columbia-area women who are able to timely access an abortion procedure in St. Louis, will still be forced to incur the enormous burdens of traveling hundreds of miles to St. Louis to access care. Each time they travel they will have to arrange the necessary funds, transportation, child care, and time off work, and because of the same-doctor informed consent requirement, each and every woman will have to either make the trip twice, or arrange to stay in St. Louis for at least three nights. *Id*. In *Whole Woman's Health*, the Court found that forcing women to travel long

distances to obtain an abortion is "one additional burden, which, when taken together with others that the closings brought about, and when viewed in light of the virtual absence of any health benefit" led the Court to invalidate the Texas restrictions. 136 S.Ct. at 2313; *see also id.* at 2318 (reasoning that "in the face of no threat to women's health, Texas seeks to force women to travel long distances to get abortions"). These burdens will fall especially hard on Comprehensive Health's low-income patients, who make up the majority of abortion patients. *Supra* Statement of Facts, Section VI.

There is therefore ample record evidence for this Court to conclude that, applying the Missouri-specific balancing required by the *Hawley* court, the Privileges Requirement unduly burdens women seeking abortion at the Columbia health center.

****

Plaintiffs are therefore likely to succeed on the merits of their claim that the Privileges Requirement imposes an unconstitutional undue burden on women seeking abortion in Columbia, and should be enjoined as to the Columbia health center. Given the lack of benefit from the requirement (and indeed the "health hazards" it creates for women) and the resulting burdens on women seeking abortion in Columbia, it is clear that the Requirement's benefits are substantially outweighed by the burdens it imposes.

## II. The Remaining Factors for a Temporary Restraining Order or Preliminary Injunction Favor Plaintiffs

Plaintiff Comprehensive Health's Columbia abortion patients will plainly suffer irreparable injury without further relief from this Court, given all these patients will be forced to travel to St. Louis twice, preventing many from obtaining abortions at all, delaying others, and causing still others to suffer a variety of harms related to the need to travel. *See supra*. As this Court found in entering the prior preliminary injunction, when the Requirement was in place "[t]he

abortion rights of Missouri women, guaranteed by constitutional rulings, [we]re being denied on a daily basis, in irreparable fashion." PI Order at 13; *see also Drummond*, 2007 WL 2463208, at \*3; *Springfield Healthcare Ctr., Inc. v. Nixon*, No. 05-4296-CV-C-NKL (W.D. Mo. September 16, 2005), attached as Ex. 6 to ECF No. 15; *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

Moreover, the balance of harms tips heavily in favor of Plaintiffs, and the public interest weighs in favor of a preliminary injunction because neither the State nor the public has any interest in the enforcement of an unconstitutional law. *See, e.g., Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (citation omitted); *Saint v. Neb. Sch. Activities Ass'n*, 684 F. Supp. 626, 628 (D. Neb. 1988). As this Court found in entering the prior preliminary injunction, "prompt relief from the requirements that [*Whole Woman's Health*] ruled invalid would not harm defendants" and "the public interest clearly favors prompt relief." PI Order at 13. Indeed, Defendants can show no harm from the previous preliminary injunction.

**III. Bond is Unnecessary**

Finally, the Court should again waive the bond requirement of Rule 65(c) of the Federal Rules of Civil Procedure because Defendants will suffer no financial harm by the entry of a preliminary injunction. *See Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1268 (N.D. Iowa 1995).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that their Second Motion for Temporary Restraining Order and Preliminary Injunction be granted.

Respectfully submitted,

ARTHUR BENSON & ASSOCIATES

*s/ Arthur. A. Benson II*
Arthur A. Benson II, Mo. Bar No. 21107
Jamie Kathryn Lansford Mo. Bar No. 31133
Arthur Benson & Associates
4006 Central Avenue
Kansas City, Missouri 64111
(816) 531-6565
(816) 531-6688 (telefacsimile)
abenson@bensonlaw.com

and

PLANNED PARENTHOOD FEDERATION OF
AMERICA, INC.

*s/ Melissa A. Cohen*
Melissa A. Cohen (*admitted pro hac vice*)
Jennifer Sandman (*admitted pro hac vice*)
Planned Parenthood Federation of America, Inc.
123 William Street
New York, New York 10038
(212) 261-4649
(212) 247-6811 (telefacsimile)
melissa.cohen@ppfa.org
jennifer.sandman@ppfa.org

## CERTIFICATE OF SERVICE

   I hereby certify that on September 19, 2018 a copy of the foregoing has been served upon all counsel of record in this action by electronic service through the Court's CM/ECF system.


          *s/ Melissa A. Cohen*
          Melissa A. Cohen