<pre>
 1            IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
 2                    CENTRAL DIVISION

 3   COMPREHENSIVE HEALTH OF       )
     PLANNED PARENTHOOD GREAT      )
 4   PLAINS, et al.                )
               Plaintiffs,         ) No.  16-CV-04313-BCW
 5                                  )      October 1, 2018
               v.                   )      Jefferson City, Missouri
 6                                  )      CIVIL
     PETER LYSKOWSKI, et al.        )
 7                                  )
               Defendants.          )
 8
                 TRANSCRIPT OF ORAL ARGUMENT
 9         BEFORE THE HONORABLE BRIAN C. WIMES
               UNITED STATES DISTRICT JUDGE
10
       Proceedings recorded by electronic voice writing
11           Transcript produced by computer

12                     APPEARANCES

13   For Plaintiff:      MR. ARTHUR BENSON
                         Arthur Benson & Associates
14                       4006 Central Ave.
                         Kansas City, Missouri 64111
15

16                       MS. MELISSA COHEN
                         Planned Parenthood Federation of America
17                       123 William Street, 9th Floor
                         New York, NY  10038
18
     For Defendant:      MR. DEAN JOHN SAUER
19                       MS. EMILY DODGE
                         MR. JOSHUA DIVINE
20                       Missouri Attorney General's Office
                         P.O. Box 899
21                       Jefferson City, Missouri  65102

22

23

24

25
</pre>

1          October 1, 2018

2          (Proceedings began at 9:08 AM)

3          THE COURT:  Good morning.  Let the Court call the

4    case.  This is Comprehensive Health of Planned Parenthood

5    Great Plains, et al, plaintiffs, versus Joshua D Hawley in his

6    official capacity as the Attorney General of Missouri, et al,

7    Case No. 16-CV-04313.

8          Can I have parties enter their appearance for the

9    record and I will start with the plaintiffs in this case.

10          MR. BENSON:  Your Honor, Arthur Benson, Melissa

11    Cohen, and Emily Wales for the plaintiff.  And Ms. Cohen will

12    be taking the lead.

13          THE COURT:  Okay.  And I'm sorry, Mr. Benson.  The

14    last attorney you mentioned is?

15          MR. BENSON:  Emily Wales, W-A-L-E-S, general counsel

16    for Planned Parenthood.

17          THE COURT:  Okay.  Thank you.

18          And for the defendants.

19          MR. SAUER:  Your Honor, John Sauer on behalf of the

20    state defendants, Attorney General Hawley, and with me is

21    Emily Dodge and Joshua Divine from the Attorney General's

22    Office.

23          THE COURT:  Okay.  And Mr. Divine?

24          MR. DIVINE:  That's correct, Your Honor.

25          THE COURT:  Okay.  Spell your name for me, sir.

```
1              MR. DIVINE:  D-I-V-I-N-E.

2              THE COURT:  Okay.

3              Well, the Court had set this matter for a hearing on

4    today's date, and we had a phone conference on Thursday to

5    establish this date based upon the motions filed with this

6    Court with respect to a temporary TRO/preliminary injunctive

7    relief sought by the plaintiffs in the case.

8              And so with that said, Ms. Cohen, would you like to

9    start?

10             MS. COHEN:  Sure, Your Honor.

11             THE COURT:  Thank you.

12             Ms. Cohen, we didn't have the opportunity in terms

13   of the briefing schedule in terms of reply so there may be

14   some questions I want to ask you up front, a few things,

15   because you didn't have the chance -- time didn't give us the

16   chance to reply.

17             MS. COHEN:  Sure, Your Honor.

18             THE COURT:  The counsel for the defense has an

19   initial matter, had brought up the issue of standing.  And

20   standing as it related to redressability.  Meaning, I guess

21   there are some -- currently, the allegation is that the clinic

22   is not in compliance, therefore, there is no redressability

23   even if the Court had sided with the plaintiffs.  What do you

24   say to that?

25             MS. COHEN:  Sure, Your Honor.
```

1          So plaintiff filed a rebuttal of declaration

2     yesterday from plaintiff Comprehensive Health's Regional

3     Director of Health Center Operations, Ms. Vicky Casey, that

4     explains the defendants' representations in their filing are

5     just incorrect.  All of the concerns the Department of Health

6     has raised about the Columbia facility have already been

7     addressed, and the facility stands ready for a final

8     inspection and to complete the licensing process.  And if it

9     would be helpful to the Court I can speak to the specific

10    issues in more detail, but all the details about the

11    completion of those outstanding issues are in the declaration.

12    So there's just no reason the license renewal process can't be

13    completed in the next couple of days if the Department of

14    Health is acting expeditiously and in good-faith as they have

15    said they are.

16          In fact, it is not unusual, Your Honor, for at least

17    in the case of abortion facilities for the license renewal

18    process to come down to the wire like this or to sometimes

19    require a final visit or something like that the day before

20    the day of a license expiration.  And historically the

21    department and my clients have always managed to get the

22    renewal process done in a timely fashion.

23          THE COURT:  And so is this just set on some time

24    schedule?  Is it a yearly thing?

25          MS. COHEN:  Correct, Your Honor.  The license needs

1   to be renewed annually.  And the way that process works is the

2   Department of Health comes and inspects.  If there are

3   concerns they will issue a statement of deficiencies.  The

4   facility submits a plan of correction and that process at

5   times under regulation can go back and forth a couple of times

6   until all outstanding issues can be resolved.  Generally, the

7   process is completed with a final inspection and a final

8   approval.

9           THE COURT:  Is that unique to these type of clinics?

10          MS. COHEN:  No, Your Honor.  That is a statewide

11  process for all healthcare facilities, correct.

12          THE COURT:  Okay.

13          MS. COHEN:  And so Your Honor, given that the

14  facility stands ready to complete that process and has already

15  resolved all the outstanding issues, plaintiff claim as to the

16  privilege requirement is plainly addressable, and plaintiffs

17  do need relief by Wednesday the 3rd.

18          But, Your Honor, even if the licensing process did

19  take another couple days past the 3rd, which as I've already

20  explained there is no need for it to, plaintiffs do still need

21  a temporary restraining order urgently because the Columbia

22  facility does have abortion patients scheduled again just a

23  few days later on the 9th.  And so even if the process spilled

24  over for a couple of days, the TRO is still urgently needed.

25          THE COURT:  Now, you would agree though there maybe

1    the issue of redressability if, in fact, it is not brought

2    into compliance.  Would you agree?

3          MS. COHEN:  That's correct, Your Honor, I would

4    agree with that.  But as I said, the remaining issues have

5    already been addressed.

6          THE COURT:  Sure.  Okay.

7          I think there is a question or at least a question

8    was raised by the defense in their briefing as to the

9    plaintiff seeking this as applied relief specific to this

10   facility as opposed to this statewide facial claim that was

11   brought initially.  Explain that to the Court.

12         MS. COHEN:  Sure.

13         So Your Honor, the case was initially brought as a

14   facial challenge.  Plaintiffs did plead in their complaint for

15   all relief just improper which the Court in the Whole Woman's

16   Health case did hold it's sufficient for the Court to enter

17   whatever relief is proper under Federal Rule of Civil

18   Procedure 54.  So that has been properly pled.

19         Here, Your Honor, we are seeking as applied relief

20   for the Columbia Health Center because that is sort a discreet

21   issue that is outstanding at this time.  Defendants' argument

22   that it is not proper to seek as applied relief for an

23   individual health center just does not have support in the

24   law.  And in fact, this is the core way that courts routinely

25   grant relief in abortion cases.  And I can give you just a

1  couple of examples, Your Honor.

2          So actually in the Whole Woman's Health case

3  initially the trial court had granted facial relief as to a

4  couple of Texas abortion restrictions.  That was appealed to

5  the Fifth Circuit.  The Fifth Circuit reversed in part and

6  modified in part.  And the modification that the Fifth Circuit

7  did was it narrowed the injunction to an as applied injunction

8  as to only one health center in McAllen, Texas.  And the

9  reason why is because it found women in that area were unduly

10 burdened, while it found that women in other areas were not.

11 The Supreme Court did ultimately reinstate the trial court's

12 facial injunction, but it took no issue with the fact that the

13 Fifth Circuit had in the interim crafted an as applied

14 injunction as to a particular health center where women were

15 burdened in a particular way.

16         Just to give another example, in Planned Parenthood

17 versus Strange, which is a case out of Alabama, that's 33 F.

18 Supp. 3d 1330.  That case was also about a privileges

19 requirement and the court there granted as applied relief as

20 to three of the five abortion facilities in the state.  Again,

21 finding that patients who would utilize those three facilities

22 were unduly burdened.

23         THE COURT:  Just factually, what clinics would we be

24 talking about in this particular instance?  And let me

25 rephrase that better.

1          MS. COHEN:  Sure.

2          THE COURT:  You said it's a discreet issue impacting

3    Columbia facility, correct?

4          MS. COHEN:  Correct.

5          THE COURT:  What other facilities would provide

6    these type of surgical abortions?  There is only one other,

7    right?

8          MS. COHEN:  Correct.  At this time there is only one

9    other in St. Louis.

10         THE COURT:  St. Louis.

11         MS. COHEN:  Correct.  The history here, Your Honor,

12   is that when we initially brought this case there were four

13   health centers that stood ready to provide abortion in

14   addition to the St. Louis facility.

15         THE COURT:  Right.

16         MS. COHEN:  What has happened since that time is a

17   variety of other restrictions have been passed by this state

18   that have prevented the other facilities from providing

19   abortions.  So at this point in time, the only one that is

20   able to provide with an injunction of the privileges

21   requirement is the Columbia Health Center.  The others have

22   other issues based upon new restrictions, and that's the

23   reason they are not part of this motion.

24         THE COURT:  Okay.  Thank you.

25         MS. COHEN:  Sure.

1            And I can speak a little bit more to this as applied

2    issue.  I'll give just one other case example where a court

3    has done this.  It's a case out of the Eleventh Circuit, West

4    Alabama Women's Center versus Williamson, it's a very recent

5    case.  It's at 900 F.3 1910.  That was a different kind of

6    case in which a state band a particular method of abortion.

7    But again, the court entered an injunction as applied to two

8    of the five health centers in the state.  And so this is

9    clearly something that is commonly done.  I think the

10   defendants' argument that this doesn't make sense because it's

11   not the facilities right is sort of a misunderstanding of the

12   undue burden challenge.  In these kinds of cases the question

13   is whether women who are served by the particular health

14   center are unduly burdened, not whether the facility is unduly

15   burdened.  It's still a claim on behalf of the patients.

16            THE COURT:  And you know, they bring in the question

17   to who is actually burdened by this.

18            MS. COHEN:  Correct, exactly.

19            And here the group of patients who are burdened is

20   those who would seek abortions at the Columbia Health Center

21   if they were able to.  But if the Health Center shuts down

22   they will be forced to travel elsewhere.

23            THE COURT:  How do we show that?

24            MS. COHEN:  Good question, Your Honor.

25            So as defendants concede in their brief, the large

1    fraction test is a test that applies when a plaintiff in an

2    abortion case is seeking facial relief.  It does not apply to

3    an as applied challenge.  Defendants are incorrect, however,

4    that on an as applied challenge plaintiffs are required to

5    show that each and every patient impacted would face an undue

6    burden.

7            The cases defendant cite to support that proposition

8    are different class of cases that are, in fact, seeking as

9    applied relief for one or just a few individuals.  In a

10   situation like what we have here when the as applied relief is

11   sought for patients served by a particular health center,

12   courts have not required a showing that every single woman is

13   burdened.  And we can just go through a couple of examples

14   again.  So the Fifth Circuit in Whole Woman's Health when it

15   crafted that as applied injunction as to the McAllen, Texas,

16   Health Center, it did not require a showing that all women in

17   the area would be burdened.  But rather the court simply

18   stated that the restriction placed a substantial obstacle in

19   the path of a woman seeking abortion because it would prevent

20   the clinic from providing abortions.  And as a result, all

21   women in the area would have to travel long distances in

22   addition to facing additional practical concerns.  That's the

23   findings of the court based its order upon.

24           Similarly, in the Strange case out of Alabama, the

25   court did not require a showing that every woman near the

1    relevant clinics would be burdened, but rather found that the

2    privileges requirement at issue there would eliminate abortion

3    services in three cities, Montgomery, Birmingham, and Mobile,

4    Alabama, and that the loss of services in those cities would

5    prevent some woman from obtaining abortion, would delay

6    others, and at the increased distances they would have to

7    travel it would present financial obstacles, psychological

8    obstacles, cost them unnecessary addition time and cause them

9    to lose their medical confidentiality.  And so sort of these

10   generalized findings about substantial obstacle.

11        But Your Honor, I would say that even if the

12   standard were that every woman has to be burdened, the record

13   here shows that every woman who would seek abortion in the

14   Columbia area will be burdened because they will all have to

15   travel very long distances twice to seek abortion services.

16   Some woman will be prevented from doing so as a result, at

17   least 22 percent under the record here, others will be

18   delayed, but every woman who has to travel will face the

19   burdens of cost and time associated with that, logistical

20   difficulties, and potentially the loss of confidentiality that

21   comes with being forced to making these sort of arrangements

22   for that sort of travel.  But again, Your Honor, that's just

23   not the test that courts have applied.

24        THE COURT:  Okay.  Well those were the initial

25   questions that I had up front.  I'll let you continue with

1    your argument, and I think within the contents of your

2    argument there will be other questions that I may have.

3          MS. COHEN:  Sure, thank you, Your Honor.

4          Your Honor, in May of 2017, this Court preliminary

5    enjoined two Missouri abortion restrictions that were nearly

6    identical to the Texas restrictions the Supreme Court struck

7    down in Whole Woman's Health as being an undue burden, because

8    neither conferred benefits sufficient to justify the burdens

9    they imposed.

10          Among the Missouri requirements previously enjoined

11   by this Court was Missouri's requirement that physicians that

12   provide abortion must have hospital-privileges within certain

13   geographic limits around a health center.  Three weeks ago the

14   Eighth Circuit vacated this preliminary injunction because it

15   held that with regard to the privileges requirement this

16   Court's preliminary injunction order did not make sufficient

17   findings about the safety of abortion in Missouri and the lack

18   of benefits of the privileges requirement in Missouri, and

19   instead relied on Whole Women Health's findings.

20          As we discussed by phone last week, the Eighth

21   Circuit did not take any issue with the record that has been

22   developed in this case, but rather directed this Court to make

23   additional findings based upon that record.  Plaintiffs now

24   seek a renewed temporary restraining order and preliminary

25   injunction only as to the privileges requirement and only as

1    applied to the Columbia Health Center run by plaintiff,

2    Comprehensive Health.

3          There is more than ample evidence in the robust

4    record already developed in this case for the Court to make

5    the findings required by the Eighth Circuit.  And the evidence

6    in the record supports findings that the burdens the

7    privileges requirement imposes on women in the Columbia area

8    substantially outweigh it's nonexistent benefits.  Not only

9    are plaintiffs, therefore, likely to succeed on their claim

10   that the privileges requirement imposes an undue burden on

11   women seeking abortion in the Columbia area, but a TRO is

12   necessary to prevent grave irreparable harm.

13         As we have already discussed, the Columbia facility

14   has abortion patients scheduled on Wednesday the 3rd.  And

15   without a TRO, those women will have those appointments

16   canceled and will be prevented from exercising their

17   constitutional rights.  As will plaintiffs scheduled at the

18   facility thereafter.

19         Turning to the undue burden test in the record in

20   this case, it is clear from the record that the burdens the

21   privileges requirement imposes on women seeking abortion in

22   the Columbia area substantially outweigh any benefit the

23   restriction provides.  The record shows the restriction does

24   not advance the state's interest in woman's heath, but will

25   prevent at least 22 percent of women in the Columbia area from

1   obtaining an abortion altogether, and will subject all other

2   women in the area to a variety of other burdens including

3   delays in accessing abortion, which increases risks to woman's

4   health, burdens associated with having to travel long

5   distances to access care, and having to make that trip twice,

6   including increased costs, difficulty arranging childcare and

7   time off work, and the associated loss of confidentiality that

8   comes with the need to make these arrangements.  The record

9   also shows that these burdens fall most heavily on woman with

10  low incomes.  And the record shows that over two thirds of

11  women seeking abortion in Missouri have low income.  This

12  Court should, therefore, make the findings required by the

13  Eighth Circuit and find that the burdens of the privileges

14  requirement substantially outweigh its benefits.

15          Turning in more detail to the safety of abortion.

16  The Eighth Circuit's decision held that the prior preliminary

17  injunction in this case did not contain sufficient findings

18  regarding safety.  But there is more than sufficient evidence

19  in the record for the Court to make the required findings.

20  And the record is clear that abortion in Missouri is extremely

21  safe, just as it is throughout the United States.

22          As plaintiffs explain in detail in their suggestions

23  in support of their motion, the record shows that every

24  reliable study in the Academic Literature, including the

25  studies relied upon by the Supreme Court in Whole Woman's

1   Heath, and the relevant and reliable studies cited by

2   defendants, has found that abortion is extremely safe with

3   very low rates of complication.  And plaintiffs have already

4   produced in discovery in this case robust data regarding the

5   number of abortions provided at their facilities, the rare

6   complications and adverse events that have occurred, and the

7   treatment that each and every one of those patients who had a

8   complications or an adverse event received.

9           THE COURT:  You know, the defense is suggesting

10  despite those national averages that Missouri far exceeds, and

11  I think they use an example of the St. Louis facility,

12  suggesting from 2012 to 2016, was six times greater than the

13  nationwide figures that are provided or at least that the

14  Court has reviewed.  What do you say to that?

15          MS. COHEN:  Your Honor, that six times greater

16  example is just a misrepresentation.  In that specific example

17  the defendants are comparing the rate of hospital contact that

18  patients in Missouri had.  So that could include going to the

19  emergency room and being released, because the patient didn't

20  require any treatment, just any hospital contact at all, to

21  the rate in the literature of patients who actually were

22  admitted to the hospital, which is a much narrower group of

23  patients who are dealing with much more serious situations.

24  So it's really just comparing apples to oranges.  The overall

25  key figure here is that one of the most reliable studies, and

1    one is actually cited repeatedly by the defendants in this

2    case, is the one that the Court in Whole Woman's Health relied

3    upon.  And that study contains a statistic that 2.1 percent of

4    abortions result in some sort of complication and adverse

5    event.  And the data in this case provided by plaintiffs from

6    their facilities shows that the overall rate in Missouri from

7    the period from 2012 through 2016, was 0.19 percent.  So it's

8    well within those national figures and well within the figures

9    cited by the Supreme Court.

10          The defendants try a number of ways to try and

11   undermine that data, but none is successful.  As I've just

12   explained they slice and dice it and make misleading

13   comparisons.  They, you know, make a number of arguments that

14   complications are under reported, but none of their arguments

15   actually undermine this robust data that has been submitted by

16   the plaintiffs in the case.

17          And so Your Honor, the record plainly shows that

18   abortion in Missouri is extremely safe.  And there is no

19   special safety problem in Missouri that the state legislature

20   sought to cure with the privileges requirement.

21          Regarding the privileges requirements lack of

22   benefit.  The evidence in the record shows that consistent

23   with the Texas requirement struck down in Whole Woman's

24   Health, Missouri's privileges requirement does nothing to

25   improve the safety of abortion or how abortion complications

1    are treated.

2            Plaintiffs' expert Dr. Eisenberg's credible

3    testimony along with other evidence in the record including

4    the recent national academy study from 2018, show that

5    hospital-privileges requirements generally and Missouri's

6    requirement just don't benefit patients' safety.  And for this

7    evidence I would direct the Court to docket entries 63-1,

8    42-1, and 133-2.  This is because it is extremely unlikely

9    that a patient will experience a complication requiring

10   hospitalization at all.  And even when this rarely happens,

11   the fact that an abortion provider has privileges does not

12   change the quality of care the patients receive and does not

13   improve continuity of care.  This is true for a variety of

14   reasons including that hospital-based physicians are able to

15   treat complications appropriately.  Abortion providers in

16   Missouri already have in place processes for communication

17   with hospital-based physicians, and for that information I'd

18   refer the Court to docket entry 63-1 and 15-1, and importantly

19   because most complications following abortion do not occur

20   until after a patient has left the health center and gone

21   home.  Abortion patients travel significant distances to

22   access care and that is even currently the case for the

23   Columbia Health Center given that it is only one of two

24   locations in the state.  And when a patient is experiencing a

25   complication she will and should seek treatment at the

1    hospital nearest to her and she should not start traveling to

2    the hospital where her physician has privileges.  And in fact,

3    could be extremely unsafe for her to do so.  And the Supreme

4    Court in Whole Woman's Health recognize this very logic about

5    privileges requirements.

6            So Your Honor, the record plainly shows that

7    Missouri's privilege requirement just like the Texas

8    requirement struck down in Whole Woman's Health does not

9    benefit patients and the Court should make findings to that

10   affect as directed by the Eighth Circuit.

11           THE COURT:  What would you say -- because part of

12   the defense's argument that Texas kind of they distinguish in

13   this way, suggesting that Texas entirely failed to submit

14   credible evidence in which the Court didn't rely on,

15   therefore, what it did rely on is different than what they are

16   asking the Court to rely on here.  Does that make sense?

17           MS. COHEN:  Yes, it does, Your Honor.

18           The evidence in the record here regardless still

19   shows that the privileges requirement does not advance patient

20   safety.  Defendants make several arguments as to why the

21   requirement would have a benefit, but none is successful.  And

22   I could go through some of those.

23           So the defendants argue that having privileges or a

24   transfer agreement is the standard of care.  But the record

25   shows that that is just not the case for outpatient abortions.

1    The American College of Obstetricians and Gynecologist which

2    is the leading professional organization of OB/GYN's has

3    recognized that it is not the standard of care for outpatient

4    abortion for physicians to have privileges.  And actually

5    oppose those sorts of requirements because they endanger

6    patients by making abortion harder to access.  And in any

7    event, the Columbia facility has a transfer agreement with a

8    local hospital ensuring that it will admit and treat the

9    health center's patients when necessary.

10           Defendants also make a number of arguments that the

11   privileges requirement gives patients access to an abortion

12   provider that can treat them.  But I've already explained

13   abortion patients travel from all over and seek care at

14   hospitals all over the state.  And so they are not going to

15   the hospital where a physician has privileges necessarily, and

16   they shouldn't be, they should get treated near their home

17   community.  The privileges requirement also doesn't require at

18   all that the abortion provider actually be the one to treat

19   the patients, it just requires that she holds privileges.

20           Another argument that the state makes is that

21   privileges improves communication and they rely upon the

22   testimony of Dr. Steele who says that he has treated abortion

23   complications and has not had communication from abortion

24   providers.  But this is just one anecdotal piece of evidence

25   from one Missouri physician, and the record actually shows

1    from the testimony of the abortion providers that they do have

2    robust systems in place to communicate with emergency

3    physicians and outside providers.

4           And finally, defendants argue that the privilege

5    requirement ensures physician competency, but this is simply

6    incorrect as the Supreme Court found.  And the Columbia Health

7    Center's physician, her experience demonstrates this fact.  So

8    this physician holds hospital-privileges at Washington

9    University in St. Louis, a very prestigious hospital, and yet

10   she cannot maintain local privileges near the Columbia Health

11   Center.  She used to have privileges at MU, but those

12   privileges were revoked because of political pressure on the

13   University from The Senate Committee for the Sanctity of Life.

14   And the hospital revoked those privileges and said

15   specifically that they had nothing to do with her competency.

16   The reasons were unrelated to her professional competency.

17          And so Your Honor, the record shows that this

18   physician competency issue is really a red herring and it's

19   just not, it's the case that privileges is a proxy for

20   competency.  And that is especially so as to this narrow

21   motion as to the Columbia Health Center where the physician

22   does have privileges.

23          THE COURT:  Let me -- and I'm going to change gears

24   for a second.

25          MS. COHEN:  Sure.

1      THE COURT:  What is the standard?  Is my standard

2  the undue burden?

3      MS. COHEN:  Yes, that's correct.

4      THE COURT:  Now, there is a suggestion that there is

5  another standard out there if my reading is correct.  Did you

6  pick up on that?  Meaning if this somehow acts as a

7  substantial -- well, there was another standard that was

8  asserted by the defense, and maybe they will correct me if I

9  am wrong, as it relates to no set of -- and you have to make a

10  finding that no set of circumstances exist under which this

11  act would be valid.  Did you see that?

12      MS. COHEN:  Yes, Your Honor, I know what you're

13  referring to.

14      THE COURT:  Yeah.

15      MS. COHEN:  Your Honor, that's just not the

16  standard.  The Court in Whole Woman's Health which is the most

17  recent Supreme Court case regarding abortion clearly held that

18  that is not the standard.  And we are also talking about, we

19  are talking about standards for facial relief, Your Honor.

20      THE COURT:  Right.

21      MS. COHEN:  Which is not what we are seeking here.

22  And so there is some debate, but I do think it is clear and

23  has been settled by the Supreme Court whether in the context

24  of facial relief the standard should be no set of

25  circumstances or large fraction.  The Court has spoken

1  clearly, the Supreme Court, that large fraction is in fact the

2  test for facial relief. But again, this motion seeks an as

3  applied temporary restraining order or preliminary injunction

4  and so the large fraction test does not apply here.

5         I can speak -- if it would be helpful to the Court

6  the defense does argue that the large fraction tests should

7  apply, but they also make a number of legal errors in how they

8  present that test. And so if the Court were to apply it even

9  though it doesn't apply to as applied relief, plaintiffs would

10 meet it. And so I could speak in a little more detail if it

11 would be helpful to the Court about that.

12        THE COURT: Please do.

13        MS. COHEN: Sure.

14        So Your Honor, there are few issues with defendants

15 presentation of the large fraction tests. And I would say

16 there are four key areas in how the test works legally. So

17 first of all, defendants say that the proper denominator for

18 the large fraction test here should be all women seeking

19 abortion in the state, rather than women seeking abortion at

20 the Columbia Health Center. But the Supreme Court was clear

21 in Whole Woman's Health that the proper denominator is women

22 for whom the restriction is relevant. So here, for example,

23 for women in St. Louis the privileges restriction is not

24 relevant. Physicians in St. Louis hold privileges and can

25 provide abortion. The group of women for whom the restriction

1    is relevant is women who seek abortion at the Columbia Health

2    Center.  Plaintiffs have previously briefed this denominator

3    issue if it would be useful for the Court to reference that at

4    docket entry 42, starting at page 8.  So defendants argue that

5    plaintiffs' expert Jason Lindo who estimates that at least 22

6    percent of women will be prevented if the Columbia Health

7    Center closes is inflated because plaintiffs are using the

8    wrong denominator.  But the Supreme Court is very clear that

9    plaintiffs are using the correct denominator and that is the

10   relevant women in the Columbia area.

11            THE COURT:  That's what I'm having some struggle

12   with that we're focusing on the Columbia area which consists

13   of what?  I mean, for example, why wouldn't it be -- where

14   does that extend to?

15            MS. COHEN:  So Your Honor, plaintiffs' expert

16   Dr. Lindo looked at women who have actually sought abortion at

17   the Columbia facility since it obtained its license following

18   the prior preliminary injunction.  And so there is a map, I

19   believe, in his expert declaration that shows exactly what

20   counties in the state women have traveled from to the Columbia

21   facility.  And that is the group that he is basing his

22   estimate on.

23            THE COURT:  Okay.

24            MS. COHEN:  Defendants are also incorrect --

25            THE COURT:  -- and where is that in the record?  I

```
1    want to be clear.  Part of my thought as we look at these
2    counties, why wouldn't women of Jackson and Lafayette -- and
3    I'm assuming, maybe I'll have to see that, why wouldn't they
4    -- I don't know if they are being included within that.  Is
5    that the area?
6              MS. COHEN:  Right.  So this document is docket entry
7    133-3, is the declaration of Jason Lindo.  And Your Honor,
8    women from those other counties may well travel to Columbia.
9    This was really a conservative approach that Dr. Lindo took
10   just to look at women that actually traveled there since the
11   Columbia facility received its license in October of 2017.  So
12   it is sort of a short window of time, and it may be that over
13   more time women from other counties would travel there as
14   well.  But Dr. Lindo being conservative looked at only that
15   group that has done so within the past year or so.  And that
16   is that group.
17             But in terms of Your Honor entering an order, I
18   don't think it would need to be limited to that specific
19   group, I think it could be, you know, the findings could be
20   based upon all women that would seek care in Columbia.
21             I want to talk about a couple other errors the state
22   makes with regard to the large fraction test.  So one is
23   defendants are incorrect about what burdens are cognizable and
24   that count toward the numerator of the large fraction test.
25   Defendants essentially say that the only women that count in
```

1   the numerator are those that are prevented from obtaining an

2   abortion altogether.  But this is just not the law.  Planned

3   Parenthood versus Casey in Whole Woman's Health, Supreme Court

4   cases, as well as Eighth Circuit cases have recognized that a

5   number of different burdens are cognizable and count toward

6   the numerator.  So in addition to women who are prevented from

7   accessing abortion, these cases talk about delays in accessing

8   abortion, affects on vulnerable populations, such as those

9   with the fewest financial resources, risk to patient

10  confidentiality, particularly in the contexts of domestic

11  abuse, lack of individualized attention and emotional support,

12  and exposure to antiabortion harassment.  And Whole Woman's

13  Health makes clear that all these burdens need to be

14  considered together when assessing the burdens of law imposes.

15  And for that I refer you to the Whole Woman's Health decision

16  at 2298.

17          And finally, and this is a really important point,

18  Your Honor.  Defendants make a legal error when they say that

19  the numerator of the large fraction needs to be the vast

20  majority or practically all women.  This is just not the law,

21  Your Honor.  Neither the Supreme Court nor the Eighth Circuit

22  has ever required such a showing.  The Eighth Circuit decision

23  in this case didn't suggest it, and neither did the Eighth

24  Circuit decision in Jegley.  And requiring a showing that

25  practically all or the vast majority of women are burdened is

1    inconsistent with the result in Whole Woman's Health.  There

2    the District Court explained that it was impossible to define

3    exactly how many women in Texas may be affected and enjoined

4    the law based on a finding that a significant but ultimately

5    unknowable number of women would be burdened.  And that is the

6    finding that was upheld by the Supreme Court.  But Your Honor,

7    even if the proper standard were vast majority or practically

8    all plaintiffs would meet that standard because as I have

9    already explained every women in the Columbia area if the

10   Columbia Health Center were to cease providing abortion would

11   be forced to do this long distance travel twice based on a

12   variety of burdens.  Women are burdened differently but each

13   and every one of them is burdened.

14          THE COURT:  Okay.  Counsel, let me ask a question

15   and I haven't had the opportunity yet to review and so I am

16   asking you, and then I will ask the defense to put this in

17   some context for the Court.

18          I think one of my colleagues had ruled and I don't

19   know if you -- I think maybe the defense had cited a ruling

20   from Judge Phillips.  Could you talk to me about that?  Are

21   you familiar with that?

22          MS. COHEN:  Sure.  I am, Your Honor, yes.

23          THE COURT:  And tell what the issue is.

24          MS. COHEN:  Sure.

25          So that case was regarding Missouri abortion

1   restriction that was put into place following the preliminary

2   injunction in this case that requires that to provide

3   medication abortion a facility must have what's called a

4   complication plan in place.  And that complication plan

5   requires physicians at the facility to have -- I believe this

6   is correct, a written agreement with at least two OB/GYN's in

7   the state who have privileges.  Judge Phillips analyzed this

8   requirement.  She found that it did not have any benefit and

9   was very clear about that.  Judge Phillips declined to enjoin

10  it because she found that the facilities at issue, Columbia

11  facility being one of them, could still provide surgical

12  abortion because the complication plan was only with regard to

13  medication abortion.  So she said these women can still access

14  abortion, being surgical abortion, so they're not burdened.

15          Your Honor, frankly, I think that is a misreading of

16  the law in this case, and that it was incorrect for the Court

17  to decide that whether -- that plaintiffs only have the

18  opportunity to access one form of care.  But setting that

19  aside, here Columbia facility has already been prevented by

20  this complication plan from providing medication abortion.  So

21  currently provides only surgical.  And if the privileges

22  requirement goes into effect, abortion services will be shut

23  down there entirely.  So it's a very different situation then

24  what Judge Phillips was looking at.  She was saying there is

25  still services available here.

```
 1              THE COURT:  Okay.  Thank you.

 2              MS. COHEN:  Sure.

 3              Your Honor, just as a final point regarding the

 4    remaining temporary restraining order factors.  The variety

 5    harms the women in Columbia area will face if the Columbia

 6    Health Center can no longer provide abortion are certainly

 7    irreparable.  And maintaining the availability of abortion at

 8    the Columbia Health Center which has safely provided abortion

 9    on and off for many years does not harm defendants and is in

10    the public interest.  And we would otherwise rely on our

11    briefing for the remaining factors.

12              And if Your Honor has no further questions I would

13    reserve some time for rebuttal.

14              THE COURT:  Sure.  I have no questions at this time.

15              Counsel, Mr. Sauer.

16              MR. SAUER:  Thank you, Your Honor.  May it please

17    the Court?  John Sauer on behalf of the state defendants in

18    this case, Attorney General Hawley and Dr. Williams.

19              It may be most helpful if I start by addressing the

20    questions that you raised when opposing counsel was talking --

21    starting with the standing question.

22              THE COURT:  Sure.

23              MR. SAUER:  There I think it is clearly a lack of

24    standing for any injunctive relief to be entered at this time

25    until the ordinary course of the regulatory process works it
```

1   way out and the Columbia facility is eligible for license on

2   the basis of, you know, regulations that are, you know,

3   unquestionably valid and aren't even challenged in this

4   particular case.

5           THE COURT:  So you're suggesting if I were to find

6   favorable for the plaintiff, I would have to wait until those

7   are addressed and then issue the order?

8           MR. SAUER:  I think that that is absolutely correct,

9   Your Honor.

10          And I point out that the -- what the Court was

11  dealing with here usually when one of these facilities is up

12  for relicensure, a couple months before hand there is an

13  initial inspection.  If that initial inspection finds any kind

14  of deficiencies related to infection control and things of

15  that nature, the facility submits a plan of correction, and

16  usually that plan of correction is reviewed and approved and

17  then there is a second inspection.

18          THE COURT:  And this applies to all these surgical

19  centers?

20          MR. SAUER:  Absolutely.

21          THE COURT:  And is there any uniqueness to abortion

22  clinics that is -- it seems to be some of the suggestion

23  within your briefing suggests that these kind of these

24  substandard practices as you say, you know, are they unique to

25  abortion centers, do you understand what I'm saying?  Somehow

1   I get this impression from this that somehow when we come to

2   the abortion clinics these type of violations seem to be more

3   apparent there than maybe others.  But I don't know.

4           MR. SAUER:  That is my view, Your Honor.

5           THE COURT:  Okay.

6           MR. SAUER:  But no evidence has been submitted to

7   the Court in this case to my knowledge that would address the

8   health and safety records of other kinds of facilities that

9   might be useful comparables to that point.  And something that

10  could be explored in discovery in this case and the state

11  probably would do that.

12          But I would point out that the specific issue that

13  raises the standing problem in this case is unique.  It's

14  egregious, right?  What happened was in August there was an

15  initial inspection, there were a number of deficiencies that

16  were noted, the facility submitted a plan of correction.  And

17  then last Wednesday the inspectors came back to sort of make

18  sure that the plaintiff correction had been followed and

19  discovered much more grave deficiencies.  The most serious of

20  them was that the suction aspiration machine itself had a tube

21  that contained to appeared to be black mold in what actually a

22  representative Plan Parenthood said, yes, that appears to be

23  mold in the tubing.  In addition, the same machine, other

24  tubing in that machine had residual reddish fluid that was or

25  at least appeared to be bodily fluid.  So we are talking about

1    really in many ways shocking or egregious health and safety

2    violations at this facility that were discovered as recently

3    as last Wednesday, five days ago.  And so I believe the state

4    is moving promptly on this.  They have already I believe

5    submitted statements of deficiency as of last Friday.  I

6    believe they may have already submitted a plan of correction.

7    But Your Honor should think about the situation.  The state is

8    not going to race to license a facility that has the actual

9    surgical machine that does its main business with those kinds

10   of really shocking health and safety violations.  Ordinarily

11   as I understand it this process historically has taken the

12   process of submitting a simple plan of correction.  Having

13   that plan of correction approved.  Going forward with this

14   subsequent inspection.  Historically it takes maybe anywhere

15   from four to eight weeks.  I'm not exactly sure how long it

16   will take in this particular instance.  We are talking about a

17   particularly disturbing finding that was made especially

18   because it was in light of the follow-up inspection where

19   usually everything is kind of taken care of.  And so the

20   inspector goes in and says okay, here are all your deficiency

21   let's make sure we have them all corrected.  Instead there was

22   this new deficiency that hadn't been there or hadn't been

23   determined to be there in the prior inspection.  And that's

24   why we submitted a supplemental affidavit I think in the

25   evening yesterday to address their affidavit to say, hey, this

1    regulatory course of dealing has to be allowed to carry out

2    its course.  But even if the Court were to get past that

3    standing issue, in other words, Ms. Cohen's representation

4    that we're going to get this all worked out in the next two

5    business days strikes me as extremely unlikely.  And I don't

6    know exactly what the schedule will be, but I do anticipate

7    there will be some delay on that ordinary process works it way

8    out.  And I believe the affidavit we submitted yesterday said,

9    look, we go through this process for every facility, right?

10   Not just the abortion facilities.  And sometimes if you find a

11   pretty shocking or egregious violation one week before

12   relicensing happens, there can be a gap in licensure.  And

13   that is an extremely reasonable position for the state to take

14   from a regulatory perspective.

15           In any event, moving onto this issue, I do want to

16   emphasize this issue.  If the Court looks carefully at the

17   case law and listens to what they're asking, what they are

18   really doing is they are trying to invent a new form of relief

19   which they are calling in this case as applied relief, but it

20   really purports to be facial to essentially a ring of counties

21   in mid-Missouri.  And what they're really doing is they are

22   trying to get what's good for them in the facial doctorate,

23   you know, for facial challenges, and what is good for them in

24   the as applied challenges.  So, for example, presuming that

25   they were bringing what they pled which is a facial challenge

1   to have this invalidated statewide, it is absolutely

2   unquestionable that they would have to satisfy the large

3   fraction test which is a threshold showing that is clearly

4   established in all the case law.

5           THE COURT:  Would you agree though or maybe you

6   wouldn't, I'm not sure.  Would you agree that the large

7   fraction doesn't apply to an as applied challenged?  Would you

8   agree with that?

9           MR. SAUER:  I agree with that only when as applied

10  challenges defined as it is in the Supreme Court opinion in

11  Gonzales against Carhart.

12          THE COURT:  Yeah, I know your argument is --

13          MR. SAUER:  -- each individual patient.

14          THE COURT:  Right.

15          MR. SAUER:  The notion that they don't have to show

16  a large fraction test in this context I think is completely

17  unsupportable.  In other words, what they are saying well,

18  we're not bringing a statewide challenge, but we are bringing

19  a challenge that would apply injunctive relief to a large

20  circle of counties in Mid-Missouri, an entire facility.

21  Keeping in mind the facility does not hold any constitutional

22  rights here.  It's each individual woman who wants to use that

23  facility or any other facility in Missouri who is the holder

24  of the recognized constitutional right.  And I have not read

25  the three District Court opinions that my opposing counsel

1  cited as engaging in that kind of narrow relief.  I believe
2  that for them to treat that as a sort of a modified facial
3  challenge is deeply problematic in light of the authorities
4  that we have cited in our brief.  But I very much doubt that
5  any of those cases said because this is an as applied
6  challenge they don't have to show that it affects a large
7  fraction of the women who are affecting that particular
8  facility.  I believe that is completely unsupportable.

9          In any event, keep in mind -- on that point I would
10  just point the Court to what the U.S. Supreme Court said in
11  the Gonzales against Carhart case where it said we're not
12  going to approve a facial challenge in this context and,
13  therefore, the only way to challenge those particular
14  regulations which is the partial birth abortion ban has to be
15  done by individual patients.  So in other words, they are
16  trying to invent a new challenge that kind of falls between
17  two stools, and in the process they are shopping for the
18  things in the legal doctrine that are good for them, as the
19  facial, and shopping for the things that are good for them in
20  as applied.  At the very least if the Court were even to
21  entertain this notion that we could consider a facial
22  challenge for part of Missouri, they should be held to the
23  burden that meets facial challenges for statewide challenges.
24  And that is in fact the threshold showing for that is the
25  large fraction test.

1          THE COURT:  Okay.

2          MR. SAUER:  And really I think the reason they are

3    calling this an as applied challenges, frankly, they are aware

4    that under the current law they have no possibility of showing

5    an impact, a substantial burden of a quote, "large fraction of

6    women."  So we have cited a whole series of cases on this.

7    The U.S. Supreme Court has never defined exactly what

8    constitutes a large fraction.  But in the Gonzales case they

9    said that whatever a large fraction is, it is more than what

10   would be required to show in a First Amendment substantial

11   over-breadth challenge.  Which as I understand it more than

12   50 percent of the statutes application.  So whatever the large

13   fraction is, it's more than the more than 50 percent that we

14   require in the First Amendment contexts.  And that's why the

15   Sixth Circuit at least in the Cincinnati against Taft case has

16   said, hey, a large fraction is really virtually all.  And then

17   the Fifth Circuit said this last week in the June medical case

18   where they upheld Louisiana very, very similar admitting

19   privileges requirement.  They said -- in that case the claim

20   was 30 percent was a large fraction.  And the Fifth Circuit

21   said, whatever large fraction means, 30 percent is not enough.

22   In the Jegley case the Eighth Circuit itself said look,

23   12 percent is nowhere near enough.  And we have cited two

24   other cases where there are fractions in this range.  And we

25   vigorously dispute the factual basis for concluding that 22

1   percent of the woman who would otherwise get abortions at the

2   Columbia facility will be prevented under this regulation.

3   But even if it were true, it would be, you know, tens and tens

4   of percentage points lower than what they would need as a

5   matter of law to get over the large fraction hurdle.  And that

6   is why they are saying to Your Honor, hey, this is an as

7   applied challenge, you don't need to make a large fraction

8   finding.  I don't believe there is any Appellate Court in the

9   country that would make that determination.  And for that

10  reason this Court can deny this request for injunctive relief

11  right now as a matter of law, because even their experts sort

12  of most optimistic forecast gets to 22 percent as the fraction

13  and that's really just not enough.  But even if the Court were

14  to get beyond that issue, they have additional problems as

15  well which I can discuss briefly.  But I don't want forestall

16  the Court's questions because I can't remember if I have

17  addressed all the ones that you have asked.

18          THE COURT:  No, no.  Those were initially.  Now we

19  can get into more -- beyond those.  Those are the questions I

20  had as related to standing and the large fraction.  And so now

21  I think you can go to your other arguments.

22          MR. SAUER:  Okay.  Yes, Your Honor.

23          And I would just point the Court on that large

24  fraction point, point the Court to the discussion of Gonzales

25  against Carhart, point the Court to the discussion in the

1    Jegley case, point the Court to the discussion in the June

2    Medical case, point to the Court to the discussion in the

3    Sixth Circuit in the Cincinnati against Taft case.

4              THE COURT:  Okay.

5              MS. COHEN:  They are all cited in our briefs.  All

6    of those show that this notion that there is 22 percent is a

7    large fraction is really just not going to get nearly over the

8    hurdle that the U.S. Supreme Court requires for the under

9    burden standard.

10             I would also point there is another sort of legally,

11   legally conclusive problem with their theory of this case.

12   The only burden that they allege that this particular

13   regulation imposes on women in mid-Missouri is increased

14   traveling distances, right?  And they're saying all these

15   women are going to have to go the St. Louis facility.  We

16   point out that that is completely counterfactual because

17   empirically women in the western half of Missouri have been

18   going to Overland Park, Kansas, and other facilities for

19   decades and decades just because of convenience reasons.  But

20   even if you were to assume that, the only additional burden

21   that they postulate for these women is increased traveling

22   distances.  And the problem for that is Casey itself addressed

23   a very similar situation.  Ms. Cohen referred to the District

24   Court opinion in Casey.  One of the regulations that was

25   upheld in Casey against Planned Parenthood was a regulation

1     that imposed increased traveling distances of approximately a

2     150 miles on I think 42 percent of the women in Missouri.

3     Keeping in mind that they are alleging that there is a

4     22 percent impact of this particular thing. And the actual

5     impact when you look at the population of Missouri as an

6     aggregate would be much narrower. And in that case all of

7     these sort of similar arguments that, well, it isn't just

8     that, that there is an extra burden on women who have limited

9     financial resources and find it more difficult to make that

10    burden. All those arguments were made and the U.S. Supreme

11    Court upheld that regulation. And that is why Whole Woman's

12    Health specifically said, we are not relying solely on

13    increased travel distances, because under Casey -- here they

14    are saying, you've got to drive an extra 100 to 120 miles from

15    Columbia to St. Louis to get an abortion. In Pennsylvania in

16    Casey, I believe, it was a 150 miles that they were talking

17    about. And Casey said, that's not enough to constitute an

18    undue burden. So Hellerstedt said, we're not relying solely

19    on increased travel distances, we're on the combination of the

20    fact that there is increased travel distances plus the Texas

21    regulations caused three-quarters of the abortion facilities

22    in the state, two-thirds, three-quarters, to shut down

23    overnight. So the real big problem there was that sort of

24    patient burden at the remaining facilities skyrocketed from

25    like 14,000 patients per year to something like 60,000 or

```
 1   80,000 patients per year.  Quadrupling or quintupling the
 2   patient burden, the congestion at each of the remaining
 3   facilities.  And that's the factor that the U.S. Supreme
 4   relied heavily on in concluding that there was an undue burden
 5   in that case.
 6           THE COURT:  What if my travel distance -- if I have
 7   to travel it several times?  So what if I have to go back and
 8   I don't have to means or the ability to stay.  For example, if
 9   there is some requirement that I have to go to that facility
10   -- isn't there some requirement in this case, where I have to
11   go to that facility 72 hours in advance to receive some
12   materials before the abortion, right?  So now we have to make
13   some assumption that now we have to stay for a period of time
14   and have the resources to do so.  Otherwise, we have to make a
15   travel there, travel back, travel there, and then travel back.
16   That's quite a difference.  Now, we're not talking 120 miles,
17   we're talking more.
18           MR. SAUER:  Probably double that.
19           THE COURT:  No.
20           MR. SAUER:  It's an excellent question, Your Honor.
21           THE COURT:  It's saying 120, 120, 120, 120.
22           MR. SAUER:  In other words two round trips as
23   opposed to one round trip?
24           THE COURT:  Yes.
25           MR. SAUER:  In order to comply with the state
```

1    separate informed consent procedure which is not challenged in

2    this case.

3              THE COURT:  Correct.

4              MR. SAUER:  This very issue is directly addressed by

5    Judge Burnett's opinion from Jackson County because they

6    raised this very argument in their separate challenge last

7    year to the same physician requirement.  So they said, look,

8    overnight -- because the legislature in 2017 amended the

9    informed consent statute to say that a portion of the

10   information, the information like the actual medical risk of

11   the procedure must be provided by the doctor who is performing

12   the procedure.  They said, because we have so few providers in

13   the state of Missouri, and our providers are not willing to

14   travel Columbia twice to do this, that then in fact is to

15   force women to take two trips.  And Judge Burnett said I think

16   very accurately relying on two cases that I call Your Honor's

17   attention, Maher against Roe and Harris against McRae, the

18   issue of abortion providers scarcity is not one of the states

19   own making.

20             THE COURT:  And I just want to be clear, I think we

21   have those cases down.  What happen in Judge Burnett's case?

22             MR. SAUER:  They sought a temporary restraining

23   order or a preliminary injunctive relief against the

24   application of requirements in Senate Bill 5 that would have

25   required -- that does require the doctor who was actually

1  performing the abortion to be the human being who actually

2  performs a portion of the informed consent process.

3      THE COURT:  So the burden was on physician?  So the

4  challenge was to her obligation to go -- to be there?  I just

5  want to be very clear.

6      MR. SAUER:  Let me put it this way, Missouri law

7  does not require a woman to make two trips.  The woman can go

8  to a facility in her own community and meet with a doctor and

9  have informed consent happen there before she makes the second

10 trip.  Their claim is because there are so few abortion

11 providers and because they are so busy and have so many other

12 things to do, like teaching classes at Washington University

13 Medical school and things of that nature, those doctors are

14 too busy to meet a woman in her own community.  And that the

15 practical affect of that requirement is that most woman will

16 have to make two trips to whatever facility they are going to.

17 And they said, that's an undue burden, you can't do this, and

18 Judge Burnett said no.  The state did not provide the scarcity

19 of abortion providers.  And that is the problem that goes

20 through all of their arguments in this case, because their

21 argument is that in Columbia that no one can get privileges if

22 the hospital is in Columbia.  There are tons of OB/GYN's in

23 the Columbia area.  Many of them I presume have privileges

24 including Boone County Hospital.  But apparently for reasons

25 that are beyond the state's control and are not created by the

1   state, few or none of them are willing to actually perform
2   abortion services.  So it's a fundamental problem that is
3   running through their cases that they are attributing the
4   scarcity of abortion providers to the state.  And there is no
5   evidence that supports that.  And the presumption that the
6   state has somehow made qualified doctors unwilling to perform
7   abortions has no evidentiary support and contradicts what the
8   Eight Circuit said in this particular case which is that the
9   state is presumed to be acting in good faith when it
10  administers these very things.  So that's a response to Your
11  Honor's question about whether or not the woman has to make
12  two trips, but it's also a deeper problem with all the
13  arguments they are making about the increased burden in this
14  case.  Because the state applies a regulation, in a state, for
15  example, where there is a lot of interest among doctors to
16  perform abortions wouldn't impose essentially no burden at
17  all.  Right now there's a lot of doctors in Columbia who said,
18  I'm quite open to doing that, getting hospital-privileges in
19  your local community is really not a big deal.  And that is
20  what we see in the St. Louis area.  There are a number of
21  doctors who are based in the St. Louis area, I believe, the
22  testimony in one of the other cases is they have a rotation of
23  I think it's like four who are frequently there and the other
24  doctors are rotating in.  That none of them has a difficulty
25  getting privileges in their community.

1         And I want to take that point and turn it back to

2    the standing question that we raised at the beginning.

3    Because I pointed out that the issue of being black mold and

4    human fluid in the actual suction aspiration machine that they

5    have now admitted that they have used on patients with those

6    problems.  That's the sort of issue that tends to arise when

7    you have doctors engaging in what Dr. Steele in his affidavit

8    calls itinerant surgery.  In other words, if the doctor is

9    there and they are frequently present at the facility and they

10   are supervising what is going on there, it's much less likely

11   that you're going to get those kinds of health and safety

12   violations.  And that's why in this particular context with

13   this regulation and throughout medicine generally, the whole

14   sort of both Missouri's regulation of medical doctors and

15   standards of care within medicine themselves push

16   responsibility to the doctor.  And if in a case like this

17   where the doctor is coming in one or two days a month and the

18   entire time she is there she is performing abortions very,

19   very quickly and then leaving, you have situations like who

20   owns this process?  Where does the buck stop?  And when it's

21   not clear where the buck stops and especially where the buck

22   does not stop with a doctor, you have a situation where the

23   state is concerned you're getting things like black mold in

24   suction aspiration machines and things of that nature.  That

25   is sort of an overarching, you know, sort of understanding of

1    how medicine functions and how medicine is regulated.  And so

2    I think this addresses Ms. Cohen's point that she raised, that

3    well, you know, facilities say is not standard care to have

4    privileges in your community for people performing outpatient

5    abortions.  The state's view is if that is so that is a bad

6    development in the standard of care that operates to the

7    detriment of patient safety at that is when regulation needs

8    to come in and make sure that the standard of care does not

9    develop in that negative way that would put patients at risk.

10            THE COURT:  Okay.

11            MR. SAUER:  I just want to address very briefly, we

12   have briefed this, Your Honor, in our brief.  They say there

13   is absolutely no benefit to hospital-privileges requirement.

14   And I think our brief identifies eight discreet benefits and

15   all of which are completely noncontroversial.  They certainly

16   are benefits.  I think the plaintiffs really say those

17   benefits are not enough to get over to outweigh the burdens

18   that they receive.  And I would just remind the Court of all

19   the cases that say this is not a 50/50 balancing.  The burdens

20   have to decisively or substantially outweigh the benefits for

21   there to be an undue burden in this particular case.  I will

22   just remind the Court and I think we said all this in the

23   brief, that having a doctor there in the community, with

24   privileges in the community, promotes continuity of care.  As

25   Dr. William said in his affidavit we filed on Friday, that

1    doctor can travel with the patient to the hospital and treat

2    her when she is in an emergency situation.  That is totally

3    different than being sent to the emergency room and be

4    subjected to, what Dr. Eisenberg himself testified in the

5    other case, could be eight hours of waiting time.  In addition

6    to that, it gives access to a physician who is definitely

7    qualified to treat post-abortion complications.  If that

8    abortion provider is an OB/GYN who is almost certainly going

9    to be able to treat them.  Whereas, they have admitted in the

10   other case that not all ER doctors are qualified to treat

11   them, not all hospitals have an OB/GYN on staff who can

12   actually treat them.  It gives you access to the physician who

13   actually performed the surgery and therefore is going to know

14   the most about where might a cervical laceration or perforated

15   uterus be, what might be causing these symptoms.  And avoids

16   unnecessary treatment.  Their expert Dr. Eisenberg testified

17   that there is a systematic problem of women who --

18           THE COURT:  -- and part of this assumes and I

19   understand what your argument is, the frequency or the rate in

20   which these individuals might end up, correct?  For example,

21   you suggest we need someone.  And I think the plaintiff will

22   argue against this.  But you need someone there who is a

23   trained OB/GYN, but that is assuming you are there.  If my

24   complication rate for a particular procedure is less than

25   another complication rate, correct, then the time in which I

1   may spend or may spend in an emergency room is different.

2   Although what you say maybe true, but then there are some

3   arguments to that.  Let's -- just as a general matter, I don't

4   know this, maybe you can tell me.  With respect to those who

5   enter the emergency room or the emergency room doctor or the

6   physician who would be treating those patients, is necessarily

7   trained in treating what the injury may be, first of all.  And

8   then secondly, if but for they were trained in another area

9   then somehow the success of the complication encountered by

10  the person would be different.  Do you see?

11          MR. SAUER:  Absolutely.  And let me say three things

12  in response to that.

13          THE COURT:  Sure.  So respond to the one where,

14  okay, yeah, I may go to the emergency room assuming you're

15  correct.  But it's one out -- and I'm just creating a number.

16  One out of every 10,000 folks, as opposed to something else

17  that is, you know, a higher risk of these complications, a

18  higher risk of me ending up in the emergency room.

19          MR. SAUER:  Yeah, let me say two things in response

20  to that.

21          THE COURT:  Okay.

22          MR. SAUER:  So first from the state of Missouri

23  perspective, even if it is one in 10,000, that one in 10,000

24  is very important and she is entitled to the full standard of

25  care that is applied to other patients in other contexts.

1          But secondly --

2          THE COURT:  -- so when you say, and I just want to

3    be clear, patients in other context.  So as it relates to

4    those other surgeries or at least where the evidence suggests

5    that the complication rate maybe higher than that of surgical

6    abortions, I'm assuming all those other areas, all those

7    doctors are required to have privileges?  The privileges

8    requirement, right?

9          MR. SAUER:  They are required by standard care, the

10   standard of care, which regulates most of medicine.  Not

11   actual express state regulations, but it is standard care in

12   comparable areas of medicine for a doctor who performs an

13   elective surgery something like an abortion to either have

14   hospital-privileges.

15         THE COURT:  That's standard of care?

16         MR. SAUER:  Yes, not specific state regulation.

17         THE COURT:  Okay.

18         MR. SAUER:  What I would submit to the Court is that

19   where there is a troubling problem of standard care -- in

20   other words in the state's view and as Dr. Williams says in

21   his affidavit what we see going on in these cases is the

22   medical community is willing to makes sacrifices to standard

23   of care in places where abortion is scarce.  And the state's

24   position is that is not a trade-off that the state is willing

25   to bless or approve.  And therefore, regulation needs to step

1    in to ensure that there is not a lapse in the standard of care

2    so that patient safety will not be protected.

3            THE COURT:  I just want to make sure I'm following

4    this.  So it's regulated at abortion clinics, but it may not

5    be regulated other places that are similar to abortion

6    clinics?

7            MR. SAUER:  It is some and not in others I would

8    say.

9            THE COURT:  So where is the standard of care that

10   you talk to.  Where is the state of Missouri stepping in to

11   ensure that they are doing what everyone else is doing, in

12   terms of the medical field and in similar circumstances?  Does

13   that make sense?

14           MR. SAUER:  Absolutely, Your Honor.

15           THE COURT:  Okay.

16           MR. SAUER:  I think standard of care is defined as

17   broadly defined as what similarly situated, similarly trained,

18   fully qualified physicians would do in similar circumstances.

19           THE COURT:  Okay.

20           MR. SAUER:  Standard of care is not like a

21   regulation that is set forth somewhere.  It is really a sort

22   of code of conduct of how physicians behave.  When the state

23   tends to regulate, it does so and it says, hey, we really

24   don't like what physician are starting to do here.  We need to

25   step in and ensure that they continue to observe best

1  practices.  And so many of the authorities that the plaintiffs

2  have cited in this particular case that say, well, it's not

3  standard of care to do this in the abortion context.  The

4  state's view is, yes, it appears to be at least starting to

5  not be true that this is standard care of the abortion

6  context, and that is something that the state thinks is a bad

7  development that risks patients safety, and that's why we have

8  specific regulation in the abortion context.  There are other

9  context like birthing centers and things of that nature where

10  the state feels like we've got to step in and make sure that

11  we express regulation that best practices that promote patient

12  safety are being addressed.

13            THE COURT:  Okay.

14            MR. SAUER:  And if I may return to your initial

15  question that had to do with how frequent are these

16  complications?

17            THE COURT:  Sure.

18            MR. SAUER:  There I would say there is a deeply

19  troubling record here.  Certainly any state that has an

20  abortion facility where abortions have been performed with

21  black mold in the suction aspiration machine is a big problem,

22  right?

23            THE COURT REPORTER:  Mr. Sauer, if you could slow

24  down a little bit.

25            MR. SAUER:  I'm sorry.

1          Let me just make a few points about that.  And

2    obviously there has been voluminous paper filings on this.

3    First of all, the way I put this in the previous oral argument

4    in this case, and this is the way I look at it.  There are

5    kind of four layers of complications.  There are the

6    complications that the abortion providers know about and

7    report.  So that is the situation where a woman receives an

8    abortion, suffers a post-abortion complication and returns to

9    the facility to be treated or the complication happens right

10   there at the facility.  So they know about it and they report

11   it.  And so that first layer of complication is what is

12   reflected in the 2012 to 2016 data that Ms. Cohen alluded to

13   that was filed with the Court, I think attached to docket 63,

14   but I'm not necessarily right about the actual ECF number.

15   And that as we argued in a five page brief that I recommend to

16   Your Honor's attention is itself deeply troubling.  Because it

17   includes, for example, the notion that at the St. Louis

18   facility the failure rate for medication abortion was three

19   times the national average predicted by their own medical

20   director.  I continue to insist that it is deeply troubling

21   that the rate of hospital contact that they reported was six

22   times as high as the rate of hospitalization that was reported

23   in the literature.  The way they distinguished is to say,

24   well, hospital contact and hospitalization are apples and

25   oranges.  As a layperson that sounds like comparing Granny

Smith apples to Golden Delicious apples.  Someone is going to

a hospital after an abortion procedure something went really

badly or appears to have gone really badly.  That's a

troubling figure.  But that's only sort of the essential core

of the complications.

There is another layer of complications which are

complications that the abortion providers find out about but

never report.  And here's something very specific to Missouri

and very troubling in this case.  Revised statutes of Missouri

188.052.2 has required since 1989 that anyone who provides an

abortion must file an abortion report with DHSS, and anyone

who files a complication report must file an abortion

complication report with DHSS.  In an emergent discovery early

in this case after at least 15 years, these plaintiffs have

never filed an abortion complication report.  And that from

the state's perspective is deeply disturbing.  And in May of

2017, Dr. Williams announced there would be vigorous

enforcement of this going forward.  So for 15 years there is a

way the state sets in place to track abortion complications,

but we don't know.  We don't have the evidence that we should

have about how frequent these complications were occurring

because they systematically disregarded that particular

reporting requirement.  In fact, Dr. Eisenberg testified in

his deposition which we filed with the Court on Friday that he

knew about that requirement, but he was told by somebody else

1    before his counsel interjected and started asserting

2    attorney/client privilege, he had been told by somebody else

3    that the state wasn't going to enforce that and he didn't have

4    to follow it.  But the statute doesn't say you have to file

5    these if state regulators demand it, the statute puts the

6    burden on the abortion provider to always file them.  And in

7    fact, makes it a crime, a misdemeanor to not file them.  And

8    yet that report requirement in Missouri alone was

9    systematically disregarded for at least 15 years.  So when we

10   went back early in this case to say what is the safety records

11   of abortion in Missouri to address all these issues they are

12   saying it is so safe, let's go to the repository of records

13   that tell us that.  And I believe there was something like 36

14   reports over 15 years.  None of them from the plaintiffs in

15   these cases.  Virtually all of them from secondary providers.

16   A woman had come to and had been treated, it wasn't the

17   abortion provider.  So there is the first layer of

18   complications that we know about, and that are serious.  And

19   that the best literature on this is probably the Upadhyay

20   study that both sides have cited that finds the complication

21   rate to not to be the one percent that Ms. Cohen just said at

22   the podium.  But at least two percent for abortions overall.

23   Then there is the complications that never get reported but

24   are known about.

25            Then there is a third layer that all of the parties

1    agree is out there which is the abortion complications that

2    happen but we never find out about them.  Because it is

3    extremely common for a woman to have an abortion, but then

4    when she has a complication afterwards to go to another

5    medical provider.  And I think there was undisputed testimony

6    I think from the doctor who performs abortions in Columbia in

7    this case, that happens.  That many women are reluctant to go

8    back to the abortion provider and want to go privately to

9    someone else.  And in fact, sometimes and frequently won't

10   even say that the complication they're suffering is from an

11   abortion.  And the best figure I can cite for Your Honor on

12   this is at the ACOG Bulletin No. 143 that both sides have

13   relied on as an authority.  Which says that in the context of

14   medication abortion, studies trying to find out how often

15   women have suffered complications after medication abortion

16   where the vast majority of complications happen later, but not

17   right there at the facility, lost of follow-up rate of

18   45 percent.  So that two percent figure, right, could be

19   dramatically understated.  Because the various other studies

20   that come in in the range of the two percent are all under the

21   understanding that there could be of loss of follow-up as high

22   as 45 percent that you never hear back from that patient.  And

23   certainly abortion facilities don't dispute that.  They just

24   never hear back from them.  They do not know if there are

25   complications.  That's the third layer.

1          And then there is the fourth layer.  The fourth

2    layer, of course, is that we have had these regulations in

3    effect for ten years since 2007 and the facilities have been

4    requiring them.  The question arises that if we didn't have

5    this rigorous regulation that promotes patient safety, how

6    much higher would the complications be?  So the fourth layer

7    of complications are the complications that would've occurred

8    but did not because the state of Missouri was vigorously

9    regulating this area and did everything it could to ensure

10   safety.  So, for example, the St. Louis facility which is the

11   one set of data points that we have because we got them in the

12   very, very limited discovery that was permitted in early 2017.

13   That facility was a facility that was always operating, it was

14   a fully qualified surgery center.  All of those doctors have

15   privileges in Barnes Jewish Hospital which is just down the

16   street and is one of the best hospitals in the United States

17   of America, and yet that facility had a troubling safety

18   occur.  The state is concerned about what happens to the

19   facility that opens up that it doesn't have any kind --

20   anything like those particular safeguards and so forth.  And

21   so that's why I would say the state vigorously disputes the

22   notion that this record supports conclusion that abortion is

23   totally safe and there is no need for regulation in this area.

24          THE COURT:  Okay.  I have two remaining questions.

25   Let me ask this, I asked this question of Ms. Cohen.  I think

1       it was you who cited Judge Phillips' case.

2               MR. SAUER:  I think we cited Judge Burnett's case.

3       There has been three or four lawsuits.

4               THE COURT:  I know Judge Burnett on the state in

5       Jackson County, correct?

6               MR. SAUER:  Right.  I don't recall citing Judge

7       Phillips.

8               THE COURT:  Did you know about it?

9               MR. SAUER:  Yes, sir.

10              THE COURT:  What did Judge Phillips say?

11              MR. SAUER:  That was as Ms. Cohen said, I think she

12      got this basically right.  Judge Phillips' holding was that it

13      basically was a challenge to be complication plan requirement

14      that only applied to the medication abortions.

15              THE COURT:  Okay.

16              MR. SAUER:  So they brought a challenge saying,

17      well, this is going to make it difficult.  Because of the

18      scarcity of doctors, the alleged scarcity of doctors again.

19              THE COURT:  Is that a facial challenge?

20              MR. SAUER:  Yes, I believe so.  Ms. Cohen will

21      correct me if I'm wrong.  I think they may have tried to do it

22      as a modified facial.

23              THE COURT:  When you say modified facial, that's

24      what you're suggesting here?

25              MR. SAUER:  That's what I'm suggesting they're doing

1    here.  I'm saying really it's a hybrid that the law does not

2    recognize between facial and as applied challenges.

3              THE COURT:  And I'll ask Ms. Cohen.  And if you

4    could come up.

5              MR. SAUER:  But I think the holding of Judge

6    Phillips opinion was --

7              THE COURT:  -- no, I'm asking you to come up.  I was

8    just curious.  Was that an as applied challenge or was that a

9    facial challenge?

10             MS. COHEN:  Your Honor, I would have to go back and

11   look at that.  I was not deeply involved in that case.

12             THE COURT:  Fair enough.

13             Go ahead, Mr. Sauer.

14             MR. SAUER:  I'm pretty sure it was a facial

15   challenge.  But in any event, what they said, look, there was

16   a complication plan requirement that applied to only

17   medication abortion.

18             THE COURT:  Okay.

19             MR. SAUER:  And they said, well, look, this is going

20   to shut down medication abortion completely at the Columbia

21   facility, and the Columbia facility will only be able to

22   provide surgical abortion.  And the state argued that there is

23   no constitutional right to a particular method of abortion.

24   But if you can get a first trimester abortion and surgical

25   abortion remains incredibly common and widely accepted method

1    of abortion, that doesn't even get to the level of addressing

2    someone's constitutional rights.  And that was her holding.

3            THE COURT:  Let me ask you this, why do you think we

4    need addition discovery other than the Court relying on the

5    record that we have?  Your argument seems very much that you

6    could rest on this.

7            MR. SAUER:  Let me put it this way.  If the Court

8    can easily and, in fact, should deny this request for

9    injunctive relief outright as a matter of law for all the

10   reasons I have stated.  And focus especially on that -- first

11   of all the standing issue is an issue.  But focus on that

12   large fraction test.  That large fraction test unquestionably

13   applies here and cannot possibly be satisfied because they are

14   forecasting their large fraction, the number we dispute, we

15   say it is exaggerated, but their best number is 22 percent.

16           THE COURT:  Tell me again, and this is where I'm

17   having a bit of a -- as it relates to the as applied and the

18   facial challenge.  And you're saying it's this modified

19   version where it is truly, judge, this is facial, therefore,

20   you should use the large -- talk to me a little bit about that

21   or explain.  Help me -- slow it down a bit.  I just want you

22   very clear on where you are seeing distinction.  That way when

23   Ms. Cohen has the opportunity I can talk to her about that.

24           MR. SAUER:  Let me put it this way.  That everybody

25   agrees that you don't have a large fraction test when an

1    individual plaintiff is saying this abortion regulation is

2    unconstitutional as applied to me.  Because there is no

3    numerator and dominator to compare.  But in the context of

4    statewide, everybody agrees that you have to show a large

5    fraction because the U.S. Supreme Court has said it in so many

6    terms multiple times.  And so has the Eighth Circuit most

7    recently in the Jegley case, right?  So if you're talking

8    about, well, is this facially -- is this unconstitutional as

9    to a large category of women.  What the Supreme Court says you

10   have to look at a numerator, the number of women affected.

11   And the denominator, the number of women for who the

12   regulation is relevant, and that has to be large.  And the

13   Supreme Court has never said how large it has to be, but what

14   it has said in Gonzales is it's got to be more than the over

15   50 percent that we usually expect in the first amended

16   context.

17          THE COURT:  And I get that aspect of it.  My

18   question kind of related to -- and I think you addressed it.

19   And I can talk to Ms. Cohen, as it applies to me being

20   Columbia.

21          MR. SAUER:  So in other words, we don't think you

22   should do this, but suppose Your Honor says, fine, you can

23   bring a sort of targeted challenges that affects the Columbia

24   facility and the women in the geographical territory around it

25   who seek -- the thousands of women or hundreds of women

1   whatever it is who seeks services there.  So the question is

2   should you look at that and say this is just like an

3   individual plaintiff where there is clearly no numerator and

4   no denominator and, therefore, I shouldn't use large fraction

5   test.  Or is this more a statewide challenge where a large

6   number of women are affected, and they are affected in

7   differential ways, and you've got to make that comparison.

8   It's obviously in the later category.  I can't imagine any

9   Court saying because it is as applied and because we are only

10  considering a large subset in Missouri, we don't have to

11  engage in a large fraction analysis.  I think that's why they

12  are calling this as applied challenge.  Because their number

13  is too low to be a large fraction.  22 percent.  We have cited

14  five different cases for the Court that all signal that

15  numbers of that range are going to be too low.  So the Court

16  may -- the state's position is deny this outright as a matter

17  of law.  Right?  And then we will set up a discovery schedule

18  for trial on the merits.  But if the Court is in anyway

19  inclined to grant it, and thinks, well, there is enough here

20  and I want to see more, the Court ought to put this motion for

21  preliminary injunction on and because of the guidance the

22  Eighth Circuit gave we ought to have substantial discovery and

23  an evidentiary hearing on this case.

24          Our principle position is as you say and correct

25  Your Honor this should be denied as a matter of law.  And for

1  all the reasons we discussed in our brief.  If Your Honor has

2  no further questions --

3          THE COURT:  -- at this time I don't.

4          MR. SAUER:  Thank you, Your Honor.

5          THE COURT:  Why don't we do this, why don't we take

6  about a ten to 15 minute recess.  It will give me the

7  opportunity to review my notes and get them in order.  And

8  then Ms. Cohen I will give you the opportunity to reply, and

9  if I have any further questions of you, Mr. Sauer, we will

10 address them at that time.

11 (THEREUPON, a short recess was had; WHEREUPON, the following

12 proceedings were had.)

13          (Proceedings began at 11:05 AM)

14          THE COURT:  Counsel, I appreciate your patience.

15          Ms. Cohen, it's your opportunity to respond or reply

16 to the argument of counsel, Mr. Sauer.

17          MS. COHEN:  Thank you, Your Honor.

18          There are several points that Mr. Sauer made that

19 I'd like to respond to.  I apologize if I'm jumping around a

20 little bit.  I'd like to first start with this licensure

21 redressability issue.  This is all covered in the declaration

22 of Ms. Casey, but I do want to point out that some of the

23 statement that counsel is making is very inflammatory and just

24 incorrect.  There was no statement by anyone at the Columbia

25 Health Center that there was mold in the medical equipment.

1  No equipment using tissue was ever used on any patients.  This

2  is just really inflammatory statements that are just not

3  correct.  But in any event, all of these issues have already

4  been corrected as is clear from our filings with the Court and

5  there's no reason why the licensure process can't move swiftly

6  to completion.  I think Mr. Sauer suggested four to eight

7  weeks to get that process completed.  That seems to me to be

8  totally outside the balance of what is reasonable and is not

9  consistent with the history that has occurred with these

10 abortion facilities.  When these processes have needed to be

11 done swiftly that has happened, and I'm there is no reason why

12 it cannot happen here.

13          I'm also not sure Mr. Sauer is correct the licensure

14 process would have to be 100 percent completed before this

15 Court can enter relief.  Redressability requires that only

16 that there is no other impediment to relief.  And the fact

17 that the licensure process needs to go through a couple of

18 more administrative steps --

19          THE COURT:  -- well, wouldn't that be a pediment for

20 this Court?

21          MS. COHEN:  Your Honor, the fact that the licensure

22 process just needs to be completed through a couple

23 administrative steps, Your Honor, I mean, the process is

24 already 99.9 percent completed.  There has been this back and

25 forth.  All of the issues have been fixed.

1          THE COURT:  But do you understand that is not what

2    the Court is being represented to the Court today that

3    everything has been fixed, I don't know that representation.

4    But let's say there is 99.9 percent.  The question is this, if

5    I found favorably for plaintiff and issued a TRO right now as

6    we speak administratively or however you want to characterize

7    it they still would have to resolve these complications before

8    this would take affect, correct?

9          MS. COHEN:  Before the license could issue, that's

10   correct, Your Honor.

11         THE COURT:  License can issue.

12         MS. COHEN:  Yes.

13         THE COURT:  Therefore the addressability.

14         MS. COHEN:  Correct.

15         THE COURT:  So we can say procedural, we can say 99

16   .9 percent, but wouldn't it actually be 100 percent before the

17   license was issued?  And you had discussed with me earlier

18   until you would be -- and I asked you, is that correct, until

19   this license is issued, the question of redressability

20   wouldn't be addressed.

21         MS. COHEN:  Well, Your Honor, as I've already

22   mentioned, I do think there is no reason why this process

23   can't be resolved in the next couple of days.

24         THE COURT:  That may or may not be the case, but I

25   want to be clear on this very issue.  I guess my position is

1   this, if I were to find favorably for the plaintiff and

2   enjoin, it is my belief as I sit here right now, that I

3   couldn't issue the Court's order until such time as that

4   facility would be licensed.  It's not 99.9.  That is my belief

5   unless you would suggest there is something out there that

6   would be different.  I'm not talking time, I'm just saying on

7   that very point, until a license is issued.

8           MS. COHEN:  I just want to clarify something, Your

9   Honor.  So the privileges requirement is actually part of the

10  licensure process.

11          THE COURT:  Right.

12          MS. COHEN:  So it's not the case that the license

13  can't issue prior to this Court entering relief for the

14  plaintiffs.  The part of the licensure process is that the

15  department has to approve either that privileges are in place

16  or if that requirement is enjoined then that is no longer part

17  of the licensing requirements.  And so it is not the case that

18  the license could issue ahead of this Court's order.  What

19  would have to happen is that this Court would enter a

20  temporary restraining order that would remove that requirement

21  from the licensure process, and then along with verified

22  completion of these other issues, then the license could

23  issue.

24          THE COURT:  And that's what I was looking for.  So

25  you are suggesting that by me enjoining would remove that

1    requirement?

2             MS. COHEN:  Exactly.  And the other remaining

3    pieces, as I've already mentioned and as is shown from the

4    declaration of Ms. Casey filed yesterday, the remaining pieces

5    for licensure have already been addressed.  And all that

6    remains to be done is for the department to -- they said they

7    need to visit again and verify that everything has been

8    completed.

9             THE COURT:  Okay.

10            MS. COHEN:  And then the last final piece for the

11   licensure is privileges.

12            THE COURT:  Okay.

13            MS. COHEN:  So I hope that clarifies for Your Honor.

14            THE COURT:  No, I think it is.  So what you're

15   disgusting is, Judge, you could do what you actually said you

16   couldn't do, but we would have to wait for that last -- well,

17   that would remove the privilege requirement, and then we would

18   just have to wait to be cleared for the lack of a better word.

19            MS. COHEN:  Precisely, Your Honor.  I'm sorry if I

20   wasn't clear.

21            THE COURT:  No, that's helpful.  Thank you.

22            MS. COHEN:  Yes, sure.

23            I next want to revisit this as applied versus facial

24   relief issue.  I don't think I need to fully revisit this.  I

25   have already explained to the Court that as applied relief for

1    a particular health centers is commonly granted in abortion

2    cases and I mentioned a few of those cases.

3              THE COURT:  Let's make sure.  Mention those cases

4    again.

5              MS. COHEN:  Sure.

6              THE COURT:  Because that's my next question.  How

7    this is not -- and I wanted you to explain to the Court as I

8    talk to Mr. Sauer about kind of this as applied but really

9    masqueraded as facial and therefore the Court should use the

10   large fraction.

11             MS. COHEN:  Sure.  I'll just give the cites for

12   those cases again so that the Court can reference them.  So

13   it's the Fifth Circuit opinion in Whole Woman's Health at 790

14   F.3d 563.  Planned Parenthood versus Strange out of Alabama,

15   which is reported at 33 F. Supp 3d. 1330.  And then West

16   Alabama Women's Center versus Williamson, that's an Eleventh

17   Circuit case and that's at 900 F3d. 1310.

18             THE COURT:  Okay.

19             MS. COHEN:  Those are just a few examples.  I don't

20   think that's exhaustive list of cases in which courts have

21   done this.

22             THE COURT:  Sure.

23             MS. COHEN:  And so Your Honor, as I explained

24   earlier the courts in those cases did not apply the large

25   fraction test but rather looked at whether a substantial

1    obstacle was put in the place of women who would seek care at

2    the individual facilities for which as applied relief was

3    sought.  And that is how courts have analyzed this sort of as

4    applied challenges.

5           Counsel for defendants talked about the Gonzales

6    case and how that court talked about how individual women

7    could bring as applied challenges.  It's of course the case

8    that that is true.  Individual women can certainly bring as

9    applied challenges.  The Gonzales didn't foreclose other forms

10   of as applied relief.  It just happened to be discussing

11   individual women.  And as is demonstrated by the fact that

12   courts do this regularly, other forms of as applied relief

13   including for individual health centers is appropriate.

14          But Your Honor, even if the Court were to treat this

15   as a facial claim or a modified facial claim as Mr. Sauer is

16   putting forth and apply the large fraction test, plaintiffs

17   would meet that test.  And I want to talk about a few very

18   important errors in what Mr. Sauer is saying.  So Mr. Sauer

19   has latched on to this 22 percent as being the numerator that

20   plaintiffs can show.  And that is just entirely incorrect.

21   Dr. Lindo's report says that at least 22 percent of women will

22   be prevented from obtaining abortions.  And importantly, he

23   explains that that is a very conservative low estimate because

24   that number is based on only one trip.  And the reason why is

25   he is comparing to the situation in Texas where if a woman

1  lives 100 miles or further from a health center she only has

2  to travel once.  And so he explains that, in fact, a Missouri

3  the number is really going to be higher.  He just can't

4  quantify it because based on his research.  Because we know in

5  Missouri every woman has to travel twice, not once.  And so

6  that 22 percent number is very conservative.

7          THE COURT:  What do you say to the argument of Judge

8  Barnett in Jackson County with regard to the traveling, and it

9  appeared -- and counsel correct me, it seemed like there is

10 nothing that would prevent the physician from my assumption is

11 traveling to where the patient would be.  You understand what

12 I'm saying?

13         MS. COHEN:  I think, Your Honor, the cases are quite

14 different.  So in Judge Barnett's case no health centers were

15 being shut down by this requirement.  Every one was gonna stay

16 open.  It is just a question of whether patients would have to

17 either the patient or the physician would have to travel to do

18 this additional informed consent.

19         THE COURT:  Right.

20         MS. COHEN:  Here on the other hand we are talking

21 about a health center being forced to cease providing abortion

22 services.  And so the distance that women are having to travel

23 are going to be changed quite drastically, whereas in the

24 other case no health centers are gonna be shut down.  And here

25 physician travel wouldn't help, because the physician can't

1    provide abortions in Columbia currently without local

2    privileges which she cannot get, her privileges were revoked.

3    And so I think the situations are very different.

4            But going back again to this 22 percent number.

5    This is critical, Your Honor, the undue burden test does not

6    ask what fraction of women are prevented from obtaining an

7    abortion, it asks what number are burdened.  And as I

8    explained earlier the case law in this area including Whole

9    Woman's Health and Casey talks about a variety of burdens that

10   are cognizable and that count in that numerator.  And those

11   burdens include delay, travel, loss of confidentiality, a

12   variety of burdens that I discussed that count in that

13   numerator.  So that 22 percent number that Mr. Sauer is

14   holding onto, it's not the numerator here.  It is

15   significantly higher than that.  And we don't have -- we're

16   not able to quantify a precise number of what that is.  But

17   Your Honor, we do know that all women in the Columbia area

18   will be forced to travel these long distances twice.  And that

19   that does come with a variety of burdens.  Mr. Sauer is

20   incorrect that we are asserting that increased travel is the

21   only burden here.  I think I've talked extensively about the

22   different kinds of burdens that come into play.

23           THE COURT:  Sure.

24           MS. COHEN:  I just want to make sure that that is

25   clear.

1          THE COURT:  Do abortion clinics do their own

2    background checks of physician, criminal background or any

3    other type of checks?

4          MS. COHEN:  I believe that they do, Your Honor.  And

5    I believe actually that part of the state's licensure

6    requirements for abortion facilities requires the facilities

7    to go through a privileging process, not hospital-privileging,

8    but privileging by the facility itself.  And that that does

9    include drug enforcement agency, licensing, and all sorts of

10   -- a whole variety of issues.  And that the state does check

11   on that as part of their annual inspection.

12         THE COURT:  Okay.

13         MS. COHEN:  So yes, I believe so, Your Honor.

14         THE COURT:  Let me ask you and I posed this question

15   to Mr. Sauer with respect to kind of this regulation of

16   standard care.  Do other areas of medicine regulate the

17   standard -- I guess my question during our discussion was and

18   I think it related to obviously privileges, but the fact that

19   the benefit of this is that doctors can travel with their

20   patient to the emergency room.

21         MS. COHEN:  Right.

22         THE COURT:  And the suggestion or at least to me

23   seemed to be when I ask if other areas of medicine whether it

24   is those who practice, you know, gastroenterological, are they

25   required also in similar type facilities or similar type

1    surgeries, are those comparable?  My question is do they have

2    the same requirements or the standard of care that those

3    doctors who are at the abortion clinics?

4              MS. COHEN:  Right.  And I'm glad you asked that,

5    Your Honor.  I wanted to make sure and hit that point.

6              The state of Missouri does not require that

7    physicians performing other kinds of outpatient procedures

8    have hospital-privileges.  And that is true even for

9    procedures that are far less safe than outpatient abortion.

10   Including different kinds of plastic surgery, colonoscopies, a

11   whole variety of procedures that occur on an outpatient basis

12   the state does not require privileges.  I think technically

13   under the licensing scheme, if a facility is providing

14   50 percent or more of surgery then they need to have

15   privileges or a transfer agreement with a hospital.

16             THE COURT:  Okay.

17             MS. COHEN:  Which if they have satisfied the

18   transfer agreement, they then don't need to have privileges.

19   Here Columbia has a transfer agreement, but because the state

20   of Missouri says you have to have privileges too.  And that is

21   a rule that applies only to abortion providers, they still

22   can't get licensed.

23             I want to talk about something -- just you mentioned

24   travel to the ER, that they can travel with their patients.

25             THE COURT:  Right.

1          MS. COHEN:  It is important to remember in the

2     abortion context that the fast majority of abortion

3     complications don't occur on the spot in the abortion

4     facility.  And the Supreme Court talks about this in Whole

5     Woman's Health.  They occur later after a patient has already

6     gone home.  And so this idea that a physician could travel

7     immediately with a patient to the ER is just not how this

8     actually plays out in practice.  I just want to be clear about

9     that.

10          THE COURT:  Sure.

11          MS. COHEN:  And I also want to talk just a little

12     bit about Mr. Sauer's arguments regarding abortion

13     complications.  We have briefed this extensively.  It is all

14     in the record.  Mr. Sauer's speculation that complications are

15     under reported is just that, it's speculation.  He mentions,

16     you know, a number of things he says the studies methodology

17     under counts calculations.  That's just not true and Dr.

18     Eisenberg has explained that multiple times in his

19     declaration.  So just to take one example of why that is not

20     true, Your Honor, and if this is too much in the weeds please

21     ask me to move on.  The Upadhyay study which is relied upon by

22     both sides here and is relied upon by the Supreme Court, the

23     methodology of that study was that it looked at California

24     Medicaid billing.  So no matter where a patient went for care

25     in California for her complication it was captured in the

1    Medicaid billing.  And so it doesn't matter if she went to

2    another provider, if she went to a hospital to get her care,

3    there was no lose to follow-up because the Medicaid billing

4    scheme contains all of that information.  And when that study,

5    which everyone here agrees is reliable, looked at that data

6    and captured all of those complications, they came up with

7    that 2.1 percent figure that was cited by the Supreme Court,

8    in which the Supreme Court said shows that abortion is very

9    safe.  So just to emphasize that this is all just speculation

10   by the state that these numbers are underreporting.

11          THE COURT:  And I think counsel characterizes these

12   four levels of these complications.

13          MS. COHEN:  Right, Your Honor.  And I'll hit a

14   couple of other points here in just a second.

15          THE COURT:  Okay.

16          MS. COHEN:  Another one is he says that the

17   plaintiffs in this case don't know about all the complications

18   that women go missing.  Dr. Eisenberg explained in his

19   declaration in this case and also in the deposition in the

20   case filed by counsel that the providers have worked really

21   hard to develop community relationships and they do feel that

22   they find out and get information from other providers.  And

23   the data produced in this case does include many patients that

24   were treated elsewhere.  And that information got back to the

25   providers and it was included in the data.  And so there is

1   just no evidence that those patients were lost in this

2   counting process.

3           And finally, this complication reporting issue.  The

4   record is clear that no one in the state, I don't know how

5   this happened, Your Honor, but the record is clear that

6   basically no one in the state was aware of this requirement.

7   No abortion providers were, no other physicians and hospitals

8   who reported.  There may have been a couple who reported.  But

9   in general, this was not -- people in the state were not aware

10  of this including the department who inspected these

11  facilities for years.  They never asked for a complication

12  report, never pointed out, hey, you're not doing this.  And so

13  the idea that the providers were just ignoring their

14  responsibilities just doesn't represent the facts, Your Honor.

15  And I would refer the Court to docket entries 83-4 and 83-5

16  for more information about this.  And in any event, the fact

17  that those reports were not being submitted does not undermine

18  the accuracy of the robust data that has been submitted in

19  this case which is based upon the providers very detailed

20  tracking processes internally that they do for quality

21  insurance.  Which is in fact, required by the state.  And the

22  state and the licensure process approves the quality insurance

23  processes of the facilities and goes over it at every

24  inspection.  And that is a very robust process, and that is

25  the data that is here in this case.

1          But the bottom line, Your Honor, is all this talk

2     about complications is really missing the point because

3     hospital-privileges by definition does not affect the

4     frequency of abortion complications.  If anything, and of

5     course, plaintiffs don't agree that this is the case, if

6     anything it could potentially affect the care that a patient

7     would receive once a complication has occurred.  And of

8     course, plaintiffs' position is that it does not change that

9     care, and there is no benefit.  But all this talk about the

10    rate of complications that is occurring, that is just part and

11    parcel with any medical procedure.  That some number of cases

12    will result in complications and privileges is just totally

13    disconnected from that.  And the state sort of obfuscates that

14    fact.

15         And finally, Your Honor, I just want to hit on this

16    discovery question.  I think as you noted when you were

17    discussing with Mr. Sauer, and it's clear from the arguments

18    today, the record here is very robust already.  I don't know

19    what discovery in particular Mr. Sauer would seek.  He hasn't

20    told us that.  Specifically what information he is looking for

21    here.  But plaintiffs' position is certainly that there is

22    more than enough in the record here for Your Honor to make the

23    findings that the Eighth Circuit was looking for in its

24    decision.

25              THE COURT:  Okay.

1          MS. COHEN:  Thank you, Your Honor.

2          THE COURT:  Thank you.  I appreciate it.

3          Mr. Sauer, I'm going to give you the opportunity --

4     I guess they would call this a sur-reply.  Just an opportunity

5     if you want to touch on something briefly.  You guys have been

6     very helpful to the Court.  Mr. Sauer.

7          MR. SAUER:  Thank you, Your Honor.

8          THE COURT:  Well, let's take up the issue of

9     standing I think I was incorrect and Ms. Cohen corrected me

10    with respect to this Court's ruling on that particular

11    provision of privilege, if I enjoin that would remove that

12    from the requirement.  So there would be no -- I guess my

13    position was that the Court could not issue unless and until

14    there was some correction of the --

15         MR. SAUER:  -- I think the Court's understanding,

16    initial understanding was absolutely correct.  And let me

17    recite the legal standard that we've relied on for that

18    argument.

19         THE COURT:  Okay.

20         MR. SAUER:  That is in the Doe against Virginia

21    Department of Police case which is cited on page 4 of our

22    brief.  That a challenge to a regulation is non-redressable

23    where quote, "there exists an unchallenged independent rule,

24    policy or decision that would prevent relief even if the Court

25    were to render a favorable decision."  So that is one case we

1   cited.

2           THE COURT:  So you're saying notwithstanding the

3   fact that a decision made by me would enjoin the privilege.

4   You're saying I can't even go there.

5           MR. SAUER:  No, I would put it this way.  There are

6   two regulations that apply here.

7           THE COURT:  Right.

8           MR. SAUER:  One is the regulation that says you have

9   to have hospital-privileges that they are challenging.

10          THE COURT:  Right.

11          MR. SAUER:  Then there is the regulation that says

12  you cannot get licensed if your suction aspiration machine has

13  black mold and human tissue in it, right?  Okay.

14          THE COURT:  And there is some debate about that.

15          MR. SAUER:  There is indeed, Your Honor.  And that

16  debate gets worked out through the regulatory process.  As

17  long as they cannot satisfy regulation A, because they both

18  stand as independent bar to doing what they want to do, which

19  is to perform abortions at the Columbia facility, as long as

20  they cannot satisfy regulation A, which they haven't

21  challenged here in which there is a process that is currently

22  going through to see if they can satisfy that.  As long as

23  they can't satisfy A, they cannot challenge B.  If you gave an

24  order today that says I'm enjoining the hospital-privileges

25  requirement for the Columbia facility, they still couldn't do

1    abortions there because they still have to go through this

2    other process, the process A, and in this case and in no case

3    have they said there is anything invalid about that regulation

4    or about that particular process.

5         THE COURT:  Well, I would not have reached that

6    addressability so I can't find that because of that

7    outstanding regulation.

8         MR. SAUER:  Exactly.  Think of it as two

9    regulations.  Both of them right now are an obstacle to them

10   doing what they want to do which is to perform abortions.  And

11   the one they are bringing a constitutional challenge to is B.

12   Regulation A, says you can't get licensed anyway until you've

13   submitted a plan of correction and addressed these health and

14   safety issues.  And so right now their claim is there is no

15   standing for them to seek injunctive relief as to regulation

16   B.  They must complete that process and get those things

17   resolved before they get there.

18        THE COURT:  And what is this issue four to eight

19   weeks.  It's just what you have been told?

20        MR. SAUER:  I just don't know how long that process

21   takes.  I'm just saying in other cases that I've seen in

22   defending these cases.  I'm litigation counsel, I really don't

23   get involved in the regulatory process.

24        THE COURT:  Sure.

25        MR. SAUER:  I'm just saying there is a reasonable

1   regulatory process.  It's one that they have never challenged.

2   It applies not just to abortion facilities, but others and

3   they must go through that process before there is anything for

4   the Court to redress as to their separate constitutional

5   challenge.

6           THE COURT:  So you would suggest to the Court,

7   Judge, if you are going to enjoin you need to take this under

8   advisement till such time that regulation -- or they have met

9   their requirements.

10          MR. SAUER:  Yeah, I think they'd have to come back

11  to the Court and renew their motion with such time when they

12  get through that particular process.

13          THE COURT:  Okay.

14          MR. SAUER:  But even if the Court decides not to do

15  that, the only thing I would say about the various points that

16  I made, I was at the podium for a long time, speaking very

17  quickly and I apologize for that, I would just say I would go

18  to those three cases that counsel cited, and see -- I don't

19  know, those cases were not cited in their briefs.  The issue

20  of the large fraction question for relief as granted as to a

21  particular facility and opposed to an individual patient.

22          THE COURT:  Right.

23          MR. SAUER:  And I would be astonished if those cases

24  hold that the large fraction test does not apply here.  And if

25  they do you have that against what all the authorities we've

1    cited from the Eighth Circuit, from the Sixth Circuit, from

2    the Fifth Circuit applying the large fraction test.

3            And I would leave the Court with one point, in

4    Cincinnati --

5            THE COURT:  -- in those cases, let me ask, were they

6    cases that were argued as applied to?  Those other cases you

7    suggest would support the large fraction.  Were they

8    challenged as applied to?  And the Court said, well, in this

9    instance we still would use this large fraction tests?

10           MR. SAUER:  Yeah, those were statewide facial

11   challenges.

12           THE COURT:  They were statewide facial.  Which we

13   all agree would require this large fraction?

14           MR. SAUER:  Yes.  And what is baffling to me is how

15   there could possibly be a rationale not to apply that in this

16   particular context where they are seeking sweeping broad

17   relief that would apply to every woman in the Columbia area

18   regardless of her individual circumstances.  That is not an as

19   applied challenge in any ordinary understanding of the term.

20   So even if the Court -- our initial position is the Court

21   shouldn't even look at that.  If they want to bring a facial

22   challenge, it's got to be statewide.  But if they want to do

23   it for a subset of the state, at the very least they have to

24   satisfy the large fraction test.

25           And I would point out the Sixth Circuit in the case,

1    it's Cincinnati against Taft.  It's cited in our brief.  Said

2    that what a large fraction means is practically all.  That is

3    what the Sixth Circuit said.  It said what is a large

4    fraction?  Well, it's not every single one, but practically

5    all.  In other words a vast majority.

6              In the recent Jegley decision from the Eighth

7    Circuit when the Eighth Circuit said that 12 percent is not a

8    large fraction, they cited that opinion.  The opinion that

9    says it's practically all.  So the notion that like 22 percent

10   might be enough or 22 percent --

11             THE COURT:  Well, that's not the only factor that

12   this Court relies on though, does it?  Is that the only thing

13   I rely on?

14             MS. COHEN:  I would say this, it is a threshold

15   showing.  In other words, the Court doesn't even get to the

16   question of weighing the benefits against the burdens, whether

17   this constitutes a substantial obstacle or a less substantial

18   obstacle, large fraction has got to be satisfied.  And you

19   don't even get to the rest of that if they don't meet the

20   large fraction requirement.

21             THE COURT:  Okay.  Fair enough.  Give me one second,

22   counsel.  I think that will conclude.  And I think you've done

23   an excellent job.  Ms. Cohen, did you want to say something?

24             MS. COHEN:  Your Honor, I apologize, Your Honor,

25   just 30 seconds.

1          I think there is still some confusion about the

2     licensure process on just how this all has to work.  And I

3     just want to make sure we are very clear.  The Department of

4     Health licensure process cannot be completed until this

5     privileges issue is resolved.  It's a prerequisite for

6     licensure that a facility meets the privileges requirement.

7     And so I'm not understanding Mr. Sauer's position.  He's

8     saying you're going to be stuck in the circular situation

9     where you can't get licensed and you can't get the TRO either.

10          THE COURT:  Is that true?

11          MR. SAUER:  I think they have to show that they

12    satisfy regulation A.  Now, they may be denied for license but

13    it would solely on the ground of regulation B.  They have to

14    satisfy all the other regulations.

15          THE COURT:  But for lack of a better -- are these

16    moving independently?  Because even if they satisfy, satisfy

17    a, which is the issues that may be with the facility, they

18    still can't get licensed without satisfy B, i.e. privileges.

19    Hold on.  So then if we have A and B, if A is resolved, B

20    privileges has to be resolved.  So it doesn't matter when I

21    resolve B, either -- I guess my point is this, instead of this

22    Court taking this position of somehow I'm going to take this

23    under advisement and wait for this.  The Court needs to either

24    deny or grant, grant or deny.  And then that will take care of

25    itself and then we move forward or we don't move forward.  So

1   I guess what I'm saying is I agree with -- if that is the

2   understanding, then I would have to agree with counsel,

3   Ms. Cohen, with respect -- because they are moving

4   independently.  No matter what I have to render some decision

5   with respect to the one is not dependent -- and that is how I

6   was almost tying these together I think.  But I think

7   independently I've got to rule on B, i.e. privileges, one way

8   or the other.  Now I know I'm in the position to grant or deny

9   and do it just as soon as practicable.  And I understand what

10  you're requesting sooner than later.  Otherwise it doesn't

11  matter because A can be resolved and they still will be denied

12  licensing because of the privileges requirement.

13          MR. SAUER:  And I think what the law says in the

14  case that we cited and numerous other cases that are in our

15  Eighth Circuit brief and the previous brief that we did on

16  this issue in this case, what the law says is if they are not

17  satisfying A, if you were to tell them now that they don't

18  need to comply with B, that would be an advisory opinion.  And

19  it would be different if the state said we're not even going

20  to go through the process of A until B is resolved.  But that

21  is not what the state has done.  It has not done it.  The

22  state is already inspecting them with the compliance with A.

23          THE COURT:  Okay.  I believe I am clear on the

24  position now.  We will make sure we look back to the briefing

25  on that particular issue.  Very instructive.  Thank you,

1    counsel.  That will conclude the hearing.  It's been very

2    helpful for the Court, the arguments, I think you'll did an

3    excellent job.  And the Court recognizes the position now,

4    well, I recognize the arguments, I should say on the standing

5    issue.  And then I think certainly if the Court's position --

6    if the Court's position is denied based upon standing, then at

7    such time if I believe the argument of counsel, then at such

8    time you would renew your motion.  I would assume that would

9    be the procedure.  And you would probably know.  But obviously

10   the Court will have had time to review and go over the issue

11   of privileges so I would imagine a ruling would be one way or

12   the other forthcoming relatively quickly.  Okay.

13           Anything else for the record?

14           MR. SAUER:  Not from the state, Your Honor.

15           MS. COHEN:  No, Your Honor.

16           THE COURT:  Okay.  Thank you, both.  I appreciate

17   it.

18   (THEREUPON, the following proceedings were adjourned.)

19                       CERTIFICATE

20           I certify that the foregoing is a correct transcript

21   from the record of the proceedings in the above-entitled

22   matter.

23           January 16, 2019
                         /s/ Denise C. Halasey
24                       Denise C. Halasey, CCR, CVR-CM, RVR
                         United States Court Reporter

25